**POLSINELLI LLP**
Randye B. Soref (SBN 99146)
Tanya Behnam (SBN 322593)
2049 Park East, Suite 2900
Los Angeles, CA 90067
Telephone:     310.556.1801
Facsimile:     310.556.1802
Email:     rsoref@polsinelli.com
Email:     tbehnam@polsinelli.com

*Attorneys for Panthers Capital LLC*

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

In Re:

CIS INTERNATIONAL HOLDINGS (N.A.)
CORPORATION,

    Debtor.

Case No. 2:25-bk-18374-BR

Chapter 11

**NOTICE OF NON-CONSENT TO THE
USE OF CASH COLLATERAL**

 

**TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY
JUDGE, AND ALL INTERESTED PARTIES:**

Panthers Capital LLC ("**Panthers**"), as secured creditor to Debtor CIS International
Holdings (N.A.) Corporation ("**Debtor**") hereby provides notice pursuant to 11 U.S.C. §
363(c)(2) that it does not consent to the use of its cash collateral and demands that Debtor
accounts for and segregates the cash collateral pursuant to 11 U.S.C. § 363(c)(4). Panthers' first
priority security interest in the cash collateral is supported by the following:

    1.       On or about December 1, 2024, Debtor and Panthers entered into that certain
*Factoring Facility Agreement* (the "**Factoring Agreement**"), pursuant to which Debtor
established a factoring facility to sell all of its accounts receivable exclusively to Purchaser
on the terms set forth therein. A true and correct copy of the Factoring Agreement is
attached hereto as **Exhibit A**.

2.      As security for the prompt and complete performance of Debtor's obligations under the Factoring Agreement, Debtor pledged and absolutely assigned to Panthers all of Debtor's right, title, and interest in the following:

> 19.1. All accounts, including without limitation, all deposit accounts, accounts receivable, and other receivables, as those terms are defined by Article 9 of the Uniform Commercial Code (the "**UCC**"), now or hereafter owned or acquired by Seller; and

> 19.2 All Seller's proceeds, as such term is defined by Article 9 of the UCC.

> (collectively, the "**Factoring Agreement Collateral**")

Factoring Agreement, at ¶ 19.

3.      On June 4, 2025, Debtor and Panthers entered into that certain *Future Receivables Sale and Purchase Agreement* (the "**MCA Agreement**"), pursuant to which Debtor sold to Panthers a Specified Percentage of the Debtor's Future Receipts, as defined in and by the terms of the MCA Agreement. A true and correct copy of the MCA Agreement is attached hereto as **Exhibit B**.

4.      As security for the prompt and complete performance of Debtor's obligations under the MCA Agreement, Debtor pledged and assigned to Panthers all of Debtor's right, title, and interest in the following:

> a.  all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, as those terms are defined by Article 9 of the Uniform Commercial Code (the "**UCC**"), now or hereafter owned or acquired by Seller; and

> b.  all Seller's proceeds, as such term is defined by Article 9 of the UCC.

> (collectively, the "**Future Receivables Collateral**", together with the Factoring Agreement Collateral, the "**Collateral**")

MCA Agreement, at ¶ 22.

5.      Panther perfected its first priority security interest in and lien on the Collateral by filing a UCC-1 Financing Statement with the State of California Office of the Secretary of State on November 18, 2024, as File No. U240089083636 (the "**UCC Financing**

2

**Statement**"). A true and correct copy of the UCC Statement is attached hereto as **Exhibit C**.

6.    On September 22, 2025 (the "**Petition Date**"), Debtor filed a voluntary petition for chapter 11 relief in the United States Bankruptcy Court for the Central District of California.

7.    Prior to the Petition Date, Debtor defaulted on its obligations contained in the terms and conditions of the Factoring Agreement and the MCA Agreement.

8.    As of the Petition Date, Panthers is owed approximately $529,332.14 under the Factoring Agreement and $1,281,948.00 under the MCA Agreement, plus attorney's fees and costs.

9.    The Factoring Agreement specifies an *absolute assignment* of accounts by Debtor to Panthers (the "**Factoring Assignment**"). Specifically, under the terms of the Factoring Agreement, Debtor assigned to Panthers "as absolute owner…all accounts receivable created now or in the future by Debtor's credit sales to Petco Animal Supplies Stores, Inc. ("**Petco**"). (*See* Factoring Agreement, at ¶ 1.1).

10.    Similarly, under the MCA Agreement, Debtor sold and assigned its right, title, and interest in and to the Specified Percentage of Future Receipts to Panther (the "**MCA Assignment**", together with the Factoring Assignment, the "**Absolute Assignments**"). Pursuant to the MCA Assignment, Debtor explicitly transferred full ownership to Panther and agreed that it retained no legal or equitable interest therein. (*See* MCA Agreement, at ¶ 3).

11.    In accordance with the Absolute Assignments, Panthers, not Debtor, is the owner of all accounts receivable created now or in the future by Debtor's credit sales to Petco and the Specified Percentage of Future Receipts. Because Debtor no longer owns the accounts, (i) Debtor cannot provide Panthers with adequate protection, (ii) the cash collected therefrom is not property of the Debtor's estate, and (iii) the cash collected therefrom cannot be part of any cash collateral pool. The accounts receivable subject to the Absolute

Assignment cannot and must not be part of Debtor's budget or balance sheet as they were sold to Panthers pursuant to the Factoring Agreement.

12.      On October 9, 2025, counsel to the Debtor sent Panthers an email requesting Panther's consent to use Debtor's cash collateral on an emergency basis through October 14, 2025.

13.      Panthers hereby gives notice pursuant to 11 U.S.C. § 363(c) that it does not consent to any use by Debtor of its Collateral, including cash collateral (the "**Cash Collateral**") as that term is defined in 11 U.S.C. § 363(a).

14.      Panthers further demands that Debtor fully complies with § 363(c) of the Bankruptcy Code and all other applicable provisions of the Bankruptcy Code with respect to the Collateral and Cash Collateral, including, without limitation, the requirement that Debtor segregates and accounts for all of Panther's Absolute Assignments that is in Debtor's possession, custody or control, as of the Petition Date, and any and all of the Cash Collateral coming in to Debtor's possession, custody, or control at any time thereafter from such Absolute Assignments.

Dated:    October 10, 2025                 **POLSINELLI LLP**

By:    _____
                          */s/ Tanya Behnam*
                          Tanya Behnam

                          *Attorneys for Panthers Capital LLC*

NOTICE OF NON-CONSENT TO USE OF CASH COLLATERAL

# EXHIBIT A

PANTHERS CAPITAL

## FACTORING FACILITY AGREEMENT

This Agreement is made and entered into as of the date of the Seller's electronic signature by and between CIS INTERNATIONAL HOLDINGS (N.A.) CORP, a California corporation, located at 1405 W 178th St, Gardena, CA 90248, with EIN 33-0862520 ("**Seller**"); and PANTHERS CAPITAL LLC, a limited liability company, located at 9 W Broad St #320, Stamford, CT 06902 ("**Purchaser**"). Charitha I. Samarasinghe, as the guarantor and CEO of CIS INTERNATIONAL HOLDINGS (N.A.) CORP, also executes this Agreement as an individual guarantor.

**Recitals**

WHEREAS, Seller desires to establish a factoring facility to sell all of its accounts receivable ("ARs") exclusively to Purchaser on the terms set forth herein, and Purchaser desires to acquire such Accounts for the purpose of providing liquidity to Seller; and

WHEREAS, the Seller hereby covenants that all Accounts Receivable due from Petco Health and Wellness Company, Inc. and/or Petco Animal Supplies Stores, Inc. (hereinafter collectively referred to as "Petco") shall be paid directly by Petco to the Purchaser, without any deviation or redirection of funds.

WHEREAS, Seller is engaged in the general business of supplying products to Petco, and normally sells and delivers merchandise to Petco on a credit basis; and

WHEREAS, Seller desires to obtain funds and commercial credit for the operation of its business against its accounts receivable; and

WHEREAS, Purchaser is willing to purchase Seller's accounts receivable according to the terms set forth in this Agreement;

NOW, THEREFORE, for and in consideration of the mutual covenants contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1    **Assignment of Accounts Receivable.**

   1.1    **Assignment of Accounts Receivable.** Seller hereby assigns to Purchaser as absolute owner, and Purchaser purchases and accepts from Seller without recourse to Seller, except as set forth in this Agreement, all accounts receivable created now or in the future by Seller's credit sales to Petco. Such accounts receivable are acceptable to Purchaser and represented by Seller to be bona fide existing obligations of Petco, arising out of and acquired by it in the ordinary course of its business. These accounts receivable are or will be due and owing to Seller without defense, offset, or counterclaim. For purposes of this Agreement, accounts receivable include all accounts, notes, trade acceptances, bills of exchange, pledges, mortgages, choses in action, or any other form of obligation.

   1.2    **Sale of Accounts.** Seller hereby sells, assigns, and transfers to Purchaser, on an ongoing and exclusive basis, all right, title, and interest in and to its eligible accounts receivable ("Eligible Accounts") that arise from the sale of goods or services by Seller to Petco. Seller agrees to

Seller Initials:

provide Purchaser with copies of all relevant documentation supporting these transactions, including invoices, shipping documentation, and proof of delivery or service acceptance.

1.3 **Factoring Facility Advance.** Purchaser shall advance to Seller an amount equivalent to eighty-five percent (85%) of the total value of Eligible Accounts presented for factoring, subject to eligibility verification. The maximum credit exposure under this facility shall be $3,000,000 at any given time.

1.4 **Factoring Fee Structure.** Purchaser shall charge a factoring fee of 0.234% per day on the face value of each financed invoice until such invoice is paid. Factoring fees will accrue from the date of advance until the invoice is fully satisfied or reaches 90 days in age, whichever comes first. Should Petco make payment within 45 days, Purchaser shall retain the accrued factoring fees along with the principal advanced, and any residual amount shall be rebated to Seller.

1.5 **Example Calculation.** Under this factoring facility, an advance of $100,000 against a gross receivable of $117,647.05 will accrue a factoring fee of $234 per day. After 45 days, once Petco remits payment, Purchaser will retain $110,530 to cover the principal and factoring fees, while rebating $7,117.05 to Seller.

1.6 **Recourse Provision.** This factoring facility is provided with recourse to the Seller. In the event that any Account remains unpaid after 90 days from the invoice date, Seller shall be obligated to repurchase the unpaid Account from Purchaser at the original advance amount, plus any applicable accrued fees. Should the Seller fail to repurchase the unpaid Account, Purchaser shall have the right to apply a clawback against future ARs from Petco to recover the outstanding amount, including any accrued fees and costs incurred.

**2    Sales and Delivery of Merchandise.**

2.1 **Sales and Delivery by Seller.** All sales and deliveries of merchandise by Seller to Petco will be made in Seller's name, with explicit notification to Petco that the accounts receivable thus created have been assigned, sold, and transferred to Purchaser as absolute owner.

2.2 **Invoicing and Notification.** Invoices and statements to Petco Health and Wellness Company, Inc. and/or Petco Animal Supplies Stores, Inc. ("Petco") shall be issued by Seller in a manner and on forms approved by Purchaser. Purchaser reserves the right, at its sole discretion, to issue such invoices or statements directly to Petco, with the costs associated with stationery and postage being charged to Seller's account. All invoices must be clearly marked in a manner specified by Purchaser, providing full notification to Petco that payment is to be made to Purchaser at the following bank account:

|  |  |
|---|---|
| **Bank Name:** | OptimumBank |
| **Bank Address:** | 2929 E. Commercial Blvd, Fort Lauderdale, FL 33308 |
| **ABA Number:** | 067015096 |
| **For Final Credit to:** | Panthers Capital LLC |
|  | 323 Sunny Isles Blvd, Suite 742 |
|  | Sunny Isles Beach, FL 33160 |
| **Account Number:** | 0210021143 |

Seller Initials: _____

2.3 **Right to Collection.** Purchaser has the right to institute and maintain actions in its name or otherwise to collect such accounts. Actions based upon Seller Risk Accounts shall be at the cost of Seller. "Seller Risk Account" shall mean any account with amounts or invoices which, when aggregated with those amounts or invoices already existing, exceed the credit limit established by Purchaser with respect to Petco.

## 3    Credit Approval.

3.1 **Sales and Deliveries with Approval.** All sales and deliveries of merchandise to Petco must be made with prior notification by email to Purchaser at Ben@pantherscapital.com and Mike@pantherscapital.com. Since all deliveries are made in large quantities, they shall be considered invoiced when the tracking number is provided to both Petco and Purchaser.

3.2 **Withdrawal of Credit Approval.** If, in Purchaser's sole opinion, Petco's creditworthiness becomes impaired before the actual delivery of merchandise, Purchaser shall have the right to withdraw approval of any order taken from Petco.

3.3 **Right of Stoppage in Transit.** Purchaser shall also be entitled to exercise a seller's right of stoppage in transit, replevin, or reclamation. Any merchandise so recovered shall be dealt with, as between Purchaser and Seller, as returned merchandise.

3.4 **Assignment of Merchandise and Receivables.** Seller hereby sells and assigns to Purchaser all receivables purchased by Purchaser that may be returned by Petco. However, due to the nature of the merchandise (i.e., live pet fish and other items that Purchaser cannot resell or utilize), Purchaser shall not be obligated to take possession or ownership of any returned merchandise. Seller retains full responsibility for any returned merchandise, including its care, handling, and any associated costs. The assignment of any interest or rights in the merchandise, including stoppage in transit, replevin, or reclamation, shall be strictly for the purpose of securing payment on the receivables, and does not obligate Purchaser to take physical control or bear any risk related to the merchandise itself.

3.5 **Liability Disclaimer.** Purchaser shall not be liable to any party for refusing to approve the delivery of merchandise sold under this Agreement. Given the nature of the merchandise, Purchaser is under no obligation to take possession or assume any responsibility for the merchandise itself, including live pet fish and other unsellable items, and any refusal to approve delivery shall not result in any liability on the part of Purchaser.

## 4    Assumption of Credit Risks.

4.1 **Assumption of Credit Risk**. On all accounts receivable accepted and purchased by Purchaser, except those receivables termed Seller Risk Accounts, Purchaser will assume any losses resulting from the insolvency of Petco. Such assumption of credit risk shall take effect upon delivery and acceptance without dispute of the value and quality of the merchandise.

4.2 Adherence to Credit Limits. Seller agrees that it shall adhere strictly to the credit limits established by Purchaser.

Seller Initials:_____

4.3 **Advances Beyond Credit Limit.** Purchaser, at its option, may advance funds against accounts or invoices exceeding the established credit limit with full recourse against Seller.

4.4 **Claim Disputes.** If an unadjusted claim or dispute delays the payment of an account beyond sixty (60) days after it is due, Purchaser's assumption of the credit risk is canceled, and the amount may be charged back to Seller as of the original credit date.

4.5 **Rejections and Returns.** Seller shall immediately notify Purchaser of all rejections, returns of merchandise, and customer claims upon becoming aware of these matters, and shall promptly resolve all claims and disputes with Petco. Any returned merchandise that comes into Seller's possession shall remain the responsibility of Seller, given that such merchandise (including live pet fish and other non-resalable items) cannot be handled or utilized by Purchaser. Seller shall either repay or secure to Purchaser's satisfaction the amount credited by reason of the sale of such merchandise. Purchaser shall have no obligation to take possession of any returned merchandise, nor shall Purchaser have any liability with respect to its disposal or resale. If Purchaser incurs any deficiency resulting from the sale or settlement of an invoice related to returned merchandise, Seller shall be fully liable for such deficiency, and Purchaser retains full recourse against Seller.

5 **Book Entries.** Immediately upon the purchase of an account by Purchaser, Seller will make appropriate entries upon its books disclosing such purchase and will execute and deliver all papers and instruments and do all things necessary to effectuate this Agreement.

6 **Amounts Owed to Purchaser.**

6.1 **Amounts Owed.** Any amounts owed by Seller to Purchaser for commissions, interest, or otherwise shall be considered as advances against Seller's sales and are chargeable to Seller's current account at any time, at Purchaser's option.

6.2 **Taxes Paid by Purchaser.** If, at any time, Purchaser is required to pay any state, federal, or local sales or excise tax on sales or services performed under and pursuant to this Agreement, the amount of the tax paid by Purchaser shall be charged to Seller's account.

7 **Rights under Seller's Contracts.** Seller warrants and agrees that all the rights and privileges existing under the contractual agreements with Petco, whose receivables are being purchased by Purchaser, are transferred to Purchaser, and Seller further agrees to provide Purchaser with a copy of such contracts or agreements.

8 **Warranty of Assignment.** Seller warrants that none of the accounts being sold to Purchaser have previously been sold or assigned to any person, firm, corporation, or other entity, and will not be sold or assigned at any time during the term of this Agreement.

9 **Power of Attorney.** Seller appoints Panthers Capital LLC ("Purchaser"), or any other person whom Purchaser may designate, as Seller's attorney-in-fact with power to receive, open, and dispose of all mail addressed to Seller relating to the Accounts; to notify postal authorities to change the address for delivery of mail addressed to Seller to an address that Purchaser may designate; to endorse in Seller's name any notes, acceptances, checks, drafts, money orders, and other evidences of payment or collateral that may come into Purchaser's possession; to sign Seller's name on any

Seller Initials: 

Docusign Envelope ID: C39B5AEA-8445-47A7-A8B0-D529838385EF

invoice or bill of lading relating to any account, drafts against debtors, assignments and verifications of accounts, and notice to debtors; to send verifications of accounts to any debtor; and to do all other acts and things necessary to effectuate this Agreement. All acts of such attorney or designee are ratified and approved, and such attorney or designee shall not be liable for any acts of commission or omission, nor for any error of judgment or mistake of law or fact. This power, being coupled with an interest, is irrevocable while any purchased account shall remain unpaid.

10  **Breach of Warranty.** If any warranty or covenant in this Agreement, express or implied, shall be broken or violated, whether caused by the act or the fault of Seller, a debtor, or others, Purchaser shall be entitled to recover from Seller or Seller's guarantors the damages consequently sustained, including, but not limited to, all attorney's fees, court costs, collection charges, and all other expenses that may be incurred by Purchaser to enforce payment of any account, either as against the debtor, Seller, or its guarantors, or in the prosecution or defense of any action or proceeding related to the subject matter of this Agreement.

11  **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" by Seller:

   11.1    Seller shall violate any term, condition, or covenant in this Agreement.

   11.2    Any representation or warranty by Seller made in this Agreement shall prove to have been incorrect, false, or misleading in any material respect when made.

   11.3    Seller shall default under any of the terms, covenants, and conditions of any other agreement with Purchaser (if any) which is related to the instant Agreement.

   11.4    Seller uses multiple depository accounts without obtaining prior written consent of Purchaser in each instance.

   11.5    Petco fails to deposit any portion of the accounts receivable owed to Seller into the designated bank account of Purchaser as specified in this Agreement.

   11.6    Seller changes the designated Purchaser bank account provided to Petco without obtaining prior written consent from Purchaser for each instance.

   11.7    Seller intentionally interferes with Purchaser's collection of Petco Accounts Receivable that become due and payable to Purchaser on behalf of Seller, as agreed herein, thereby obstructing the agreed payment process.

   11.8    Seller changes the agreement between Purchaser, Seller, and Petco, wherein all future Accounts Receivable that become due and payable shall be paid directly to Purchaser, without obtaining prior written consent from Purchaser.

12  **Default under the Agreement.** In case any Event of Default occurs and is not waived by Purchaser, in writing, Purchaser may declare Seller in default under this Agreement without notice.

13  **Seller's Obligations Upon Default.** In the event of an occurrence of default due to Seller's breach of any obligations under this Agreement, Seller shall immediately remit to Purchaser the entire outstanding and undelivered portion of the Purchased Amount. Furthermore, upon such default, all future Accounts Receivable owed by Petco shall be deemed fully factored to Purchaser, with the Specified Percentage adjusted to 100% of all such future receivables, thereby entitling Purchaser to absolute and direct collection rights over all Petco AR. Seller shall additionally be liable to Purchaser for all reasonable costs and expenses incurred in enforcing Purchaser's rights and recovering any amounts owed under this Agreement, including, but not limited to, expenses arising from the

Seller Initials:

retention of third-party collection firms and reasonable attorneys' fees, as well as any related disbursements (collectively, "Reasonable Damages").

14  **No Liability Clause.** In no event shall Purchaser be liable for any claims asserted by Seller or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby knowingly and voluntarily waived by Seller and Guarantor(s).

15  **Waiver.**

    15.1  **Waiver by Purchaser.** Purchaser's waiver of a particular breach by Seller of any covenant or warranty contained in this Agreement shall not be deemed to constitute a waiver of any subsequent breach.

    15.2  **Non-Waiver of Rights.** Purchaser's failure at any particular time to exercise a right or privilege granted to it in this Agreement shall not be deemed to constitute a waiver of that or any other right or privilege.

16  **Profit and Loss Statement.**

    16.1  **Monthly Profit and Loss Statement.** Seller shall submit to Purchaser, at Purchaser's request, a monthly profit and loss statement signed by an officer or employee of Seller on behalf of and as the act of Seller within five (5) days after the close of each month, covering the business for the month immediately preceding the statement. In addition, Seller shall furnish Purchaser a semiannual balance sheet on Seller's business, accompanied by a profit and loss statement from the beginning of Seller's then-current fiscal year. Such semiannual balance sheet and accompanying profit and loss statement shall be prepared by an independent, certified public accountant that has no pecuniary interest in Seller's business.

    16.2  **Inspection of Records.** All books, records, accounts, corporate records, bank statements, and records of deposit of Seller, as well as any other financial records maintained by Seller, shall be open to inspection by Purchaser, and any accountant or auditor designated by Purchaser, for all purposes and at all times during normal business hours at Seller's main place of business.

17  **Warranty of Solvency.**

    17.1  **Warranty of Solvency.** Seller warrants its solvency. If Seller receives any checks, drafts, notes, acceptances, or other moneyed instruments, or cash in payment of any of the receivables assigned to Purchaser under and pursuant to this Agreement, such payment will immediately be turned over to Purchaser in its original form.

    17.2  **Endorsement of Instruments.** Purchaser, or other persons as it may from time to time designate, shall have the right to endorse all instruments in Seller's name or otherwise.

18  **Eligible Accounts Criteria.**

    **18.1  Eligible Accounts are defined as follows:**

        18.1.1  All accounts due from Petco that are less than 90 days from the invoice date.

Seller Initials: 

18.1.2    All accounts due from Petco that, in Purchaser's judgment, are deemed creditworthy, up to the credit limit established by Purchaser.

18.1.3    All accounts arising from the shipment of goods or completion of services to Petco that are not subject to any disputes, offsets, or counterclaims.

18.1.4    All accounts due from Petco where less than 25% of the total outstanding invoices are aged more than 90 days.

18.1.5    All accounts due from Petco with payment terms of Net 60 days or less.

18.2    Purchaser reserves the right to make exceptions to these criteria at its sole discretion on a case-by-case basis.

19    **Pledge of Security.** As security for the prompt and complete performance of any and all liabilities, obligations, covenants, or agreements of Seller under this Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "Obligations"), Seller hereby pledges, assigns and hypothecates to Purchaser a continuing, perfected and first priority lien upon and security interest in, to, and under all of Seller's right, title, and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

19.1    All accounts, including without limitation, all deposit accounts, accounts receivable, and other receivables, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Seller; and

19.2    All Seller's proceeds, as such term is defined by Article 9 of the UCC.

20    **Termination of Pledge.** Upon the performance by Seller in full of the Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Seller. Upon any such termination, Purchaser will execute, acknowledge (where applicable), and deliver such satisfactions, releases, and termination statements, as Seller shall reasonably request.

21    **Representations with Respect to Collateral.** Seller hereby represents and warrants to Purchaser that the execution, delivery, and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same; and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement, or any other instrument to which Seller is a party.

22    **Further Assurances.** Upon the request of Purchaser, Seller, at Seller's sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances, and assignments of the Collateral and documents with respect to the pledge of the Collateral as Purchaser shall reasonably request. Seller shall execute and deliver such instruments, assignments, or documents and do all such other acts and things, as Purchaser may reasonably request to effectuate the purpose and purposes of this Pledge and to provide for the continuing validity, perfection, and priority of Purchaser's security interest in the Collateral.

Seller Initials: _____

22.1    **Security Interest.**

22.1.1    **Security Interest Grant.** Seller grants to Purchaser a first-priority security interest in all of Seller's present and future accounts receivable and all proceeds thereof. Seller further authorizes Purchaser to file a UCC-1 Financing Statement naming Purchaser as the secured party to perfect such security interest.

22.1.2    **Subordination of Existing Liens.** Seller agrees to obtain lien terminations or subordinations from any third parties holding liens against accounts receivable and proceeds as required by Purchaser in order to maintain Purchaser's priority interest.

23    **Guaranty of Performance.** Charitha I. Samarasinghe personally guarantees the prompt and full performance of all obligations of Seller under this Agreement. This personal guaranty shall be binding and enforceable immediately, and shall not be contingent upon Purchaser seeking recourse against Seller or any other party. Purchaser is entitled to pursue remedies against the Guarantor independently of actions taken against Seller.

24    **Prejudgment Remedy.** In the event of a default by Seller, Purchaser is entitled to seek a prejudgment remedy under Uniform Commercial Code (UCC) laws. Seller and Guarantor hereby waive all rights to prior notice and prior opportunity for a hearing under applicable Connecticut General Statutes regarding Purchaser's obtaining of any prejudgment remedy. Purchaser may attach or garnish the Seller's or Guarantor's funds and property held at financial institutions if certain statutory conditions are satisfied.

25    **Term and Termination of Facility.**

25.1    **Term of Facility.** The initial term of this factoring facility shall be twenty-four (24) months from the effective date of this Agreement. The facility shall automatically renew for additional twelve (12) month periods unless either party provides written notice of termination at least sixty (60) days prior to the end of the current term.

25.2    **Early Termination by Seller.** If Seller wishes to terminate this Agreement before the end of the term, Seller must provide a ninety (90) days written notice. Seller shall also be responsible for any outstanding advances, accrued fees, and any applicable early termination charges.

25.3    **Termination Rights.** Either party may terminate this Agreement as to future transactions on one hundred eighty (180) days' written notice.

26    **Severability Clause.** The invalidity of any portion of this Agreement will not and shall not be deemed to affect the validity of any other provision. If any provision of this Agreement is held to be invalid, the parties agree that the remaining provisions shall be deemed to be in full force and effect as if they had been executed by both parties subsequent to the expungement of the invalid provision.

27    **Governing Law.** This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Connecticut.

Seller Initials:

28  **Notices Requirements.** Any notice provided for or concerning this Agreement shall be in writing and shall be deemed sufficiently given when sent by certified or registered mail if sent to the respective address of each party as set forth at the beginning of this Agreement.

29  **Attorney Fees.** In the event that any lawsuit is filed in relation to this Agreement, the unsuccessful party in the action shall pay to the successful party, in addition to all the sums that either party may be called on to pay, a reasonable sum for the successful party's attorney fees.

30  **Mandatory Arbitration.** Any dispute arising under this Agreement shall be resolved through binding arbitration, as determined solely at Purchaser's discretion. Seller irrevocably agrees that, if the parties are unable to mutually agree upon an arbitrator, Purchaser shall have the exclusive right to appoint the arbitrator who will arbitrate the dispute. The arbitration shall be conducted in accordance with the rules of the American Arbitration Association in force at the time of arbitration, and all decisions made by the appointed arbitrator shall be final and binding upon Seller without further recourse.

31  **Modification of Agreement.** Any modification of this Agreement or additional obligation assumed by either party in connection with this Agreement shall be binding only if placed in writing and signed by each party or an authorized representative of each party.

32  **Assignment of Rights.** The rights under this Agreement are personal to each party; however, only Purchaser shall have the right to assign or transfer its rights to any other person, firm, corporation, or entity without the prior consent of Seller. Seller may not assign or transfer any rights or obligations under this Agreement without the prior, express, and written consent of Purchaser.

33  **Counterparts and Electronic Signatures.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any electronic signature, including signatures executed through electronic means such as DocuSign or email, shall be considered valid, binding, and fully enforceable as if signed in physical form.

34  **Binding Effect on Successors.** In this Agreement, any reference to a party includes that party's heirs, executors, administrators, successors, and assigns. Singular includes plural, and masculine includes feminine.

35  **Entire Agreement.** This Agreement shall constitute the entire agreement between the parties and any prior understanding or representation of any kind preceding the date of this Agreement shall not be binding upon either party except to the extent incorporated in this Agreement.

**36  Miscellaneous Provisions.**

36.1    **Governing Law.** This Agreement and all related matters shall be governed by and construed in accordance with the laws of the State of Connecticut, Fairfield County, without giving effect to conflict of law principles.

36.2    **Enforceability of Electronic Signatures.** The parties agree that this Agreement may be executed electronically, and such electronic execution shall have the same legal effect as

Seller Initials:

manual signatures. The Agreement shall become effective and binding once signed electronically by Seller.

**36.3    Operational Mechanics and Documentation.** In the event that Seller receives any payment on an Account assigned to Purchaser, or if any payment intended for Purchaser is mistakenly remitted to Seller, Seller shall hold such payment in trust as fiduciary for Purchaser, segregating said funds from its own assets, and shall immediately remit the full amount to Purchaser without delay. Seller acknowledges that any failure to promptly remit such funds shall constitute a material breach of this Agreement. Purchaser shall have the absolute right to recover all reasonable costs, expenses, and attorney's fees incurred in enforcing this provision, including any actions taken to recover improperly retained payments.

**36.4    Acknowledgment of Default and Factoring Terms for Petco Accounts.** Seller hereby irrevocably acknowledges and stipulates that, as of the effective date of this Agreement, Seller is in default under a prior funding agreement executed with Purchaser, resulting in an outstanding adjusted balance of $1,018,196.92. This balance accounts for the application of a wire transfer payment in the amount of $150,177.08, received by Purchaser from Petco on November 27, 2024, which was applied towards Seller's defaulted obligation. Petco has formally agreed to remit all future Accounts Payable directly to Purchaser and shall continue to do so for the duration of this Agreement. This Agreement shall, under no circumstances, be construed as a waiver or release of Seller's liability for the remaining defaulted balance owed to Purchaser. Until the entire outstanding defaulted balance is fully satisfied by Petco's remittances, Purchaser shall have no obligation to purchase any new Accounts Receivable from Petco. The remaining balance owed by Seller shall be adjusted accordingly by Purchaser, and only Accounts Receivable in excess of the outstanding balance shall be eligible for future purchase by Purchaser. Furthermore, all Accounts Receivable currently assigned to satisfy Seller's defaulted balance, which Petco has agreed to pay directly to Purchaser, shall be deemed irrevocably allocated for such purposes, and shall not be subject to further sale, transfer, or assignment by Seller under this or any other agreement. Seller expressly agrees that Purchaser maintains an absolute priority on these receivables until the defaulted balance is extinguished. Any interference by Seller in directing or controlling these payments shall be deemed a material breach of this Agreement, entitling Purchaser to immediate enforcement of remedies. Seller further covenants and agrees to sell and assign to Purchaser only those Petco Accounts Receivable that are in excess of the obligations currently in default, ensuring that the defaulted balance is fully prioritized and satisfied prior to any additional assignment or transaction under this Agreement. Any attempts by Seller to divert, hinder, or otherwise delay payment by Petco to Purchaser will result in immediate enforcement action, and Seller shall be liable for all costs and attorneys' fees incurred by Purchaser in securing its rights hereunder.

**37    Clawback and Misapplication of Payments.** In the event that Seller receives any payment on an Account that has been assigned to Purchaser, or if any payment intended for Purchaser is mistakenly remitted to Seller, Seller shall hold such payment in trust for the sole benefit of Purchaser, segregating said funds from Seller's own assets. Seller shall immediately and without delay remit the entirety of such funds to Purchaser in the form received. Seller's failure to remit these funds promptly shall constitute a material breach of this Agreement and result in immediate liability for all damages and remedies available to Purchaser. Seller expressly acknowledges that

Seller Initials: 

Purchaser has the absolute right to recover from Seller any and all costs, expenses, and reasonable attorneys' fees incurred by Purchaser in enforcing this provision, including, but not limited to, any actions taken to recover misapplied or improperly retained payments. Seller's obligation to hold and remit such payments is fiduciary in nature, and any failure to comply shall be deemed a breach of trust, entitling Purchaser to pursue equitable remedies, including but not limited to specific performance, injunctive relief, and recovery of all legal costs associated with the enforcement of Purchaser's rights under this Agreement.

This Agreement is executed by the authorized representatives of both parties as of the date of Seller's electronic signature. This Agreement shall be binding upon and inure to the benefit of each party's successors and permitted assigns.

**CIS INTERNATIONAL HOLDINGS (N.A.) CORP – Seller:**

By: _____
By: Charitha I. Samarasinghe
Title: CEO and President
SSN: 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
Phone: (310)-930-6978
Email: sam@etropicalfish.com
Address: 4 Sundown Dr, Rolling Hills Estates, CA 90274
Date: December 1, 2024

**Owner/Guarantor:**

By: _____
Name: Charitha I. Samarasinghe
SSN: 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
Phone: (310)-930-6978
Email: sam@etropicalfish.com
Address: 4 Sundown Dr, Rolling Hills Estates, CA 90274
Date: December 1, 2024

**PANTHERS CAPITAL LLC - Purchaser**

By: _____
By:
Title:
Date:

Seller Initials: _____

## CROSS COLLATERAL ADDENDUM

This Cross Collateral Addendum (the "Addendum") is entered into as of December 1, 2024, by and between Panthers Capital, LLC (hereinafter referred to as "Purchaser") and CIS INTERNATIONAL HOLDINGS (N.A.) CORP, along with the other entities listed below (hereinafter collectively referred to as "Seller" or "Affiliates"). This Addendum serves as an integral supplement to the existing Factoring Facility Agreement (the "Agreement") entered into between the aforementioned parties.

### Recitals

WHEREAS, each of the Seller entities has individually entered into the Factoring Facility Agreement with Purchaser, whereby the Seller agreed to sell and assign all accounts receivable arising from transactions with Petco (the "ARs") to Purchaser, on the terms set forth therein; and

WHEREAS, the Seller entities are affiliated entities under common control and ownership, and each Seller entity desires to further secure its obligations to Purchaser by pledging a cross-collateralized security interest in favor of Purchaser, thereby guaranteeing each other's performance under the Factoring Facility Agreement; and

NOW, THEREFORE, for good and valuable consideration, the Affiliates listed below (collectively, the "Corporate Guarantors") agree as follows:

1. **Corporate and Personal Guarantors.**

   a. CIS International Holdings (N.A.) Corp - EIN: 33-0862520 - Charitha I. Samarasinghe
   b. CIS International Distributor - EIN: 27-0293303 - Charitha I. Samarasinghe
   c. Siam Tropical Fish Ltd - EIN: 59-3449098 - Charitha I. Samarasinghe
   d. Tropical Fish International Europe - EIN: 59-3449098 - Charitha I. Samarasinghe
   e. Tropical Aquarium Fish (Fiji) Ltd - EIN: 59-3449098 - Charitha I. Samarasinghe
   f. Live Aquaria Holdings Corp - Charitha I. Samarasinghe
   g. T3 Aquatics - Charitha I. Samarasinghe
   h. LIONSROCK INVESTMENTS LLC - Charitha I. Samarasinghe
   i. LIONSROCK WISCONSIN LLC - Charitha I. Samarasinghe

2. **Cross-Collateralization and Security Interest.**

   a. **Cross-Collateralization.** Each Seller and Corporate Guarantor hereby irrevocably and unconditionally grants to Purchaser a cross-collateral pledge of their respective assets to secure the performance and obligations of each other entity under the Factoring Facility Agreement. This pledge extends to all present and future accounts receivable, personal property, general intangibles, and any other assets of each Corporate Guarantor, which shall serve as collateral to secure the obligations of any affiliated entity in the event of breach or default by any one entity.

   b. **First-Priority Security Interest.** To further secure the obligations arising under the Factoring Facility Agreement, each Seller and Corporate Guarantor grants Purchaser a continuing, perfected, first-priority security interest in all present and future accounts, chattel paper, deposit accounts, inventory, equipment, fixtures, general intangibles, and all proceeds now owned or hereafter acquired by any Seller or Corporate Guarantor (the "Collateral"). Each Seller

Seller Initials: 

and Corporate Guarantor authorizes Purchaser to file any and all necessary Uniform Commercial Code (UCC) Financing Statements, as well as any amendments or continuation statements, in order to evidence and perfect such security interest.

c.   **Cross-Default.** A default by any one Seller or Corporate Guarantor shall be deemed a default by all affiliated entities. Upon such an event of default, Purchaser shall have the immediate right to enforce its rights and remedies under the Factoring Facility Agreement and this Addendum, including, but not limited to, repossession, foreclosure, attachment, garnishment, and sale of the Collateral, without limitation and without further notice to any Seller or Corporate Guarantor.

d.   **Cumulative Rights.** All rights and remedies available to Purchaser under this Addendum are cumulative and are in addition to any other rights or remedies provided by law, equity, or under the original Factoring Facility Agreement. The exercise of any right or remedy by Purchaser shall not preclude the concurrent or subsequent exercise of any other right or remedy available to Purchaser.

3.   **No Alteration of Original Agreement.**

a.   **No Alteration or Waiver.** Except as expressly modified by this Addendum, all terms, conditions, covenants, representations, and warranties set forth in the original Factoring Facility Agreement shall remain in full force and effect. Nothing in this Addendum shall be construed as a waiver, modification, or novation of Purchaser's rights under the Agreement, except as specifically provided herein.

4.   **Execution and Authority.**

a.   **Authority to Bind.** Each undersigned representative of the Seller and Corporate Guarantors represents and warrants that they have the full authority to execute this Addendum, and that this Addendum constitutes a valid, binding, and enforceable agreement of each respective Seller and Corporate Guarantor. This Addendum shall be binding upon the parties and their respective successors and assigns.

Seller Initials: _____

IN WITNESS WHEREOF, the parties hereto have executed this Cross Collateral Addendum as of the day and year first above written.

**CIS INTERNATIONAL HOLDINGS (N.A.) CORP – Seller:**

By: _____

By: Charitha I. Samarasinghe

Title: CEO and President

SSN: 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

Phone: (310)-930-6978

Email: sam@etropicalfish.com

Address: 4 Sundown Dr, Rolling Hills Estates, CA 90274

Date: December 1, 2024

**Owner/Guarantor:**

By: _____

Name: Charitha I. Samarasinghe

SSN: 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

Phone: (310)-930-6978

Email: sam@etropicalfish.com

Address: 4 Sundown Dr, Rolling Hills Estates, CA 90274

Date: December 1, 2024

Seller Initials: _____

# EXHIBIT B

PANTHERS CAPITAL

## FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT

This agreement (this "Agreement"), dated _____6/4/2025_____, between Panthers Capital LLC D/B/A Panthers Capital ("Panthers Capital"), the seller(s) listed herein (collectively, the "Seller"), and each guarantor identified below (each a "Guarantor") (all capitalized terms shall have the meanings ascribed to them below):

**Seller Legal Name:** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES LISTED ON "EXHIBIT A"

**D/B/A:** E TROPICAL FISH

**Form of Business Entity:** Corporation                    **EIN #:** 33-0862520

**Physical Address:** 1405 W 178TH ST, GARDENA , CA 90248

**Mailing Address:** 1405 W 178TH ST, GARDENA , CA 90248

**PURCHASE PRICE:** $ 1,020,569.00      **PURCHASED AMOUNT:** $ 1,500,236.00      **SPECIFIED PERCENTAGE:** 50.00%

**ORIGINATION FEE:** $ 250.00      **PRIOR BALANCE:** $ 1,020,319.00      **INITIAL** Daily **DEBIT:** $ 10,002.00

**AMOUNT PAID TO SELLER (AFTER DEDUCTING THE ORIGINATION FEE AND ANY PRIOR BALANCE):** $ 0.00

| FOR SELLER #1 | FOR SELLER #2 |
|---|---|
| **By:** _(signature)_ 086ED1260399401... | **By:** _____ |
| **Name:** CHARITHA I  SAMARASINGHE | **Name:** _____ |
| **Title:** Owner | **Title:** Owner |
| **Email:** sam@etropicalfish.com | **Email:** _____ |
| **Business Phone:** (310)-515-9469 | **Business Phone:** _____ |

*Accurate contact information is required to provide the Seller with important information regarding the Agreement.

Concurrently with the execution of this Agreement by Seller, and as condition to the effectiveness hereof, Seller has caused the **Personal Guaranty of Performance** in the form attached hereto as "Exhibit A" (the "Guaranty") to be signed and delivered to Panthers Capital by the following Owner(s)/Guarantor(s) of Seller

| OWNER/GUARANTOR #1 | OWNER/GUARANTOR #2 |
|---|---|
| **By:** _(signature)_ 086ED1260399401... | **By:** _____ |
| **Name:** CHARITHA I  SAMARASINGHE | **Name:** _____ |
| **SSN:** 593449508 | **SSN:** _____ |
| **PHONE:** (310)-930-6978 | **PHONE:** _____ |
| **Address:** 4 SUNDOWN DR , RLLNG HLS EST , CA 90274 | **Address:** _____ |

**WHEREAS**, Seller is desirous to sell to Panthers Capital, and Panthers Capital is desirous to purchase from Seller a Specified Percentage of the Seller's Future Receipts, but only on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged by both parties, Panthers Capital and Seller hereby agree to the foregoing and as follows:

## 1. Basic Terms and Definitions.

**a.**  "Effective Date" shall mean the later of: (i) the date set forth in the preamble to this Agreement, and (ii) the date when Panthers Capital paid the Purchase Price to Seller. The obligation of Panthers Capital under this Agreement will not be effective unless and until Panthers Capital has completed its review of the Seller and has accepted this Agreement by delivering the Purchase Price, minus any Origination Fee and Prior Balance.

**b.**  "Specified Percentage" shall mean the percentage set forth in the preamble to this Agreement of Seller's Future Receipts.

**c.**  "Future Receipts"  shall mean, collectively, all of Seller's receipts of monies for the sale of its goods and services that monies shall be paid and delivered to Seller by Seller's customers and/or other vendees after the Effective Dateof this Agreement; which payments or deliveries of monies can be made in the form of cash, check, credit, charge,or debit card, ACH or other electronic transfer or any other form of monetary payment and/or pecuniary benefit received by Seller.

**d.**  " Daily  Receipts" shall mean the amount of Future Receipts received by Seller on a  Daily  basis.

**e.**  "Purchased Amount" shall mean the total amount of the Specified Percentage of the Future Receipts that Seller shall be under obligation to deliver and permit Panthers Capital to debit pursuant to this Agreement. The Purchased Amount shall be the amount set forth under "Purchased Amount" in the preamble to this Agreement.

**f.**  "Purchase Price" shall mean the total amount that Panthers Capital agrees to pay for the Purchased Amount. Note that the amount that Seller will actually receive from Panthers Capital pursuant to this Agreement will be less than the Purchase Price by the total sum of the Origination Fee and Prior Balance, if any, set forth in the Preamble to this Agreement.

**g.**  " Daily  Installment" shall mean the amount that Seller and Panthers Capital agree to be a good faith approximation of the Specified Percentage of Seller's  Daily  Future Receipts. Seller and Panthers Capital further agree that the Initial  Daily  Installment set forth in the Preamble to this Agreement is based upon the information provided by Seller to Panthers Capital concerning Seller's most recent accounts receivables, including representations by the Seller to Panthers Capital regarding the Seller's estimated Future Receipts, and subject to Seller's right of adjustment/reconciliation set forth in this Agreement.

**h.**  "Workday" shall mean Monday through Friday except on days when banking institutions are closed for the holidays and do not process ACH payments.

**i.**  "Prior Balance" shall mean the sum of all amounts that Seller may owe to Panthers Capital and/or third party(s) as of the Effective Date of this Agreement. The Prior Balance, if any, is described in Section 19 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 2 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price.

**j.**  "Origination Fee" shall mean the fee that Panthers Capital charges Seller for the costs of underwriting and processing Seller's application for funding. The Origination Fee, if any, is described in Section 20 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 3 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchased Price or Purchased Amount.

**k.**  In the event "Seller" is comprised of more than one entity, then:

**i.**  The term "Seller" shall mean, individually and collectively, all such entities; and

**ii.**  Each Seller is an "Affiliate" of all other Seller(s). The term "Affiliate" shall mean an entity or an individual that (1) controls, (2) is under the "Control", or (3) is under common Control with the entity or individual in question. The term "Control" shall mean direct or indirect ownership of more than 50% of the outstanding voting stock of a corporation or other majority equity interest if not a corporation and the possession of power to direct or cause the direction of the management and policy of such corporation or other entity, whether through ownership of voting securities, by statute, or by contract; and

**iii.**  The representations, warranties, covenants, obligations and liabilities of each Seller shall be joint and several under this Agreement; and

iv.    The liability of each Seller under this Agreement shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

v.    The terms "Specified Percentage", "Future Receipts", " Daily  Receipts", " Daily  Installment" shall mean the Specified Percentage, the Future Receipts and the   Daily   Receipts of all Sellers jointly; and each Seller individually; and

vi.    Panthers Capital may pursue its rights and remedies under this Agreement against any one or any number of entities that constitute Seller without obligation to assert, prosecute or exhaust any remedy or claim against any other Seller or any Guarantor.

l.    In the event "Guarantor" is comprised of more than one individual, then:

i.    The term "Guarantor" shall mean, individually and collectively, all such individuals; and

ii.    Each Guarantor is an Affiliate of all other Guarantor(s); and

iii.    The representations, warranties, covenants, obligations and liabilities of each Guarantor shall be joint and several under this Agreement and the Guaranty; and

iv.    The liability of each Guarantor under this Agreement and the Guaranty shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

v.    Panthers Capital may pursue its rights and remedies under this Agreement and/or Guaranty against any one or any number of individuals that constitute Guarantor without obligation to assert, prosecute or exhaust any remedy or claim against any other Guarantor or any Seller.

2.    **No Fixed Term.** This Agreement for the purchase and sale of Future Receipts does not have a fixed duration or term, which is potentially infinite. Subject to the provisions of Sections 10-13 hereof, the term of this Agreement shall commence on the Effective Date and expire on the date (the "Expiration Date") when the Purchased Amount and all other sums due to Panthers Capital pursuant to this Agreement are received by Panthers Capital in full. Seller hereby acknowledges that it fully understands that: (i) Panthers Capital's ability to collect the Purchased Amount (or any portion thereof) is contingent upon Seller's continued operation of its business and successful generation of the Future Receipts until the Purchased Amount is delivered to Panthers Capital in full; and (ii) that in the event of decreased efficiency or total failure of Seller's business Panthers Capital's receipt of the full or any portion of the Purchased Amount may be delayed indefinitely.

3.    **Sale of Purchased Future Receipts.** Seller hereby sells, assigns, transfers and conveys (hereinafter, the "Sale") unto Panthers Capital all of Seller's right, title and interest in to the Specified Percentage of the Future Receipts until the Purchased Amount shall have been delivered by Seller to Panthers Capital (hereinafter, the portion of the Future Receipts sold by Seller to Panthers Capital pursuant to this Agreement, the "Purchased Future Receipts" ); to have and hold the same unto Panthers Capital, its successors and assigns, forever. This Sale of the Purchased Future Receipts is made without express or implied warranty to Panthers Capital of collectability of the Purchased Future Receipts by Panthers Capital and without recourse against Seller and/or Guarantor(s), except as specifically set forth in this Agreement. By virtue of this Agreement, Seller transfers to Panthers Capital full and complete ownership of the Purchased Future Receipts and Seller retains no legal or equitable interest therein.

4.    **Payment of Purchase Price**. The obligation of Panthers Capital under this Agreement will not be effective unless and until Panthers Capital has completed its review of the Seller and has accepted this Agreement by paying to Seller the Purchase Price (reduced by the Origination Fee and Prior Balance, if any).

5.    **Use of Purchase Price**. Seller agrees to use the Purchase Price exclusively for the benefit and advancement of Seller's business operations and for no other purpose.

6.     **Daily   Installments of Purchased Amount.** Subject to Seller's right of adjustment/reconciliation set forth in this Agreement, the Purchased Amount shall be delivered by Seller to Panthers Capital   Daily   in the amount of the   Daily   Installment on each and every Workday commencing on the Effective Date and ending on the Expiration Date.

7.    **Approved Bank Account and Credit Card Processor**. During the course of this Agreement, Seller shall: (i) deposit all Future Receipts into one (and only one) business-purpose bank account which bank account shall be acceptable and preapproved by Panthers Capital (the "Approved Bank Account"), (ii) use one (and only one) credit card processor which processor shall be acceptable and preapproved by Panthers Capital (the "Approved Processor") and (iii) deposit all credit card receipts into the Approved Bank Account. In the event the Approved Bank Account or Approved Processor shall become unavailable or shall cease providing services to Seller during the course of this Agreement, prior to the first date of such unavailability or cessation of services, Seller shall arrange for another Approved Bank Account or Approved Processor, as the case may be.

8.    **Authorization to Debit Approved Bank Account.** Seller hereby authorizes Panthers Capital to initiate electronic checks or ACH debits from the Approved Bank Account (which as of the Effective Date of this Agreement shall be the account listed below) in the amount of the   Daily   Installment on each Workday commencing on the Effective Date until Panthers Capital receives the full Purchased Amount;

The   Daily   Installment is to be drawn via ACH payment, from the following bank account:

> **i.** Account Number:  2010007610

> **ii.** Routing Number:  122245280

> **iii.** Account Name:   CIS INTERNATIONAL HOLDINGS (N.A.) CORI

> **iv.** Bank Name:  GENESIS BANK - ACCOUNT ENDING IN 761

NOTE that this authorization is to remain in full force and effect until Panthers Capital receives written notification from Seller of its termination in such time and in such manner to afford Panthers Capital a reasonable opportunity to act on it; provided, however, that revocation of this authorization prior to remittance of the balance under the Agreement shall constitute a breach thereunder, subject to Sections 10-13 herein.

**9.**    <u>**Fees Associated with Debiting Approved Bank Account.**</u> It shall be Seller's exclusive responsibility to pay to its banking institution and/or Panthers Capital's banking institution directly (or to compensate Panthers Capital, in case it is charged) all fees, charges and expenses incurred by either Seller or Panthers Capital due to rejected electronic checks or ACH debit attempts, overdrafts or rejections by Seller's banking institution of the transactions contemplated by this Agreement, including without limitation a $35.00 charge per bounced or rejected ACH debit.

**10.**    <u>**Seller's Right of Reconciliation.**</u> Seller and Panthers Capital each acknowledge and agree that:

     **a.**    If at any time during the course of this Agreement Seller experiences a decrease or increase in its   Daily   Receipts, Seller shall have the right to request retroactive reconciliation of the   Daily   Installments for one (1) full calendar month immediately preceding the day when such request for reconciliation is received by Panthers Capital (each such calendar month, a <u>"Reconciliation Month"</u>).

     **b.**    Such reconciliation (the <u>"Reconciliation"</u>) of the Seller's   Daily   Installment for a Reconciliation Month shall be performed by Panthers Capital within five (5) Workdays following its receipt of the Seller's request for Reconciliation by either crediting or debiting the difference back to, or from, the Approved Bank Account so that the total amount debited by Panthers Capital from the Approved Bank Account during the Reconciliation Month at issue is equal to the Specified Percentage of the Future Receipts that Seller collected during the Reconciliation Month at issue.

     **c.**    One or more Reconciliation procedures performed by Panthers Capital may reduce or increase the effective   Daily   Installment amount during the Reconciliation Month in comparison to the one set forth in Section 1 of this Agreement, and, as the result of such reduction, the term of this Agreement during which Panthers Capital will be debiting the Approved Bank Account may get shortened or  extended indefinitely.

**11.**    <u>**Request for Reconciliation Procedure.**</u>

     **a.**    Seller may initiate Reconciliation of Seller's actual   Daily   Installments at any time by sending a request for Reconciliation to Panthers Capital.

**b.**    Any such request for Reconciliation of the Seller's   Daily   Installments for a specific Reconciliation Month shall be in writing, shall include a copy of Seller's bank statement, credit card processing statements,and pertinent aging report(s) for the Reconciliation Month at issue, and shall be received by Panthers Capital via email to <u>accounting@pantherscapital.com</u> with the subject line "REQUEST FOR RECONCILIATION."

     **c.**    Seller shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and Panthers Capital shall comply with each such request, provided that:

         **i.**    Each such request is made in accordance with the terms of this Section 11; and

         **ii.**    If a request for Reconciliation is made after the expiration of the term of this Agreement and, as the result of such Reconciliation, the total amount actually debited by Panthers Capital from the Approved Bank Account will become less than the Purchased Amount, then and in such event the term of this Agreement shall automatically be extended until the time when the total amount actually debited from Approved Bank Account pursuant to this Agreement shall become equal to the Purchased Amount.

     **d.**    Nothing set forth in Sections 10 or 11 of this Agreement shall be deemed to: (i) provide Seller with the right to interfere with Panthers Capital's right and ability to debit the Approved Bank Account while the request for Reconciliation of Seller's receipts is pending or until the Purchased Amount is collected by Panthers Capital in full, or (ii) modify the amount of the   Daily   Installment for any calendar month during the term of this Agreement other than during the Reconciliation Month (s) as the result of the Reconciliation.

**12.**    <u>**Adjustment of the   Daily   Installment**</u>. Seller and Panthers Capital each acknowledge and agree that:

     **a.**    Seller and Panthers Capital shall have the right to request modification ("Adjustment") of the amount of

the   Daily   Installment on a going-forward basis to more closely reflect Seller's actual   Daily   Receipts times the Specified Percentage. Panthers Capital will notify Seller prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount will be deemed the updated   Daily   Installment until any subsequent Adjustment. If Seller requests an Adjustment, Panthers Capital shall perform the   Adjustment   within five (5) Workdays following its receipt of the Seller's request for Adjustment by modifying the amount of the   Daily   Installment that shall be debited from the Approved Bank Account.

b.    One or more Adjustments performed by Panthers Capital may substantially extend the term of this Agreement.

## 13.    Request for Adjustment Procedure.

a.    Seller and/or Panthers Capital may initiate an Adjustment by sending a request for Adjustment to the other party in writing. Seller may request an adjustment via e-mail to accounting@pantherscapital.com with the subject line "REQUEST FOR ADJUSTMENT."

b.    Within five (5) Workdays following a request for Adjustment (an "Adjustment Request") Seller shall provide to Panthers Capital's copies of: (i) Seller's most recent month's bank statement of the Approved Bank Account and month-to-date transaction activity, credit card processing statements and any aging reports immediately preceding the date of Panthers Capital's receipt of the Adjustment Request.

c.    Seller and Panthers Capital shall have the right to request Adjustment of the   Daily   Installment as many times during the term of this Agreement as it deems proper, and Panthers Capital shall comply in good faith with such request, provided that:

    i.    Each such request for Adjustment is made in accordance with the terms of this Section 13; and

    ii.    A request for Adjustment shall not be made after the Expiration Date.

## 14.    Rights and Obligations of Panthers Capital upon Receipt of the full Purchased Amount.

Upon receipt of the full amount of the Purchased Amount and any fees owed to Panthers Capital under this Agreement:

    a. Panthers Capital shall notify Seller's bank and request from it to stop transferring   Daily   Installments to Panthers Capital's bank account.

    b. If Panthers Capital shall have received funds in excess of the Purchased Amount and any fees owed to Panthers Capital under this Agreement, Panthers Capital shall promptly return such excess to Seller.

## 15.    Risk Sharing Acknowledgments and Arrangements.

    a. Seller and Panthers Capital each hereby acknowledges and agrees that:

      i.    The Purchased Future Receipts represent a portion of Seller's Future Receipts.

      ii.    This Agreement consummates the sale of the Purchased Future Receipts at a discount, not the borrowing of funds by Seller from Panthers Capital. Panthers Capital does not charge Seller and will not collect from Seller any interest on the monies used by Panthers Capital for the purchase of the Purchased Future Receipts. The period of time that it will take Panthers Capital to collect the Purchased Amount is not fixed, is unknown to both parties as of the Effective Date of this Agreement and will depend on how well or not well Seller's business will be performing following the Effective Date. As an extreme example, in the event Seller's business ceases to exist after Panthers Capital's purchase of the Purchased Future Receipts as a result of a drying up of revenues for reasons outside Seller's reasonable control, Panthers Capital may never collect all or a substantial portion of the Purchased Future Receipts and will never recover the moneys it spent on such purchase.

      iii.    The amount of the Initial   Daily   Installment set forth in Section 1 of this Agreement is calculated based upon the information concerning an average amount of   Daily   Receipts collected by Seller's business immediately prior to the Effective Date of this Agreement, as well as representations regarding the Seller's estimated Future Receipts, which  information  was provided by the Seller to Panthers Capital.

      iv.    The amounts of Seller's future   Daily   Receipts may increase or decrease over time.

## 16.    Panthers Capital's Risk Acknowledgments. Panthers Capital agrees to purchase the Purchased Future Receipts knowing the risks that Seller's business may slow down or fail, and Panthers Capital assumes these risks based

exclusively upon the information provided to it by Seller related to the business operations of Seller's business prior to the date hereof, and upon Seller's representations, warranties and covenants contained in this Agreement that are designed to give Panthers Capital a reasonable and fair opportunity to receive the benefit of its bargain. Panthers Capital assumes the risk that Future Receipts may be remitted more slowly than Panthers Capital may have anticipated or projected because Seller's business has slowed down, and the risk that the full Purchased Amount may never be remitted because Seller's business went bankrupt or Seller otherwise ceased operations in the ordinary course of business.

17. **Application of Amounts Received by** Panthers Capital. Panthers Capital reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Panthers Capital from Seller prior to applying such amounts to reduce the outstanding amount of the Purchased Amount. Any ACH payments and/or payments which clear after the Effective Date of this Agreement shall be applied to the balance hereunder.

18. **Not a Loan.** Seller and Panthers Capital agree that the Purchase Price is paid to Seller in consideration for the acquisition of the Purchased Future Receipts and that payment of the Purchase Price by Panthers Capital is not intended to be, nor shall it be construed as, a loan from Panthers Capital to Seller that requires absolute and unconditional repayment on a maturity date. To thecontrary, Panthers Capital's ability to receive the Purchased Amount pursuant to this Agreement, and the date when the Purchased Amount is delivered to Panthers Capital in full (if ever) are subject to and conditioned upon performance of Seller's business.

19. **Prior Balance.** Seller represents and warrants that Rider 2, which is attached hereto and made a part hereof, contains true and correct information as to the name(s) of Seller's creditors and the amounts that Seller owes eachof those creditors as of the Effective Date (and these amounts being a portion of the Prior Balance), and that as of the date hereof there are no creditors of Seller which may otherwise encumber the Purchased Future Receipts other than those listed in Rider 2. Seller indemnifies and holds harmless Panthers Capital for any and all damages and losses (including without limitation legal fees and expenses) incurred by Panthers Capital as the result of such representation being untrue, incorrect or incomplete.

20. **Origination Fee.** Seller hereby agrees for Panthers Capital to withhold from the Purchase Price the Origination Fee contained in Rider 1, which is attached hereto and made a part hereof.

### REPRESENTATIONS, WARRANTIES AND COVENANTS

21. Seller represents, warrants and covenants that as of this date and, unless otherwise stated, during the course of this Agreement:

   a. **Financial Condition and Financial Information.** Seller's bank and financial statements, copies of which have been furnished to Panthers Capital, and future statements which may be furnished hereafter pursuant to this Agreement or upon Panthers Capital's request, fairly represent the financial condition of Seller as of the dates such statements were issued, and prior to execution of the Agreement there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Seller. Panthers Capital may request Seller's bank statements at any time during the term of this Agreement and view-only access to Seller's bank account and Seller shall provide them to Panthers Capital within five (5) Workdays. Seller's failure to do so is a material breach of this Agreement.

   b. **Governmental Approvals.** Seller is in compliance and, during the term of this Agreement, shall be in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

   c. **Good Standing.** Seller is a corporation/limited liability company/limited partnership/other type of entity that is in good standing and duly incorporated or otherwise organized and validly existing under the laws of its jurisdiction of incorporation or organization and has full power and authority necessary to carry its business as it is now being conducted.

   d. **Authorization.** Seller has all requisite power to execute, deliver and perform this Agreement and consummate the transactions contemplated hereunder; entering into this Agreement will not result in breach or violation of, or default under, any agreement or instrument by which Seller is bound or any statute, rule, regulation, order or other law to which Seller is subject, nor require the obtaining of any consent, approval, permit or license from any governmental authority having jurisdiction over Seller. All organizational and other proceedings required to be taken by Seller to authorize the execution, delivery and performance of this Agreement have been taken. The person signing this Agreement on behalf of Seller has full power and authority to bind Seller to perform its obligations under this Agreement.

   e. **Accounting Records and Tax Returns.** Seller will treat receipt of the Purchase Price and payment of the Purchased Amount in a manner evidencing sale of its future receipts in its accounting records and tax returns and further agrees that Panthers Capital is entitled to audit Seller's accounting records upon reasonable notice in order to verify compliance. Seller hereby waives any rights of privacy, confidentiality or taxpayer privilege in any litigation or arbitration arising out of this Agreement in which Seller asserts that this transaction is anything other than a sale of future receipts.

**f.**    **Taxes; Workers Compensation Insurance.** Seller has paid and will promptly pay, when due, all taxes, including without limitation, income, employment, sales and use taxes, imposed upon Seller's business by law, and will maintain workers compensation insurance required by applicable governmental authorities.

**g.**    **Electronic Check Processing Agreement.** Seller shall not change its Approved Processor, add terminals, change its Approved Bank Account(s) or take any other action that could have any adverse effect upon Seller's obligations or impede Panthers Capital's rights under this Agreement, without Panthers Capital's prior written consent.

**h.**    **No Diversion of Future Receipts.** Seller shall not allow any event to occur that would cause a diversion of any portion of Seller's Future Receipts from the Approved Bank Account or Approved Processor without Panthers Capital's written permission.

**i.**    **Change of Name or Location.** Seller, any successor-in-interest of Seller, and Guarantor shall not conduct Seller's businesses under any name other than as disclosed to the Approved Processor and Panthers Capital, shall not change and/or transfer ownership in/of the Seller and will not change any of its places of business without first obtaining Panthers Capital's written consent.

**j.**    **Prohibited Business Transactions.** Seller shall not: (i) voluntarily transfer or sell all or substantially all of its assets (including without limitation the Collateral as such term is defined in Section 23 or any portion thereof) without first obtaining Panthers Capital's consent; or (ii) make or send notice of its intended bulk sale or transfer.

**k.**    **Closing of Business.** Seller will not voluntarily sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without first: (i) obtaining the express written consent of Panthers Capital, and (ii) providing Panthers Capital with a written agreement of a purchaser or transferee of Seller's business or assets to assume all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Panthers Capital. Seller represents that it has no current plans to close its business either temporarily (for renovations, repairs or any other purpose), or permanently. Seller agrees that until Panthers Capital shall have received the Purchased Amount in full, Seller will not voluntarily close its business on a permanent or temporarily basis for renovations, repairs, or any other purposes. Notwithstanding the foregoing, Seller shall have the right to close its business temporarily if such closing is necessitated by a requirement to conduct renovations or repairs imposed upon Seller's business by legal authorities having jurisdiction over Seller's business (such as from a health department or fire department), or if such closing is necessitated by circumstances outside Seller's reasonable control. Prior to any such temporary closure of its business, Seller shall provide Panthers Capital ten (10) Workdays advance notice, to the extent practicable.

**l.**    **No Pending Bankruptcy.** As of the date of Seller's execution of this Agreement, Seller is not insolvent, has not filed, and does not contemplate filing, any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary bankruptcy petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney on the issue of filing bankruptcy or some other insolvency proceeding within six (6) months immediately preceding the date of this Agreement.

**m.**    **Estoppel Certificate.** Seller will at any time, and from time to time, upon at least one (1) Workday's prior notice from Panthers Capital to Seller, execute, acknowledge and deliver to Panthers Capital and/or to any other person or entity specified by Panthers Capital, a statement certifying that this Agreement is unmodified and in full force and effect or, if there have been modifications, that the same is in full force and effect as modified and stating the modification(s) and stating the date(s) on which the Purchased Amount or any portion thereof has been delivered.

**n.**    **Unencumbered Future Receipts.** Seller has and will continue to have good, complete and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests other than by virtue of entering into this Agreement. Seller specifically warrants and represents that it is not currently bound by the terms of any future receivables and/or factoring agreement which may encumber in any way the Future Receipts.

**o.**    **No Stacking.** Seller shall not further encumber the Future Receipts, without first obtaining written consent of Panthers Capital.

**p.**    **Business Purpose.** Seller is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes.

**q.**    **No Default Under Contracts with Third Parties.** Seller's execution of and/or performance of its obligations under this Agreement will not cause or create an event of default by Seller under any contract, which Seller is or may become a party to.

**r.    Right of Access.** In order to ensure Seller's compliance with the terms of this Agreement, Seller hereby grants Panthers Capital the right to enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and/or batch Seller's Daily receipts to the Approved Processor and to ensure that Seller has not violated any other provision of this Agreement. Furthermore, Seller hereby grants Panthers Capital and its employees and consultants access during regular business hours to Seller's employees and records and all other items of property located at the Seller's place of business during the course of this Agreement. Seller hereby agrees to provide Panthers Capital, upon request, all and any information concerning Seller's business operations, banking relationships, names and contact information of Seller's suppliers, vendors and landlord(s), to allow Panthers Capital to interview any of those parties.

**s.    Phone Recordings and Contact.** Seller agrees that any call between Seller and Panthers Capital and its owners, managers, employees and agents may be recorded and/or monitored. Furthermore, Seller acknowledges and agrees that: (i) it has an established business relationship with Panthers Capital, its managers, employees and agents (collectively, the "Panthers Capital Parties") and that Seller may be contacted by any of Panthers Capital Parties from time-to-time regarding Seller's performance of its obligations under this Agreement or regarding other business transactions; (ii) it will not claim that such communications and contacts are unsolicited or inconvenient; and (iii) any such contact may be made by any of Panthers Capital Parties in person or at any phone number (including mobile phone number), email addresses, or facsimile number belonging to Seller's office, or its owners, managers, officers, or employees.

**t.    Knowledge and Experience of Decision Makers.** The persons authorized to make management and financial decisions on behalf Seller with respect to this Agreement have such knowledge, experience and skill in financial and business matters in general and with respect to transactions of a nature similar to the one contemplated by this Agreement so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, Seller entering into this Agreement.

**u.    Seller's Due Diligence.** The person authorized to sign this Agreement on behalf of Seller: (i) has received all information that such person deemed necessary to make an informed decision with respect to a transaction contemplated by this Agreement; and (ii) has had unrestricted opportunity to make such investigation as such person desired pertaining to the transaction contemplated by this Agreement and verify any such information furnished to him or her by Panthers Capital.

**v.    Consultation with Counsel.** The person(s) signing this Agreement of behalf of Seller: (a) has read and fully understands the content of this Agreement; (b) has consulted to the extent he/she wished with Seller's own counsel in connection with entering into this Agreement; (c) has made sufficient investigation and inquiry to determine whether this Agreement is fair and reasonable to Seller, and whether this Agreement adequately reflects his or her understanding of its terms.

**Y.    No Reliance on Oral Representations.** This Agreement contains the entire agreement between Seller and Panthers Capital with respect to the subject matter of this Agreement and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by Panthers Capital or any of the Panthers Capital Parties with respect thereto (if any), whether or not relied or acted upon. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by the Panthers Capital Parties, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect Seller's obligations pursuant to this Agreement or any rights and remedies of the parties to this Agreement

**Z.    No Additional Fees Charged.** Seller hereby acknowledges and agrees that: (i) other than the Origination Fee, if any, set forth in Section 20 herein, Panthers Capital is NOT CHARGING ANY ADDITIONAL FEES OR CLOSING COSTS to Seller; and (ii) if Seller is charged with any fee and/or cost not listed in Section 2 hereof, such fee is not charged by Panthers Capital. Moreover, as all working capital received under this Agreement is intended to ensure Seller's continued success, Seller warrants and covenants not to pay any fee and/or commission with regard to this transaction other than as provided for herein.

**aa.    Credit Report and Other Authorizations** Seller and each of the Owners signing above authorize Panthers Capital, its agents and representatives and any credit reporting agency engaged by Panthers Capital, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Owners for the purpose of this Agreement; (ii) obtain consumer and business credit reports on the Seller and any of its Owners; and (iii) to contact personal and business references provided by the Seller in any application, at any time now or for so long as Seller and/or Owners continue to have any obligations to Panthers Capital as a consequence of this Agreement or for Panthers Capital's ability to determine Seller's eligibility to enter into any future agreement with Panthers Capital.

### PLEDGE OF SECURITY

22. **Pledge.** As security for the prompt and complete performance of any and all liabilities, obligations, covenants or agreements of Seller under this Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "Obligations"), Seller hereby pledges, assigns and hypothecates to Panthers Capital (collectively, "Pledge") and grants to Panthers Capital a continuing, perfected and first priority lien upon and security interest in, to and under all of Seller's right, title and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

    **a.** all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Seller; and

    **b.** all Seller's proceeds, as such term is defined by Article 9 of the UCC.

23. **Termination of Pledge.** Upon the performance by Seller in full of the Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Seller. Upon any such termination, Panthers Capital will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Seller shall reasonably request.

24. **Representations with Respect to Collateral.**  Seller hereby represents and warrants to Panthers Capital that the execution, delivery and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same; and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Seller is a party.

25. **Further Assurances.** Upon the request of Panthers Capital, Seller, at Seller's sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments  of  the Collateral and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as Panthers Capital may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

### EVENTS OF DEFAULT AND REMEDIES

26. **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" by Seller:

    **a.**   Seller shall violate any term, condition or covenant in this Agreement.

    **b.**   Any representation or warranty by Seller made in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made.

    **c.**   Seller shall default under any of the terms, covenants and conditions of any other agreement with Panthers Capital (if any) which is related to the instant Agreement.

    **d.**   Seller uses multiple depository accounts without obtaining prior written consent of Panthers Capital in each instance.

    **e.**   Seller fails to deposit any portion of its Future Receipts into the Approved Bank Account;

    **f.**   Seller changes the Approved Bank Account or Approved Processor without obtaining prior written consent of Panthers Capital in each instance.

    **g.**   Seller intentionally interferes with Panthers Capital's collection of  Daily  Installments.

27. **Default under the Agreement.** In case any Event of Default occurs and is not waived by Panthers Capital, in writing, Panthers Capital may declare Seller in default under this Agreement without notice.

28. **Seller's Obligations Upon Default.** Upon occurrence of an Event of Default due to Seller's  breach  of  its obligations under this Agreement, Seller shall immediately deliver to Panthers Capital the  entire undelivered portion of the Purchased Amount and the Specified Percentage shall equal 100% of all Future Receipts. In addition, Seller shall also pay to Panthers Capital, as additional damages, any reasonable expenses incurred by Panthers Capital in connection with recovering the monies due to Panthers Capital from Seller pursuant to this Agreement, including without limitation the costs of retaining collection firms and reasonable attorneys' fees and disbursements (collectively, "Reasonable Damages").

29. **Remedies Upon Default.** Upon Seller's default, Panthers Capital may immediately proceed to protect and enforce

its rights under this Agreement and/or Guaranty by:

**a.** Enforcing its rights as a secured creditor under the Uniform Commercial Code including, without limitation, notifying any account debtor(s) of Seller as the term is defined below, of Panthers Capital's security interest;

**b.** Enforcing the provisions of the Personal Guaranty of Performance against the Guarantor(s) without first seeking recourse from Seller;

**c.** Notifying Seller's credit card processor of the sale of Future Purchase Receipts hereunder and to direct such credit card processor to make payment to Panthers Capital of all or any portion of the amounts received by such credit card processor on behalf of Seller;

**d.** Subject to arbitration as provided in Section 50 of this Agreement, commencing a suit in law and/or equity, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Seller's obligations hereunder (including the Personal Guaranty) or any other legal or equitable right or remedy including without limitation Panthers Capital's rights of a secured party under the UCC.

**30.** **Remedies are not Exclusive.** Subject to arbitration as provided in Section 50 of this Agreement,  all  rights,powers and remedies of Panthers Capital in connection with this Agreement set forth herein may be exercised at any time after the occurrence of any Event of Default, are cumulative and not exclusive and shall bein addition to any other rights, powers or remedies provided to Panthers Capital by law or equity.

### ADDITIONAL TERMS

**31.** **Seller Deposit Agreement.** Seller shall execute an agreement with Panthers Capital that shall authorize Panthers Capital to arrange for electronic fund transfer services and/or "ACH" payments of   Daily  Installments from the Approved Bank Account. Seller shall upon request provide Panthers Capital and/or its authorized agent with all information, authorizations and passwords necessary to verify Seller's receivables, receipts and deposits into the Approved Bank Account. The authorization shall be irrevocable until such time when Seller shall have performed its obligations under this Agreement in full.

**32.** **Financial Condition.**  Seller and its Guarantor(s) authorize Panthers Capital and its agents to investigate their financial status and history and will provide to Panthers Capital any bank or financial statements, tax returns, etc., as Panthers Capital deems reasonably necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable for release of financial information. Seller hereby authorizes Panthers Capital to receive from time to time updates on such informationand financial status.

**33.** **Transactional History.** Seller shall execute written authorization(s) to its bank(s) to provide Panthers Capital with Seller's banking and/or credit-card processing history.

**34.** **Indemnification.**  Seller and its Guarantor(s) jointly and severally, indemnify and hold harmless to the fullest extent permitted by law Approved Processor, any ACH processor, customer and/or Account Debtors of the Seller, its/their officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any ACH processor, customer and/or Account Debtors of  the  Sellerresulting from (a) claims asserted by Panthers Capital for monies owed to Panthers Capital from Seller and (b) actions taken by any ACH processor, customer and/or Account Debtor of the Seller in reliance upon information or instructions provided by Panthers Capital.

**35.** **No Liability.** In no event shall Panthers Capital be liable for any claims asserted by Seller or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby knowingly and voluntarily waived by Seller and Guarantor(s).

### MISCELLANEOUS

**36.** **Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

**37.** **Assignment.** Panthers Capital may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Seller. Seller shall not assign its rights or obligations under this Agreement without first obtaining Panthers Capital's written consent.

**38.** **Notices.**

**a.** Panthers Capital may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller by regular mail or by e-mail, at Panthers Capital's option and Seller consents to such electronic delivery.  Notices sent by e-mail are effective when sent.  Notices sent by regular mail become effective three days after mailing to Seller's address set forth in this Agreement.

    **b.** Subject to Section 11 of this Agreement, Seller and Guarantor may send any notices to Panthers Capital by e-mail only upon the prior written consent of Panthers Capital, which consent may be withheld or revoked at any time in Panthers Capital's sole discretion.  Otherwise, any notices or other communications from Seller and Guarantor to Panthers Capital must be delivered by certified mail, return receipt requested, to Panthers Capital's address as set forth in this Agreement.  Notices sent to Panthers Capital shall become effective only upon receipt by Panthers Capital.

**39.** **Waiver Remedies.** No failure on the part of Panthers Capital to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. Subject to arbitration as provided in Section 50 of this Agreement, the remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**40.** **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

**41.** **Governing Law, Venue and Jurisdiction.** This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of Connecticut, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted exclusively in any court sitting in the State of Connecticut, Fairfield County, (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the partiesto this Agreement irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to an Acceptable Forums. Seller and Guarantor(s) hereby agree that the mailing of any summons and complaint, or demand, in any proceeding commenced by Panthers Capital by certified or registered mail, return receipt requested to the mailing address(es) listed on this Agreement, or via email address(es) listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

**42.** **Service of Process.**

    **IMPORTANT NOTICE -** THIS SERVICE OF PROCESS PROVISION CONTAINS IMPORTANT CONSENTS AND WAIVERS. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

    a. In addition to service of process under the laws of the Acceptable Forums, each Seller and Guarantor agree and consent to receive any court required service of process (including, without limitation, service of process (a) to commence litigation, (b) after litigation has been commenced for any court filings, and (c) for Panthers Capital obtaining a Prejudgment Remedy), through the following methods and manners (collectively "Acceptable Methods"):

        1. Mail when sent by certified or registered mail, return receipt requested, Federal Express, or other overnight courier, addressed to the respective mailing addresses of each Seller and Guarantor, as contained in this Agreement, or in Panthers Capital's records, or any other mailing address provided to Panthers Capital in writing; and

        2. Electronic mail (e-mail) when sent to the respective e-mail addresses of each Seller and Guarantor, as contained in this Agreement, or in Panthers Capital's records, or any other e-mail address provided to Panthers Capital in writing.

    b. Each Seller and Guarantor make, agree and consent to the following representations and waivers:

        1. Each Seller and Guarantor agrees that service of process made through either or both of the Acceptable Methods will constitute valid and lawful service of process on them without the necessity for service of process by other means (e.g., as provided for by statute or rules of court), but without invalidating service of process performed in accordance with such other provisions;

        2. Each Seller and Guarantor agrees and consents that service of process is deemed effective according to the following:

            i. If sent by certified or registered, mail return receipt requested, Federal Express, or other overnight courier, at the earlier of: (a) four calendar days after mailing, (b) when delivered, or (c) when actually received; and

            ii. If sent by e-mail, on the same day and time that the e-mail is sent;

        3. Each Seller and Guarantor represents that their respective mailing and e-mail addresses as contained in this Agreement, and/or as provided to Panthers Capital in writing, are correct and valid, they regularly receive and send correspondence from these addresses, and service sent to these addresses is expected

to be received by them;

4. Each Seller and Guarantor agrees and consents that Panthers Capital may serve process on them directly, including for the Acceptable Methods, without the necessity of having service completed by a marshal or indifferent person, but without invalidating service of process completed by a marshal or indifferent person, and each Seller and Guarantor waives any objection if Panthers Capital serves process directly on them; and

5. EACH SELLER AND GUARANTOR WAIVES ANY OBJECTION TO INSUFFICIENCY OF PROCESS, INSUFFICIENCY OF SERVICE OF PROCESS, OR PERSONAL JURISDICTION, WHETHER RAISED IN A MOTION TO DISMISS, OR OTHER SIMILAR MOTION, IF SERVICE IS CONDUCTED BY ANY METHOD OR MANNER CONTAINED IN THIS SERVICE OF PROCESS PROVISION OR ANY OTHER METHOD ALLOWED UNDER THE LAWS OF THE ACCEPTABLE FORUMS.

43. **PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT IS $250,000 OR LESS.**

**IMPORTANT NOTICE** - THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

a. EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1. THIS AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2. WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY <u>AFTER, BUT NOT UPON,</u> COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3. WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE PANTHERS CAPITAL TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) PANTHERS CAPITAL'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) IS $250,000 OR LESS, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 APPLY TO THIS AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) PANTHERS CAPITAL MAY ONLY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER, <u>AFTER, BUT NOT UPON, COMMENCING ANY LITIGATION</u> AGAINST ANY ONE OF THE UNDERSIGNED.

c. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, PANTHERS CAPITAL MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

d. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 42, INCLUDING FOR PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY.

44. **PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT EXCEEDS $250,000.**

**IMPORTANT NOTICE -** THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

a. EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1. THIS AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2. **WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY <u>UPON OR AFTER</u> COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND**

3. **WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE PANTHERS CAPITAL TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.**

b. **EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, PANTHERS CAPITAL MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.**

c. **EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) PANTHERS CAPITAL'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) EXCEEDS $250,000, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 DO NOT APPLY TO THIS AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) PANTHERS CAPITAL MAY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER <u>UPON OR AFTER COMMENCING ANY LITIGATION</u> AGAINST ANY ONE OF THE UNDERSIGNED.**

d. **EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 42, INCLUDING FOR PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY.**

45. <u>**Survival of Representation, etc.**</u> All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have expired.

46. <u>**Severability.**</u>  In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

47. <u>**Entire Agreement.**</u>  This Agreement embodies the entire agreement between Seller and Panthers Capital and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s) and Riders to this Agreement are part of this Agreement.

48. <u>**JURY TRIAL WAIVER**</u>. **THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. EACH PARTY HERETO ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION AND DISCUSSIONS OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.**

49. <u>**CLASS ACTION WAIVER.**</u>  **EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY, AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR IS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATEDWITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT TO THE CONTRARY); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECUREDTHROUGH THE CLASS OR REPRESENTATIVE ACTION.**

50. <u>ARBITRATION.</u>  Notwithstanding any other provision of this Agreement, ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR INVALIDITY THEREOF, MAY BE SETTLED BY ARBITRATION ADMINISTERED BY MEDIATION AND CIVIL ARBITRATION, INC. D/B/A RAPIDRULING (WWW.RAPIDRULING.COM) in accordance with its Commercial Arbitration Rules effective at the time a claim is made, and JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. Arbitrators may be appointed by RapidRuling. The place of

arbitration may be in Connecticut, and any hearing may be held via video or telephone conference. The parties agree that no objection may be taken to the decision, order or award of the tribunal following any such hearing on the basis that the hearing was held by video or telephone conference. SELLER AND ANY GUARANTOR CONSENT TO ELECTRONIC SERVICE OF PROCESS, WITH SERVICE TO BE MADE TO THE EMAIL ADDRESS(ES) PROVIDED IN THIS AGREEMENT. All such service of process may come from the opposing party's email listed here, efile@rapidruling.com, or efile@mcarbitration.org. The parties shall list all said email addresses as "SAFE SENDERS" (or other whitelist) and are responsible to check their "SPAM" and "JUNK" type incoming messages on a daily basis. Panthers Capital, SELLER AND ANY GUARANTOR agree that arbitration and arbitrator fees may be equally paid by the parties, and the commencing party may be entitled to any unreimbursed fees or expenses paid on behalf of the non-commencing party within any award. Panthers Capital, SELLER AND ANY GUARANTOR further agree that, in the event of confirmation, domestication and/or enforcement, the delinquent party may be responsible for any attorney's fees, court or other fees associated with such actions. Panthers Capital, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, Panthers Capital, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE MAY BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

51. **RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION PROVISION, SELLER AND EACH GUARANTOR MUST SEND Panthers Capital A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: Panthers Capital – ARBITRATION OPT OUT, 9 W Broad St #320, Stamford, CT 06902, ATTENTION: Arbitration Opt-Out.**

52. **Counterparts and Facsimile Signatures.** This Agreement can be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together, shall constitute one and the same agreement. Signatures delivered via facsimile and/or via Portable Digital Format (PDF) shall be deemed acceptable for all purposes, including without limitation the evidentially purposes.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first above written.

**FOR SELLER #1**

**By:** _____

**Name:** CHARITHA I  SAMARASINGHE

**Title:** Owner

**EIN:** 33-0862520

**FOR SELLER #2**

**By:** _____

**Name:** _____

**Title:** Owner

**EIN:** _____


**AGREE TO BE BOUND BY THE PROVISIONS OF THIS AGREEMENT APPLICABLE TO AND CONCERNING GUARANTOR.**

**OWNER/GUARANTOR # 1**

**By:** _____

**Name:** CHARITHA I  SAMARASINGHE

**SSN:** 593449508

**OWNER/GUARANTOR # 2**

**By:** _____

**Name:** _____

**SSN:** _____


**Panthers Capital LLC**

**By:** _____

# PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is being executed and delivered by each undersigned ("Guarantor") in favor of Panthers Capital LLC, and its subsidiaries, affiliates, agents, and assigns (collectively, "Buyer"), in connection with that certain Future Receivables Sale and Purchase Agreement (the "Agreement"), dated effective as of [ __6/4/2025__ ] by and between Buyer and [CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHE] ("Seller"), a business entity that desires to sell certain of its Future Receipts to Buyer pursuant to the Agreement. Capitalized terms used herein have the meanings provided in the Agreement. Each Guarantor is a shareholder, member, partner or other principal owner of Seller or is an affiliate of seller that is owned and controlled by a shareholder, member, partner or other principal owner of Seller. Each Guarantor executes and delivers this Guaranty to induce Buyer to enter into the Agreement and purchase Seller's Future Receipts. Accordingly, each Guarantor acknowledges and agrees that Guarantor will receive substantial benefits from providing this Guaranty.

**SELLER # 1:**                                                    **SELLER # 2:**

**Legal Business Name** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTI **Legal Business Name** _____

**D/B/A:** E TROPICAL FISH _____    **D/B/A:** _____

**NOW, THEREFORE**, as an inducement for Buyer to enter into the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, each Guarantor does hereby agree as follows:

**1. Defined Terms.** All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

**2. Guaranty of Obligations.** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt, full, faithful and complete performance and observance of all of Seller's obligations under the Agreement (the "Obligations"); and Guarantor unconditionally covenants to Buyer that if default or breach shall at any time be made by Seller in the Obligations, Guarantor shall well and truly perform (or cause to be performed) the Obligations and pay all damages and other amounts stipulated in the Agreement with respect to the non-performance of the Obligations, or any of them.

**3. Guarantor's Additional Covenants.** The liability of Guarantor hereunder shall not be impaired, abated, deferred, diminished, modified, released, terminated or discharged, in whole or in part, or otherwise affected, by any event, condition, occurrence, circumstance, proceeding, action or failure to act, with or without notice to, or the knowledge or consent of, Guarantor, including, without limitation:

    **a.** any amendment, modification or extension of the Agreement or any Obligation;

    **b.** any extension of time for performance, whether in whole or in part, of any Obligation given prior to or after default thereunder;

    **c.** any exchange, surrender or release, in whole or in part, of any security that may be held by Buyer at any time under the Agreement;

    **d.** any other guaranty now or hereafter executed by Guarantor or anyone else;

    **e.** any waiver of or assertion or enforcement or failure or refusal to assert or enforce, in whole or in part, any Obligation, claim, cause of action, right or remedy which Buyer may, at any time, have under the Agreement or with respect to any guaranty or any security which may be held by Buyer at any time for or under the Agreement or with respect to the Seller;

    **f.** any act or omission or delay to do any act by Buyer which may in any manner or to any extent vary the risk of Guarantor or which would otherwise operate as a discharge of Guarantor as a matter of law;

    **g.** the release of any other guarantor from liability for the performance or observance of any Obligation, whether by operation of law or otherwise;

    **h.** the failure to give Guarantor any notice whatsoever;

    **i.** any right, power or privilege that Buyer may now or hereafter have against any person, entity or collateral.

**4. Guarantor's Other Agreements.** Guarantor will not voluntarily dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any material business assets of Seller outside of the ordinary course of Seller's business without the prior written consent of Buyer, which consent may be withheld for any reason, until receipt of the entire Purchased Amount. Guarantor shall pay to Buyer upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) of, or incidental to, or relating to the enforcement or protection of Buyer's rights hereunder or Buyer's rights under the Agreement. This Guaranty is binding upon Guarantor and Guarantor's heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors and assigns of Buyer. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim, which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement.

**5. Waiver; Remedies.** No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. Subject to arbitration as provided in Section 13 of this Guaranty, the remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Seller fails to perform any obligation under the Agreement, Buyer may enforce its rights under this Guaranty without first seeking to obtain performance for such default from Seller or any other guarantor.

**6. Acknowledgment of Purchase.** Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Purchased Amount of Future Receipts is a payment for an adequate consideration and is not intended to be treated as a loan or financial accommodation from Buyer to Seller. Guarantor specifically acknowledges that Buyer is not a lender, bank or credit card processor, and that Buyer has not offered any loans to Seller, and Guarantor waives any claims or defenses of usury in any action arising out of this Guaranty. Guarantor acknowledges that the Purchase Price paid to Seller is good and valuable consideration for the sale of the Purchased Amount.

**7. Governing Law and Jurisdiction.** This Guaranty shall be governed by and construed exclusively in accordance with the laws of the State of Connecticut, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Guaranty shall be instituted exclusively in any court sitting in the State of Connecticut, Fairfield County, (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the parties to this Guaranty irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to an Acceptable Forums. Seller and Guarantor(s) hereby agree that the mailing of any summons and complaint, or demand, in any proceeding commenced by Panthers Capital by certified or registered mail, return receipt requested to the mailing address(es) listed on the Agreement, or via email address(es) listed on the Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

**8. Service of Process.**

<u>**IMPORTANT NOTICE**</u> - THIS SERVICE OF PROCESS PROVISION CONTAINS IMPORTANT CONSENTS AND WAIVERS. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

a. In addition to service of process under the laws of the Acceptable Forums, each Seller and Guarantor agree and consent to receive any court required service of process (including, without limitation, service of process (a) to commence litigation, (b) after litigation has been commenced for any court filings, and (c) for Panthers Capital obtaining a Prejudgment Remedy), through the following methods and manners (collectively "Acceptable Methods"):

    1. Mail when sent by certified or registered mail, return receipt requested, Federal Express, or other overnight courier, addressed to the respective mailing addresses of each Seller and Guarantor, as contained in the Agreement, or in Panthers Capital's records, or any other mailing address provided to Panthers Capital in writing; and

    2. Electronic mail (e-mail) when sent to the respective e-mail addresses of each Seller and Guarantor, as contained in the Agreement, or in Panthers Capital's records, or any other e-mail address provided to Panthers Capital in writing.

b. Each Seller and Guarantor make, agree and consent to the following representations and waivers:

    1. Each Seller and Guarantor agrees that service of process made through either or both of the Acceptable Methods will constitute valid and lawful service of process on them without the necessity for service of process by other means (e.g., as provided for by statute or rules of court), but without invalidating service of process performed in accordance with such other provisions;

    2. Each Seller and Guarantor agrees and consents that service of process is deemed effective according to the following:

        i.       If sent by certified or registered, mail return receipt requested, Federal Express, or other overnight courier, at

the earlier of: (a) four calendar days after mailing, (b) when delivered, or (c) when actually received; and

    ii.     If sent by e-mail, on the same day and time that the e-mail is sent;

3.  Each Seller and Guarantor represents that their respective mailing and e-mail addresses as contained in the Agreement, and/or as provided to Panthers Capital in writing, are correct and valid, they regularly receive and send correspondence from these addresses, and service sent to these addresses is expected to be received by them;

4.  Each Seller and Guarantor agrees and consents that Panthers Capital may serve process on them directly, including for the Acceptable Methods, without the necessity of having service completed by a marshal or indifferent person, but without invalidating service of process completed by a marshal or indifferent person, and each Seller and Guarantor waives any objection if Panthers Capital serves process directly on them; and

5.  EACH SELLER AND GUARANTOR WAIVES ANY OBJECTION TO INSUFFICIENCY OF PROCESS, INSUFFICIENCY OF SERVICE OF PROCESS, OR PERSONAL JURISDICTION, WHETHER RAISED IN A MOTION TO DISMISS, OR OTHER SIMILAR MOTION, IF SERVICE IS CONDUCTED BY ANY METHOD OR MANNER CONTAINED IN THIS SERVICE OF PROCESS PROVISION OR ANY OTHER METHOD ALLOWED UNDER THE LAWS OF THE ACCEPTABLE FORUMS.

### 9.  PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT IS $250,000 OR LESS.

**IMPORTANT NOTICE** - THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

a.  EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1.     THE AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2.     WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY <u>AFTER, BUT NOT UPON</u>, COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3.     WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE BUYER TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) PANTHERS CAPITAL'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) IS $250,000 OR LESS, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 APPLY TO THE AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) PANTHERS CAPITAL MAY ONLY OBTAIN A PREJUDGMENT REMEDY, THROUGH USE OF THIS WAIVER, <u>AFTER, BUT NOT UPON, COMMENCING ANY LITIGATION</u> AGAINST ANY ONE OF THE UNDERSIGNED.

c.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, PANTHERS CAPITAL MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

d.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 8, INCLUDING FOR PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY.

### 10. PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT EXCEEDS $250,000.

**IMPORTANT NOTICE** - THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

a.  EACH AND EVERY SELLER AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

1.     THE AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

2.     WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH PANTHERS CAPITAL OBTAINING ANY PREJUDGMENT REMEDY <u>UPON OR AFTER</u> COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

3.    WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE BUYER TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

b.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, PANTHERS CAPITAL MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

c.  EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) PANTHERS CAPITAL'S EXTENSION OF SALES-BASED FINANCING TO SELLER(S) EXCEEDS $250,000, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 DO NOT APPLY TO THE AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) PANTHERS CAPITAL MAY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER <u>UPON OR AFTER COMMENCING ANY LITIGATION</u> AGAINST ANY ONE OF THE UNDERSIGNED.

d. EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 8, INCLUDING FOR BUYER OBTAINING ANY PREJUDGMENT REMEDY.

**11. JURY WAIVER.** THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION ORPROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**12.  CLASS ACTION WAIVER.** THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS GUARANTY); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OROTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

13. ARBITRATION. Notwithstanding any other provision of this Guaranty, ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THE AGREEMENT, THE SECURITY AGREEMENT AND/OR THE GUARANTY(S), OR THE BREACH, TERMINATION OR INVALIDITY THEREOF, SHALL BE SETTLED BY ARBITRATION ADMINISTERED BY MEDIATION AND CIVIL ARBITRATION, INC. D/B/A RAPIDRULING (WWW.RAPIDRULING.COM) in accordance with its Commercial Arbitration Rules effective at the time a claim is made, and JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED, CONFIRMED AND ENFORCED IN ANY COURT HAVING JURISDICTION THEREOF. Arbitrators shall be appointed by RapidRuling. The place of arbitration shall be in Connecticut and any hearing shall be held via video or telephone conference. The parties agree that no objection shall be taken to the decision, order or award of the tribunal following any such hearing on the basis that the hearing was held by video or telephone conference. SELLER AND ANY GUARANTOR CONSENT TO ELECTRONIC SERVICE OF PROCESS, WITH SERVICE TO BE MADE TO THE EMAIL ADDRESS(ES) PROVIDED IN THE AGREEMENT. All such service of process may come from the opposing party's email listed here, efile@rapidruling.com, or efile@mcarbitration.org. The parties shall list all said email addresses as "safe senders" (or other whitelist) and are responsible to check their "SPAM" and "JUNK" type incoming messages on a daily basis. BUYER, SELLER AND ANY GUARANTOR agree that arbitration and arbitrator fees shall be equally paid by the parties, and the commencing party shall be entitled to any unreimbursed fees or expenses paid on behalf of the non-commencing party within any award. BUYER, SELLER AND ANY GUARANTOR further agree that, in the event of confirmation, domestication and/or enforcement, the delinquent party shall be responsible for any attorney's fees, court or other fees associated with such actions. BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ORREPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

**14. RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION PROVISION, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS GUARANTY. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS GUARANTY: PANTHERS CAPITAL. – ARBITRATION OPT OUT, 9 W Broad St #320, Stamford, CT 06902 ATTENTION: <u>Arbitration Opt-Out</u>.**

**15. Severability.** If for any reason any court of competent jurisdiction finds any provisions of this Guaranty to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in this Guaranty shall be effective to the fullest extent allowed under applicable law.

**16. Opportunity for Attorney Review.** The Guarantor represents that he/she has carefully read this Guaranty and has had a reasonable opportunity to, - and to the extent he or she wishes did, - consult with his or her attorney. Guarantor understands the contents of this Guaranty, and signs this Guaranty as his or her free act and deed.

**17. Counterparts and Facsimile Signatures.** This Guaranty may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile or scanned documents shall have the same legal force and effect as an original and shall be treated as an original document for evidentiary purposes.

**AGREED AND ACCEPTED:**

**OWNER/GUARANTOR #1**                           **OWNER/GUARANTOR #2**

**By:** _____                **By:** _____

**Name:** CHARITHA I SAMARASINGHE               **Name:**

**SSN:** 593449508                               **SSN:**

**Panthers Capital LLC**

**By:** _____

**RIDER 3**

**TO THE**    6/4/2025

**FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT ("Agreement")**

**Between Panthers Capital LLC ("BUYER")**

**and** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES L ("Seller")

## APPLICABLE FEES

1. **Possible Conflicts**. If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

2. **Definitions.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated here in.

3.  C. I. S.    **Applicable Fees.** The parties agree that the Applicable Fees which Seller shall pay to Buyer, pursuant to Section 17 of the Agreement shall be as follows:

   A. **Monthly Fee:**    $299    (charged monthly to cover expense of ACH processing program).

   B. **UCC Fee:**    $200    (part of filing UCC financing statements and their terminations).

   C. **Wire Fee**    $50    (deducted from the Purchase Price to cover cost of remitting the Purchase Price).

   D. **NSF Fee:**    $10    (to cover expense of an NSF – if this occurs twice in a row, the third occurrence constitutes a default under the Agreement).

   E. **ACH Rejection Fee:**    $25    for each rejected ACH debit.

   F. **Bank Change Fee:**    $25

   G. **Blocked Account Fee:**    $100

   H. **UCC Release Fee:**    $200

   I. **Additional Broker Fee:**    _____

   J. **Stacking Fee:**    $5,000    (in the event Seller takes additional capital without written consent of Buyer).

   K. **Default Fee:**    $10,000

   L. **Cancellation of contract:**    $0

4. **Authorization.** Seller hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Applicable Fees pursuant to the Agreement by deducting the amount of the Applicable Fees from the Purchase Price prior to delivery to Seller.

5. **No Reduction of Purchase Price.** Seller hereby agrees that deduction of the Applicable Fees from the Purchase Price shall not be deemed a reduction of the Purchase Price.

**Seller and Buyer agree that this Rider shall be attached to the Agreement and shall be made a part thereof.**

**FOR THE SELLER**    **FOR THE BUYER**

By: _____    By: _____
086ED1260399401...

**Name:** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES  **Name:** Panthers Capital

## RIDER 2

TO THE ___6/4/2025___

**FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT**

("Agreement")

**Between Panthers Capital LLC ("Buyer")**

**and CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ("Seller")**

### PRIOR BALANCE

**1. Possible Conflicts.** If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

**2. Definitions.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated here in.

**3. Prior Balance.** Seller represents and warrants that the following list of its creditors and the amounts that Seller owes its creditors as of the Effective Date of the Agreement is true, correct and complete:

**TOTAL PRIOR BALANCE:** $ 1,020,319.00    **owed to:** Panthers Capital ___

**4. Authorization.** Seller hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Prior Balance pursuant to Section 19 of the Agreement by deducting the amount of the Prior Balance from the Purchase Price prior to delivering it to Seller, and to forward the specific amounts owed by Seller to Buyer and/or the creditors listed in this Rider.

**5. No Reduction of Purchase Price.** Seller hereby agrees that deduction of the Prior Balance from the Purchase Price shall not be deemed to reduce the Purchase Price.

**6. Indemnification.** Seller hereby indemnifies and holds harmless Buyer for any and all damages and losses (including without limitation legal fees and expenses) incurred by Buyer as the result of the information set forth in this Rider being untrue or incorrect or incomplete.

Seller and Buyer agree that this Rider shall be attached to the Agreement and shall be madea part thereof.

**AGREED AND ACCEPTED:**

**OWNER/GUARANTOR #1**                    **OWNER/GUARANTOR #2**

Signed by:

By: _____            By: _____

086ED1260399401...

**Name:** CHARITHA I  SAMARASINGHE        **Name:**

**Panthers Capital LLC**

**By:** _____

## RIDER 1

### TO THE ___6/4/2025___

### FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT

("Agreement")

### Between Panthers Capital LLC ("Buyer")

**and** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES **("Seller")**

### ORIGINATION FEE

**1. Possible Conflicts.** If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

**2. Definitions.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated.

**3. Origination Fee.** The parties agree that the Origination Fee that Seller shall pay to Buyer pursuant to Section 20 of the Agreement shall be:

___$ 250.00___

**4. Authorization.** Seller hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Origination Fee pursuant to Section 20 of theAgreement by deducting the amount of the Origination Fee from the Purchase Price prior to delivering it to Seller.

**5. No Reduction of Purchase Amount.** Seller hereby agrees that deduction of the Origination Fee from the Purchase Price shall not be deemed to reduce the Purchased Amount.

**Seller and Buyer agree that this Rider shall be attached to the Agreement and shall be madea part thereof.**

**AGREED AND ACCEPTED:**
**OWNER/GUARANTOR #1**                    **OWNER/GUARANTOR #2**

**By:** _____            **By:** _____
086ED1260399401...

**Name:** CHARITHA I  SAMARASINGHE        **Name:**

**Panthers Capital LLC**

**By:** _____

**EARLY DELIVERY ADDENDUM**

**TO THE**  6/4/2025

**FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT**

("Agreement")

**Between Panthers Capital LLC ("Buyer")**

**and** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES **("Seller")**

<u>**EARLY DELIVERY OPTION**</u>

1. <u>**Qualification.**</u> As long as no Event of Default has taken place during the term of the Agreement, Seller may opt-in to obtain a discounted Purchased Amount.

2. <u>**Thirty (30) Day Option.**</u> If paid in full within 30  calendar  days, payback will be at a discounted rate of ___1.1___.

3. <u>**Sixty (60) Day Option.**</u> If paid in full within 60  calendar  days, payback will be at a discounted rate of ___1.15___.

4. <u>**Ninety (90) Day Option.**</u> If paid in full within 90  calendar days, payback will be at a discounted rate of _____.

5. <u>**One hundred twenty (120) Day.**</u> If paid in full within 120 calendar days, payback will be at a discounted rate of _____.

**Seller and Buyer agree that this Addendum shall be attached to the Agreement and shall be madea part thereof.**

**AGREED AND ACCEPTED:**
**OWNER/GUARANTOR #1**                          **OWNER/GUARANTOR #2**

By: _____          By: _____
       086ED1260399401...

Name: CHARITHA I  SAMARASINGHE            Name: _____


**Panthers Capital LLC**


By: _____

 PANTHERS CAPITAL

**List of top 5 clients – Please list the top 5 clients that you are currently providing services for / have provided services for in the past 30 days.**

Business Name: PETCO

Contact Name: GINO

Phone Number:

Does the client owe you money? Yes ✔ If so, Amount: $ 1,800,000.00

Business Name: CHEWY

Contact Name:

Phone Number:

Does the client owe you money? Yes ✔ If so, Amount: $ 50,000.00

Business Name:

Contact Name:

Phone Number:

Does the client owe you money? Yes _____ If so, Amount: $

Business Name:

Contact Name:

Phone Number:

Does the client owe you money? Yes _____ If so, Amount: $

Business Name:

Contact Name:

Phone Number:

Does the client owe you money? Yes _____ If so, Amount: $

Signature here: _____
086ED1260399401...

# OFFER SUMMARY - Sales-Based Financing

| | | |
|---|---|---|
| Funding Provided | $ 1,020,569.00 | This is how much funding Panthers Capital will provide. Due to deductions or payments to others, the total funds that will be provided to you directly is ___$ 0.00___. For more information on what amounts will be deducted, please review the attached document "Itemization of Amount Financed."<br><br>The amount paid directly to Merchant may change where the required disbursements to satisfy Merchant's other obligations change. |
| Estimated Annual Percentage Rate (APR) | % 114.00 | APR is the estimated cost of your financing expressed as a yearly rate. APR incorporates the amount and timing of the funding you receive, fees you pay, and the periodic payments you make. This calculation assumes your estimated average monthly income through revenue of CIS INTERNATIONAL HOLDINGS (N.A.) CORP will be ___$ 1,500,000.00___. Since your actual income may vary from our estimate, your effective APR may also vary.<br><br>APR is not an interest rate. The cost of this financing is based upon fees charged by Panthers Capital rather than interest that accrues over time. |
| Finance Charge | $ 479,667.00 | This is the dollar cost of your financing.<br><br>Your finance charge will not increase if you take longer to pay off what you owe. |
| Estimated Total Payment Amount | $ 1,500,236.00 | This is the total dollar amount of payments we estimate you will make under the contract. |
| Estimated Monthly Cost | $ 210,042.00 | Although you do not make payments on a monthly basis, this is Panthers Capital 's calculation of your average monthly cost based upon the payment amounts disclosed below. |
| Estimated Payment | ___$ 10,002.00___ / ___Daily___<br>Panthers Capital | is not aware of any reasonably anticipated true-ups. |
| Payment Terms | ___Daily___ ACH withdrawals of the Estimated Payment described above will be made from the bank account you provided to us for this purpose.<br><br>The Estimated Payment is based on our estimate of ___Daily___ of your ( CIS INTERNATIONAL HOLDINGS (N.A.) CORP 's) daily revenue, based upon your average monthly revenue income of ___$ 1,500,000.00___ for the last four months.<br><br>You have the right to receive refunds of all or part of your payments if you demonstrate that your payments have exceeded ___Daily___ of your | |

| | | | |
|---|---|---|---|
| | | total income during any given month. For more details on your rights, see section 10. Seller's Right of Reconciliation and 11. Request for Reconciliation Procedure of your revenue purchase agreement. | |
| Estimated Term | __150__ days | This is our estimate of how long it will take to collect amounts due to <u>Panthers Capital</u> under the revenue purchase agreement based upon the assumption that you will receive ___$ 1,500,000.00___ in monthly income through your revenue stream. | |
| Prepayment | If you pay off the financing faster than required, you still must pay all or a portion of the finance charge, up to ___$ 479,667.00___ based upon our estimates. | | |
| | If you pay off the financing faster than required, you will not be required to pay additional fees. | | |

Applicable law requires this information to be provided to you to help you make an informed decision. By signing below, you are confirming that you received this information.

Signed by:

086ED1260399401...
_____
Recipient Signature

_____
Recipient Signature

_____
Date

_____
Date

- By checking this box, you are confirming that you have read and understand the Offer Summary provided to you.

# EXHIBIT A

## CROSS COLLATERAL ADDENDUM

This addendum shall serve to modify the Agreement of Sale of Future Receivables ("Merchant Agreement") which was entered into between _____<u>Panthers Capital</u>_____ (hereafter "Purchaser") and <u>CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OT</u> (Hereafter the "Merchants" or "Affiliates") **Dated:** ___<u>6/4/2025</u>___

**Whereas**, the Merchants have individually entered into a Merchant Agreement with Purchaser to sell a portion of their future receivables at a discount;

**Whereas**, the Merchants are affiliated and hereby pledge to assume any and all liability of the other owned entities in the event that one fails to perform or defaults under the terms and conditions the Merchant Agreement.  Affiliated entity or collateral is as follows:

| | | | |
|---|---|---|---|
| 1. | CIS INTERNATIONAL HOLDINGS (N.A.) CORP | CHARITHA I SAMARSINGHE | 33-0862520 |
| 2. | CIS INTERNATIONAL DISTRIBUTOR | CHARITHA I SAMARSINGHE | 27-2923093 |
| 3. | SIAM TROPICAL FISH LTD | CHARITHA I SAMARSINGHE | 59-3449508 |
| 4. | TROPICAL FISH INTERNATIONAL EUROPE | CHARITHA I SAMARSINGHE | 59-3449508 |
| 5. | TROPICAL AQUARIUM FISH (FIJI) LTD | CHARITHA I SAMARSINGHE | 59-3449508 |
| 6. | LIVE AQUARIA HOLDINGS CORP | CHARITHA I. SAMARASINGHE | |
| 7. | T3 AQUATICS | CHARITHA I. SAMARASINGHE | |
| 8. | LIONSROCK INVESTMENTS LLC | CHARITHA I. SAMARASINGHE | |
| 9. | LIONSROCK WISCONSIN LLC | CHARITHA I. SAMARASINGHE | |
| 10. | | | |
| 11. | | | |
| 12. | | | |
| 13. | | | |
| 14. | | | |
| 15. | | | |
| 16. | | | |
| 17. | | | |
| 18. | | | |
| 19. | | | |
| 20. | | | |

**("Corporate Guarantor(s)")**

Additionally, the Merchants and Affiliates individually hereby grant cross collateral to each other and all the affiliated entities included in this addendum.

Merchants and Corporate Guarantor(s) hereby grant Purchaser a security interest in, and authorizes Purchaser to file a UCC financing statement covering, all of Merchants and Corporate Guarantor(s)' present and future accounts, chattel paper, deposit accounts, personal property, assets and fixtures, general intangibles, instruments, equipment, inventory wherever located, and proceeds now or hereafter owned or acquired by Merchant and Corporate Guarantor(s).

This addendum does not alter the terms and conditions of the original Merchant Agreement and that all terms remain in full force and effect.

By executing this addendum, the undersigned represent that it has authority to enter into this agreement on behalf of the above-named Corporate Guarantors.

**Agreed & Accepted:**

**For:** CIS INTERNATIONAL HOLDINGS (N.A.) CORP AND ALL OTHER ENTITIES LISTED ON "EXHIBIT A"
**(as member, manager, or authorized agent of Corporate Guarantor(s))**

Signed by:

086ED1260399401...                                    6/4/2025                          _____

Name:  CHARITHA I SAMARASINGHE                        Name: _____

Title:  OWNER                                          Title: _____

Docusign Envelope ID: 5258F2DB-AAC8-469C-AEC4-6B2A205FA633

| ITEMIZATION OF AMOUNT FINANCED | |
|---|---|
| 1. Amount Given Directly to You | $ 1,020,569.00 |
| 2. Amount Paid on your Account with Us | $ 1,020,319.00 |
| 3. Disbursement paid to a third-party on your behalf to _____ | |
| 4. Amount Provided to You or on Your Behalf (Sum of Items 1-3) | $ 2,040,888.00 |
| 5. Prepaid Finance Charge: Brokerage Fee | |
| 6. Prepaid Finance Charge: Origination Fee | $ 250.00 |
| 7. Amount Financed (Item 4 minus Items 5 and 6) | $ 2,040,638.00 |

# EXHIBIT C



U240089083636



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 657-5448

For Office Use Only

**-FILED-**

File No.: U240089083636

Date Filed: 11/18/2024

Submitter Information:

| | |
|---|---|
| Contact Name | Mike Herzog |
| Organization Name | Panthers Capital LLC |
| Phone Number | (561) 922-5838 |
| Email Address | Mike@pantherscapital.com |
| Address | 9 W BROAD ST #320 STAMFORD, CT 06902 |

Debtor Information:

| Debtor Name | Mailing Address |
|---|---|
| CIS INTERNATIONAL HOLDINGS (N.A.) CORP. | 1405 W 178TH ST GARDENA, CA 90248 |
| CIS INTERNATIONAL DISTRIBUTORS INC. | 1405 W 178TH ST GARDENA, CA 90248 |
| SIAM TROPICAL FISH LTD | 1405 W 178TH ST GARDENA, CA 90248 |
| LIVE AQUARIA HOLDINGS CORP | 1405 W 178TH ST GARDENA, CA 90248 |
| CIS INTERNATIONAL TROPICAL FISH CORP. | 1405 W 178TH ST GARDENA, CA 90248 |
| AUTOMATED SYSTEMS INTERNATIONAL INC. | 1405 W 178TH ST GARDENA, CA 90248 |

Secured Party Information:

| Secured Party Name | Mailing Address |
|---|---|
| PANTHERS CAPITAL LLC | 157 CHURCH STREET SUITE 1971 NEW HAVEN, CT 06510 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
THE SECURED PARTY HAS LAWFULLY ACQUIRED ALL "FUTURE RECEIPTS" FROM THE DEBTOR THROUGH AN ABSOLUTE AND IRREVOCABLE SALE, NOT A SECURITY ASSIGNMENT. "FUTURE RECEIPTS" ENCOMPASS ALL FORMS OF MONETARY PAYMENTS RECEIVED BY THE DEBTOR, INCLUDING CASH, CHECKS, ACH, ELECTRONIC TRANSFERS, CREDIT CARD, DEBIT CARD, BANK CARD, AND ANY OTHER PAYMENT METHODS IN THE ORDINARY COURSE OF BUSINESS. THE DEBTOR IS STRICTLY PROHIBITED FROM OBTAINING FINANCING OR CREATING ANY ENCUMBRANCE THAT COULD IMPAIR THE VALUE OF THE FUTURE RECEIPTS OR THE SECURED PARTY'S RIGHT TO COLLECT THEM. SUCH ACTIONS CONSTITUTE A DIRECT BREACH OF THE AGREEMENT AND WILL BE SUBJECT TO IMMEDIATE LEGAL REMEDIES. THE SECURED PARTY RETAINS A PERFECTED, FIRST-PRIORITY LIEN ON ALL PRESENT AND FUTURE ASSETS OF THE DEBTOR, INCLUDING BUT NOT LIMITED TO ACCOUNTS RECEIVABLE, INVENTORY, EQUIPMENT, CONTRACT RIGHTS, GENERAL INTANGIBLES, AND ALL PROCEEDS THEREOF. THIS LIEN IS SECURED UNDER UCC ARTICLE 9 AND SUPPORTED BY A PERSONAL GUARANTY OF PERFORMANCE. UPON DEFAULT, THE SECURED PARTY IS ENTITLED TO ALL AVAILABLE REMEDIES UNDER UCC ARTICLE 9, INCLUDING THE PRE-JUDGMENT RIGHT TO SEIZE ACCOUNTS RECEIVABLE AND OTHER COLLATERAL. THE DEBTOR MUST MAINTAIN ALL ASSETS FREE OF ANY LIENS OR ENCUMBRANCES THAT WOULD COMPROMISE THE SECURED PARTY'S PRIORITY. ANY VIOLATION CONSTITUTES AN EVENT OF DEFAULT, INVOKING THE SECURED PARTY'S RIGHTS UNDER THE GUARANTY AND UCC ARTICLE 9. THE SECURED PARTY

B3202-1710 11/18/2024 3:06 PM Received by California Secretary of State

ASSERTS A CONTINUING CLAIM ON ALL ASSETS NOW OWNED OR ACQUIRED IN THE FUTURE BY THE DEBTOR, INCLUDING ACCOUNTS (INCLUDING CREDIT CARD RECEIVABLES), CHATTEL PAPER, INVENTORY, EQUIPMENT, INSTRUMENTS (INCLUDING PROMISSORY NOTES), INVESTMENT PROPERTY, DOCUMENTS, DEPOSIT ACCOUNTS, LETTER OF CREDIT RIGHTS, GENERAL INTANGIBLES, SUPPORTING OBLIGATIONS, AND ALL PROCEEDS THEREOF. FURTHER ENCUMBRANCE OF ANY COLLATERAL DESCRIBED HEREIN MAY CONSTITUTE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHTS. THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS RESULTING FROM ANY UNAUTHORIZED SECURITY INTEREST GRANTED IN DEBTOR'S ACCOUNTS, CHATTEL PAPER, OR GENERAL INTANGIBLES.

| | |
|---|---|
| Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:<br>Not Applicable | |
| Select an alternate Financing Statement type:<br>Not Applicable | |
| Select an additional alternate Financing Statement type:<br>Not Applicable | |
| Select an alternative Debtor/Secured Party designation for this Financing Statement:<br>Not Applicable | |
| Optional Filer Reference Information: | |
| Miscellaneous Information: | |
| Search to Reflect:<br>☒ Order a Search to Reflect | |
| Debtor Name | CIS INTERNATIONAL HOLDINGS (N.A.) CORP. |

B3202-1711  11/18/2024  3:06  PM  Received by California Secretary of State

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

2049 Century Park East, Suite 2900, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*): **NOTICE OF NON-CONSENT TO THE USE OF CASH COLLATERAL**   will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) October 10, 2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) October 10, 2025, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) October 10, 2025, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**BY OVERNIGHT MAIL (FEDERAL EXPRESS)**
Hon. Barry Russell
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1660 / Courtroom 1668
Los Angeles, CA 90012

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct .

| October 10, 2025 | Cindy M. Cripe | *Cindy M. Cripe* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**1**. <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF) (Continued)**</u>

Dennis A Dressler on behalf of Creditor Tokyo Century (USA) Inc.
ddressler@dresslerpeters.com

Ron Maroko on behalf of U.S. Trustee United States Trustee (LA)
ron.maroko@usdoj.gov

Byron Z Moldo on behalf of Debtor CIS International Holdings (N.A.) Corporation
bmoldo@ecjlaw.com, aantonio@ecjlaw.com,dperez@ecjlaw.com

Amitkumar Sharma on behalf of Creditor Ford Motor Credit Company LLC, c/o AIS Portfolio Services, LLC
amit.sharma@aisinfo.com

Randye B Soref on behalf of Creditor Panthers Capital LLC
rsoref@polsinelli.com, ccripe@polsinelli.com;ladocketing@polsinelli.com

Chase Aleksander Stone on behalf of Debtor CIS International Holdings (N.A.) Corporation
cstone@ecjlaw.com, aantonio@ecjlaw.com,dperez@ecjlaw.com,cmacan@ecjlaw.com

United States Trustee (LA)
ustpregion16.la.ecf@usdoj.go

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
106464755.1

**F 9013-3.1.PROOF.SERVICE**