1   SEYFARTH SHAW LLP
    Scott Olson (SBN 249956)
2   solson@seyfarth.com
    560 Mission Street, 31st Floor
3   San Francisco, California 94105
    Telephone: (415) 397-2823
4   Facsimile: (415) 397-8549

5   Attorneys for Creditor
    SETTLE FUNDING, LLC

6

7

8                   UNITED STATES BANKRUPTCY COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                       LOS ANGELES DIVISION

11

12  | In re | Case No. 2:25-BK-18374-br |
13  | CIS International Holdings (N.A.) Corporation, | Chapter 7 |
14  | Debtor | Hon. Barry Russell |
15  |  | **LENDER'S OBJECTION, OBJECTION TO PANTHERS CAPITAL'S MOTION TO RECONSIDER** |
16  |  |  |
17  |  | Date:      December 16, 2025 |
18  |  | Time:      10:00 a.m. |

19

20          **OBJECTION TO PANTHERS CAPITAL'S MOTION TO RECONSIDER**

21

22          Lender and secured creditor Settle Funding, LLC ("**Settle**"), as secured lender to debtor CIS

23  International Holdings (N.A.) Corporation d/b/a Tropical Fish ("**Debtor**"), through counsel, files this

24  *Objection* (the "**Objection**") to *Panthers Capital LLC's Motion to Reconsider Order Approving*

25  *Stipulation Between Debtor and Petco for Turnover* [DN 100] (the "**Motion**"),[1] and states as follows:

26

27

28  ---
    [1]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

## INTRODUCTION

Panthers Capital LLC ("**Panthers**") urges this Court to vacate its prior order and compel the disbursement of certain funds directly to Panthers. Panthers makes this request despite being subject to Settle's senior interest in those funds, which it omits from the Motion. Accordingly, Panthers' Motion should be denied and such funds should either be remitted directly to Settle or held for further adjudication of the competing claims therein. In no case, however, should any funds be disbursed directly to Panthers.

## BACKGROUND

### I.  Settle's Loans to Debtor

Debtor and Settle are parties to numerous Business Loan and Security Agreements (the "**Agreements**"), pursuant to which Settle loaned money to Debtor (the "**Loans**"). Debtor and Settle entered into the first of these Agreements on or about April 16, 2024, and executed a series of Agreements thereafter.[2]

Under the Loans, Settle lent Debtor millions of dollars. As of September 22, 2025 (the "**Petition Date**"), Debtor owed Settle no less than $2,799,928.57.

Pursuant to the Agreements, Debtor granted Settle a security interest in substantially all of Debtor's assets, including all of its accounts receivable and cash collateral. Agreements, § 9.

Settle filed a UCC-1 financing statement with the California Secretary of State on April 17, 2024, at Filing Number U240034230118 (the "**Settle UCC-1**"), thereby perfecting its security interests in substantially all of Debtor's assets.

Thereafter, Debtor defaulted on its obligations under the terms of the Agreements, including by failing to make certain payments when due. As a result, on October 15, 2024, Settle sent Debtor a notice of default and demand for payment (the "**Notice of Default**"), notifying Debtor of its numerous defaults under the Agreements and demanding payment in full of all amounts outstanding thereunder. Debtor failed to cure these defaults, which remain outstanding. A copy of the Notice of Default is attached hereto as **Exhibit B**.

---

[2]  The Agreements are voluminous in nature, so Settle has only attached one Agreement as an example, attached hereto as **Exhibit A**. The other Agreements are substantially similar.

## II.    Debtor's Transactions with Panthers

Several weeks after Settle issued the Notice of Default to Debtor, Debtor and Panthers purportedly entered into a Factoring Facility Agreement, dated December 1, 2024 (the "**Factoring Agreement**"). Pursuant to the Factoring Agreement, Panthers purportedly agreed to purchase certain accounts receivable of Debtor and the proceeds thereof. Motion, ¶¶ 1 and 3. However, these assets were already subject to the prior perfected security interest of Settle.

On November 18, 2024 – approximately two weeks before entering into the Factoring Agreement – Panthers purportedly filed a UCC-1 financing statement in connection with its security interest in Debtor's future receivables. *Id*., ¶ 11.

Further, Panthers asserts that it entered into a Three-Party Addendum to Factoring Facility Agreement (the "**Three-Party Agreement**") with Debtor and Petco Animal Supplies Stores, Inc. ("**Petco**"). Pursuant to the Three-Party Agreement, all Petco accounts receivable owed to Debtor (the "**Petco A/R**") would be paid to Panthers. *Id*., ¶ 6.

Upon information and belief, Panthers received approximately $6.6 million in Petco A/R from December 2024 to July 2025.

## III.    Panthers' Termination of UCC-1 Financing Statements

Panthers asserts that Petco requested that Panthers satisfy the claims of Debtor's creditors. As a result, Panthers purportedly caused the termination of numerous UCC-1 financing statements of third parties. *Id*., ¶ 8. This includes the termination of the Settle UCC-1. Panthers asserts that in April 2025 it flagged the Settle UCC-1 to Debtor. This occurred approximately one year after it was filed and approximately five months after Panthers entered into the Factoring Agreement. After Panthers flagged the Settle UCC-1 to Debtor, Debtor terminated the Settle UCC-1. *Id*., ¶¶ 12-13. Upon information and belief, Panthers may have assisted Debtor in terminating the Settle UCC-1.

Settle never authorized the termination of the Settle UCC-1 and the Loans remain outstanding. As a result, Settle filed a UCC-5 Information Statement to remedy the improper termination of the Settle UCC-1.

## IV.    Debtor's Bankruptcy and the Petco Stipulation

On the Petition Date, Debtor commenced a voluntary case under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Central District of California, thereby commencing this case.

On October 3, 2025, Debtor and Petco entered into a *Stipulation for Turnover (11 U.S.C. § 542)* [DN 15] (the "**Petco Stipulation**"). Pursuant to the Petco Stipulation, Petco would remit all Petco A/R to Debtor (after application of certain credits and recoupments). On October 7, 2025, this Court entered its *Order Approving the Petco Stipulation* [DN 22] (the "**Petco Stipulation Order**"), and Petco then remitted approximately $700,000 to Debtor on account of outstanding Petco A/R.

Shortly thereafter, this Court entered its *Order Converting Case to Chapter 7* [DN 80], thereby converting the case to a chapter 7 proceeding.

Thereafter, on November 6, 2025, Panthers filed the Motion, thereby seeking reconsideration of the Petco Stipulation Order.

Upon information and belief, Petco has offered to remit the Petco A/R to the chapter 7 trustee, who is willing to hold the Petco A/R in a segregated account for final adjudication of the relative rights and priorities therein. Panthers has repeatedly rejected these offers.

## ARGUMENT

Panthers repeatedly claims that the Petco Stipulation was rife with material omissions, intended to conceal from this Court Panthers' interests in the Petco A/R and rights under the Three-Party Agreement. However, the Motion has the same effect, except with respect to Settle's rights. Whether Panthers owns the Petco A/R or has a security interest in the Petco A/R, the result is the same: Settle is senior to Panthers. As a result, any Petco A/R should, if anything, be paid to Settle or, at the very least, held in trust pending final determination of the respective rights therein.[3] In fact, the Three-Party Agreement also requires this result. However, Panthers omits these facts from the Motion.

### I.    Any Payment of the Petco A/R Should Be Made to Settle

Panthers not only seeks that this Court vacate the Petco Stipulation Order, it asserts that it should receive all Petco A/R and requests that this Court direct Petco to pay to Panthers all remaining Petco A/R. Motion, p. 17. This exceeds the rights that Panthers has in the Petco A/R.

---

[3]    It is unclear if any other parties assert an interest in the Petco A/R.

4

Settle filed the Settle UCC-1 on April 17, 2024. Panthers filed its UCC-1 financing statement on November 18, 2024, approximately seven months later. As a result, Panthers was on constructive notice of Settle's interest in the Petco A/R (and all of Debtor's other assets). Further, any lender would be expected to run a UCC search on its borrower prior to loaning them money (or purchasing its assets). As such, Panthers likely had *actual* notice of the Settle UCC-1 well before it flagged the Settle UCC-1 to Debtor in April 2025. Taken together, it is clear that Settle is senior to Panthers in the Petco A/R. Despite having actual or constructive knowledge of this, Panthers entered into the Factoring Agreement, agreeing to either be a junior lender on Debtor's receivables or purchasing those receivables subject to Settle's security interests.

In any event, Panthers is not entitled to receive the Petco A/R. If Panthers purchased the Petco A/R from Debtor, it did so subject to Settle's senior security interest. Given that the Loans secured by this security interest are in default, the Petco A/R must be paid to Settle until the Loans are paid in full. If Panthers received a security interest in the Petco A/R, the security interest is junior to Settle's security interest. As such, Panthers cannot receive any Petco A/R until Settle is paid in full. In either event, the outcome is the same: Settle, not Panthers, must receive the Petco A/R.

In connection therewith, Settle understands that Panthers received approximately $6.6 million in Petco A/R between December 2024 and July 2025, notwithstanding Settle's senior interest. While Settle is not requesting that this Court adjudicate this issue, it further shows Panthers' cavalier disregard for the interests and existence of senior lenders.[4]

## II.    The Three-Party Agreement Authorizes Petco Not to Pay Panthers

Despite knowing that it was junior to Settle in the Petco A/R, Panthers entered into the Three-Party Agreement. Pursuant to the Three-Party Agreement, Petco agreed to pay all Petco A/R to Panthers. Presumably, Panthers did not disclose to Petco that the Petco A/R was subject to the senior interests of Settle (as well as numerous other creditors, as described in Exhibits C-R of the Isaacov Declaration) and did not notify Settle of the Three-Party Agreement.

---

[4]    While Debtor is not absolved for these improper payments, Debtor made clear during the 341 meeting of the creditors that it felt it had no other choice but to appease Panthers in order to continue receiving funding.

However, Panthers must have expected that senior claimants may make demands on Petco for the Petco A/R because it built a mechanism into the Three-Party Agreement for addressing senior claims.

Specifically, Section 2 of the Three-Party Agreement provides that: (i) if Petco receives a demand from a secured party (other than Kash Advance LLC or Launch Funding Group LLC); (ii) the demand relates to the payment of Petco A/R; and (iii) the demanding party filed a UCC-1 financing statement prior to November 18, 2024 (collectively, an "**A/R Demand**"), then Petco shall be entitled to hold back such Petco A/R and shall not be obligated to pay Panthers such held back amounts. Three-Party Agreement, ¶ 2.

After receiving an A/R Demand, under the Three-Party Agreement Petco is only required to pay to Panthers such withheld Petco A/R if either: (i) Petco receives a final, non-appealable court order, issued in an action where the demanding party is a party, providing that Petco must pay to Panthers such Petco A/R; or (ii) Panthers agrees, in writing, that it will indemnify, defend, and hold Petco harmless from any claims by the demanding party. *Id*.

Petco has received demands for Petco A/R from Settle, including pursuant to that certain *Notice Pursuant to UCC 9-607 Regarding Payments*, dated August 19, 2025 (the "**Deflection Notice**"). A copy of the Deflection Notice is attached hereto as **Exhibit C**. In addition, the Settle UCC-1 was filed prior to November 18, 2024. As such, under the terms of the Three-Party Agreement, Petco is entitled to hold back the Petco A/R unless Panthers indemnifies Petco or provides Petco with a court order that compelling Petco to pay the Petco A/R to Panthers. Upon information and belief, Panthers has done neither. Therefore, not paying Panthers the Petco A/R is consistent with the terms of the Three-Party Agreement.

Panthers asserts that Debtor "misled the Court by deceitfully withholding the terms of the Three-Party Agreement". Panthers then describes the Three-Party Agreement as requiring Petco "to remit the Petco A/R directly to Panthers", without exception. Motion, p. 11. However, Panthers fails to mention that the Three-Party Agreement authorizes Petco to withhold payment of Petco A/R where, as here, a senior secured party has demanded it.

Similarly, Panthers argues that the Petco Stipulation Order improperly modifies "a three-party contract through a two-party stipulation". *Id*., p. 11. Yet, that is exactly what Panthers seeks to do to Settle.

Settle holds a senior interest in the Petco A/R and is not a party to the Three-Party Agreement (even though Panthers had prior notice of Settle's senior interest). Nonetheless, Panthers is relying on the Three-Party Agreement to set the rights of all parties with respect to the Petco A/R. In other words, Panthers is trying to use a three party contract to modify a fourth party's rights. While Panthers is bound by the Three-Party Agreement, Settle is not.

### III.        The Petco Stipulation Order Is Not Prejudicial

While Panthers makes numerous complaints about the Petco Stipulation and the Petco Stipulation Order, it is unable to illustrate how those are prejudicial.

The Petco Stipulation provides that the Petco A/R is to paid into the estate. As the case was converted to a chapter 7 proceeding, that account is now held by (or will be held by) the chapter 7 trustee.

The Petco Stipulation Order expressly reserves all of Debtor's, Panthers', and Petco's respective rights, claims, and defenses with respect to the Three-Party Agreement.

As a result of Settle's senior interest in the Petco A/R, Petco would otherwise be entitled under the Three-Party Agreement to withhold any payment of the Petco A/R to Panthers.

Therefore, with or without the Petco Stipulation Order, Panthers would not receive payment of the Petco A/R. If anything, the Petco Stipulation Order provides a benefit as it creates an opportunity for this Court to adjudicate the relative rights, interests, and priorities in the Petco A/R. This is particularly useful given past attempts to circumvent the rights and interests of senior parties in the Petco A/R. Nonetheless, Panthers continues to staunchly oppose such Court adjudication.

### CONCLUSION

Panthers' omits numerous material facts that doom its Motion. For example, Panthers fails to mention that Settle holds a senior interest in the Petco A/R and that the Three-Party Agreement authorizes Petco to withhold payment of the Petco A/R. These facts support the same conclusion: Panthers has no right to receive the Petco A/R.

However, Panthers seeks to ignore the rights of Settle and demands to be paid all outstanding Petco A/R. This is simply contrary to the priorities in the Petco A/R and the express terms of the Three-Party Agreement.

# EXHIBIT A

**OFFER SUMMARY - CLOSED-END BUSINESS LOAN**

| | | |
|---|---|---|
| Funding Provided | $15,976.12 | This is how much funding Settle Funding, LLC will provide. Due to deductions or disbursements made to others on Borrower's behalf, the total funds that will be provided to Borrower directly is $0. For more information on what amounts will be deducted, please review the attached document "Itemization of Amount Financed".* |
| Annual Percentage Rate (APR) | 17.642% | APR is the cost of financing expressed as a yearly rate. APR includes the amount and timing of the funding Borrower receives, fees Borrower pays and the payments Borrower makes.<br><br>The APR is not an interest rate. Borrower's interest rate is 17.642%. Borrower's APR may be higher than the interest rate because APR incorporates interest costs and other finance charges. |
| Finance Charge | $701.63 | This is the dollar cost of the financing. |
| Total Payment Amount | $16,677.75 | This is the total dollar amount of payments Borrower will make during the term of the contract. |
| Payment | $3,335.55 / 30 days | Borrower must make a payment of $3,335.55 every 30 days, with the first payment due 30 days after the Funding Date and each subsequent payment due every 30 days thereafter, with the final payment due 150 days after the Funding Date. |
| Term | 150 days | |
| Prepayment | If Borrower pays off the financing early, Borrower will still need to pay all or a portion of the finance charge, up to $701.63. | |
| | If Borrower pays off the financing early Borrower will not pay additional fees. | |

Applicable law requires this information to be provided to you to help you make an informed decision. By signing below, you are confirming that you received this information.

___Sam Samarasinghe____                    ___04/18/2024____

Recipient Signature                                     Date

*Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Business Loan and Security Agreement.

| ITEMIZATION OF AMOUNT FINANCED | |
|---|---|
| 1. Amount Given Directly to Borrower | $0 |
| 2. Amount Paid on Your Behalf to Tropical Fish International (Pvt) Ltd | $15,976.12 |
| 3. Amount Provided to You or on Your Behalf (1+2) | $15,976.12 |
| 4. Amount Financed | $15,976.12 |

### BUSINESS LOAN AND SECURITY AGREEMENT

| | |
|---|---|
| **Lender:** | **Borrower:** |
| Settle Funding, LLC | CIS International Holdings (N.A.) Corp. |
| 29 W 17th Street<br>2nd Floor<br>New York, NY 10011 | 1405 W 178th St<br>Gardena, CA 90248 |

| | |
|---|---|
| **Contract Date ("Effective Date"):** | **Loan Number:** 559396 |
| 04/18/2024 | |

This Business Loan and Security Agreement incorporates by reference the Disclosure Table (the **"Agreement"**). This Agreement is made as of the Effective Date by and among Lender and Borrower.

**BY ENTERING INTO THIS AGREEMENT, BORROWER VOLUNTARILY AGREES THAT BORROWER IS BOUND BY THE AGREEMENT TO ARBITRATE CONTAINED IN THE TERMS OF SERVICE, WHICH IS HEREBY INCORPORATED BY REFERENCE INTO THIS AGREEMENT AND BORROWER CAN ACCESS THE TERMS OF SERVICE INCLUDING THE AGREEMENT TO ARBITRATE LOCATED AT HTTPS://APP.SETTLE.CO/TERMS-OF-SERVICE. UNDER THE AGREEMENT TO ARBITRATE, LENDER CAN REQUIRE INDIVIDUAL (NOT CLASS) ARBITRATION OF ANY CLAIM BORROWER BRINGS AGAINST LENDER, AND BORROWER CAN REQUIRE ARBITRATION OF ANY CLAIM LENDER BRINGS AGAINST BORROWER.**

1. <u>Important Definitions.</u> The following terms have the meanings set forth in this Section 1. Other capitalized terms have the meanings set forth in the Disclosure Table or elsewhere in this Agreement.

    a. **"Authorized Representative"** means the person who applied for the Loan on behalf of Borrower and has authority to sign contracts and authorize payments on behalf of Borrower.

    b. **"Bank Account"** means any and all of Borrower's business purpose bank account(s) that Borrower has identified by providing bank information to Lender. As part of this Agreement, Borrower has provided the necessary bank account information and appropriate authorization for Lender to debit payments from the Bank Account as provided in this Agreement. In the event Borrower changes Borrower's bank account to a new or different business purpose bank account, or adds additional bank account(s), the term "Bank Account" includes this new, different, or additional bank account, and Borrower agrees to provide sufficient information about and hereby authorizes the Lender to debit payments from, the new, different, or additional bank account(s) along with other existing bank account(s), collectively referred to herein as the Bank Account.

    c. **"Business Day"** means Monday through Friday, excluding all U.S. federal holidays.

    d. **"Disclosure Table"** means the Offer Summary – Closed-End Business Loan.

    e. **"Finance Charge"** is the Finance Charge set forth in the Disclosure Table.

    f. **"Funding Date"** means the date Lender initiates disbursement of the Loan proceeds.

    g. **"Invoice"** means, to the extent Lender disburses funds directly to a Merchant, the invoice showing an amount owed by Borrower to a Merchant. The Invoice is submitted by Borrower to Lender in connection with this Agreement, and the amount owed on the Invoice may be an amount equal to or greater than the Disbursement Amount.

h.  **"Disbursement Amount"** means the amount Lender disburses to the Merchant in partial or full satisfaction of the Invoice.

i.  **"Itemization of Amount Financed"** means the disclosure captioned "Itemization of Amount Financed" attached to the Disclosure Table.

j.  **"Loan"** means the Loan evidenced by this Agreement.

k.  **"Maturity Date"** means the day when the final payment is due as disclosed in the Payment section of the Disclosure Table.

l.  **"Merchant"** means a third party person or organization to whom the Invoice was originally payable, as shown on the face of the Invoice, to be paid for goods, services rendered, or other business-purpose obligation.

m.  **"Notice Address"** means credit@settle.co, or such other email or physical address for notices as Lender may specify from time to time.

n.  **"Amount Financed"** means the Amount Financed set forth in the "Itemization of Amount Financed" attached to the Disclosure Table.

o.  **"Total Payment Amount"** means the Total Payment Amount set forth in the Disclosure Table.

p.  **"We,""us,""our"** and **"Lender"** each means or refers to Settle Funding, LLC and its successors or assigns, and includes any agent, servicer, or successor servicer duly authorized to act on Settle Funding, LLC's behalf in connection with this Agreement.

q.  **"You," "your"** and **"Borrower"** each means CIS International Holdings (N.A.) Corp..

2.  <u>Using Your Loan.</u> Borrower has applied for and Lender agrees to extend to Borrower a Loan on the terms described in this Agreement, subject to Borrower's compliance with the terms, conditions, and obligations of this Agreement. To the extent Lender disburse funds directly to a Merchant, Borrower promises that the Invoice evidences a business-purpose obligation Borrower incurred in making a transaction with Merchant. Borrower agrees that the Invoice does not evidence the purchase of securities.

3.  <u>Conditions Precedent; Funding Date; Cancellation.</u>

    a.  The following conditions must be satisfied before any obligation of the Lender hereunder becomes effective: (a) Borrower's representations and warranties herein are true and correct as of the Effective Date; and (b) Borrower is not currently in default on any other obligation to Lender as of the Funding Date.

    b.  The Lender shall be entitled to append to this Agreement a loan confirmation evidencing the Funding Date, and absent manifest error, such Funding Date shall be deemed to be the Funding Date for purposes of this Agreement.

    c.  In the event Borrower fails to satisfy any condition precedent including, but not limited to, those set forth in Sections 3 and 11, Lender may rescind the disbursement transaction. If Lender is unable to rescind the disbursement transaction, Borrower shall immediately pay the Disbursement Amount back to Lender upon request.

4. <u>Payment of Loan Proceeds on Borrower's Behalf.</u> As set forth in the Itemization of Amount Financed, Lender will disburse the Loan proceeds to Merchant (or at Merchant's direction) as payment toward the Invoice, subject to the terms herein, including, but not limited to, Sections 3 and 11. If Lender receives information that a payment should be made to a third party, Lender may in Lender's sole discretion (a) disburse the proceeds to such third party; (b) disburse the proceeds to the Merchant, (c) hold the proceeds until Lender has ascertained the proper party owed on the Invoice; or (d) cancel the Loan before disbursing any funds. If Lender cancels the Loan under this Section 4, Lender will refund any interest Borrower has incurred and Borrower will not be required to pay any additional amount.

5. <u>No Obligation Arising from Merchant Misconduct.</u> Lender does not assume any liability for Merchant misconduct, whether in connection with the Invoice, the related goods or services or otherwise.

6. <u>Agreement to Pay.</u> Borrower promises to pay Lender the Total Payment Amount set forth in the Disclosure Table by making the payments set forth in such Disclosure Table. For more information about interest charges following a failure to make a payment on time, notification to Lender that a payment will not be made on time, or in the event of another default, see the Deferral and Post-Default Interest section below.

   a. If Borrower pays the entire amount due under this Agreement early, Borrower will not have to pay a penalty, and will not be entitled to a rebate of any interest (except as may be required by law).

7. <u>Payment Authorization.</u>

   a. *Basic Authorization.* Borrower authorizes and directs Lender to initiate from a Bank Account on or after each payment date set forth in the Disclosure Table an Electronic Funds Transfer (**"EFT"**) for an amount up to or equal to the amount shown.

   b. *Resubmissions.* If any EFT is returned unpaid, Borrower agrees that Lender may re-initiate such EFT up to two (2) additional times at any time Lender deems appropriate, including but not limited to after acceleration of the Loan. Borrower remains responsible for making any payment that is returned unpaid.

   c. *Liability for Bank Charges.* Borrower is liable for any amounts Borrower's bank charges as a result of any EFT Lender initiates under this Payment Authorization. This includes charges in connection with EFTs Lender re-initiates in accordance with subsection (b).

   d. *Authorization to Correct Errors.* If Lender makes an error in processing any EFT, Borrower authorizes Lender to correct the error by initiating an electronic fund transfer to or from the Bank Account.

   e. *Compliance with Rules.* Borrower acknowledges that the origination of EFTs from a Bank Account may be subject to the operating rules and guidelines of the National Automated Clearing House Association (NACHA) or any other applicable payment network.

   f. *Stopping EFTs.* This Payment Authorization is irrevocable. Any attempt Borrower makes to revoke the Payment Authorization constitutes an Event of Default under this Agreement.

   g. *Additional Payments.* Except for any payments Lender initiates pursuant to this Payment Authorization, any payments Borrower makes must be made to Lender at an address or in a manner that Lender designates. All payments must be in U.S. dollars from a U.S. bank or depository institution. Borrower must not make payments using cash or coin. Borrower must include Borrower's Loan Number on any payment submitted by mail or payment that Borrower

initiates from Borrower's bank. Failure to include Borrower's Loan Number with Borrower's payment may delay or prevent the crediting of such payment. Payments that are not received by 5:00 p.m. ET on a Business Day at the address Lender designates will be considered received on the next Business Day.

8.  <u>Deferral and Post-Default Interest.</u> In the event Borrower fails to make a payment when due under this Agreement, or if Borrower notifies Lender that Borrower will not be able to make a payment when due, Borrower agrees that interest may accrue on the delinquent principal balance daily at an annual rate of 25% per year, or if less, the highest rate permitted by applicable law. In the event Lender accelerates the Loan pursuant to this Agreement, Borrower agrees that interest may accrue on the principal balance daily at an annual rate of 25% per year, or if less, the highest rate permitted by applicable law.

9.  <u>Security Agreement.</u>

    a.  Borrower hereby grants to Lender a continuing first priority security interest in all Collateral (as defined below), to secure payment and performance of all Borrower's debts, liabilities and obligations owed to Lender hereunder due or to become due, now existing or hereafter arising, and includes obligations to perform acts and refrain from taking action as well as obligations to pay money including, without limitation, all interest, other fees and expenses, and payment terms under this Agreement. As used herein, the term **"Collateral"** shall mean, collectively, all of the Borrower's right, title and interest in and to the following, wherever located, whether now existing or hereafter arising or acquired:

        i.  all accounts (including health-care-insurance receivables), goods, inventory, equipment (including such goods, inventory and equipment currently or hereafter held on consignment), documents (including, if applicable, electronic documents), fixtures, instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims, general intangibles (including all payment intangibles and intellectual property), money, deposit accounts, and any other contract rights or rights to the payment of money; and

        ii. all proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Borrower from time to time with respect to any of the foregoing.

    b.  Borrower agrees that Lender may file any financing statement, lien entry form or other document Lender requires in order to perfect, amend or continue Lender's security interest in the Collateral and Borrower agrees to cooperate with Lender as may be necessary to accomplish such filing and whatever actions Lender deems necessary or appropriate to confirm and perfect the security interest in the Collateral.

10. <u>Survival of Representations and Warranties.</u> All representations and warranties by Borrower set forth in this Agreement shall survive the execution and delivery of this Agreement.

11. <u>Representations, Warranties, and Covenants.</u> Borrower represents, warrants, and covenants as of the date hereof and every day during the term of this Agreement that:

    a.  Borrower's Authorized Representative was and is duly authorized to apply for the Loan and to bind Borrower to this Agreement.

b.  Borrower is duly organized as a corporate or limited liability company, validly existing and in good standing under the laws of the jurisdiction of its organization and any such jurisdiction where it operates (as applicable) and is fully authorized to enter into this Agreement and to perform Borrower's obligations hereunder, and this Agreement constitutes Borrower's legal, valid, and binding obligation.

c.  Without Lender's prior written consent, Borrower will not: (i) merge or consolidate with, or sell all or substantially all of Borrower's assets to, another person or entity (ii) change Borrower's place of business or organizational identification number, if any; (iii) change Borrower's type of organization, jurisdiction of organization or formation or other legal structure; (iv) change or amend Borrower's organizational documents; or (v) materially change the nature of Borrower's business from that disclosed to Lender in the loan application.

d.  All information provided by Borrower in connection with the Loan and Borrower's application for the Loan, including all information related to Borrower's business, the Collateral, financials, and the Invoice, is true and correct. There is no fact or circumstance that could adversely affect Borrower's business, assets or financial condition, Borrower's ability to perform Borrower's obligations under this Agreement, or the accuracy and completeness of Borrower's representations and warranties, that has not been disclosed in writing.

e.  This Agreement and the performance of Borrower's obligations hereunder do not violate: (a) any applicable law, regulation, or order from any governmental agency; (b) any charter, bylaws, or other organizational documents of the Borrower; or (c) any indenture, agreement, or other instrument binding upon the Borrower.

f.  Borrower has legal title to the Collateral and is authorized to pledge the Collateral to Lender.

g.  All Collateral is and will be free and clear of any and all liens, charges, attachments, or security interests, defenses, disputes, offsets, counterclaims, or rights of return or cancellation (except hereunder, and any others as disclosed to Lender by Borrower at the time of funding). Borrower has not transferred, assigned, pledged or granted a security interest, and there are no financing statements now or soon to be on file in any public office relating to any Collateral in which Borrower is named or has signed as the debtor, except for any financing statements in connection with this Agreement (except to Lender, and any others as disclosed to Lender by Borrower at the time of funding) and will not do so during the term of this Agreement without prior written consent from Lender.

h.  To the extent Lender disburses funds directly to a Merchant, Borrower is not an affiliate, agent or contractor of Merchant or any other third party owed money in connection with the Invoice.

i.  Borrower is solvent and has the ability to pay Borrower's debts as they become due. Borrower is not entering into this Agreement with the intention to hinder or impair any of Borrower's creditors.

j.  To the extent Lender disburses funds directly to a Merchant, Borrower has not entered into any financing transaction with any Merchant or other third party based on Borrower's transactions with Merchant or the Invoice.

k.  The goods and services Borrower has sold or subsequently sells complies and will comply with all applicable laws, regulations, contracts and commercial standards applicable thereto.

l.  To the extent Lender disburses funds directly to a Merchant, Borrower is not, has not been and will not be, subject to any dispute alleging fraudulent conduct on Borrower's part with Merchant or any other third party.

m.  To the extent Lender disburses funds directly to a Merchant, Borrower does not, and will not, dispute the validity of the Invoice or any part of the balance of the Invoice, and agrees that Borrower owes the Merchant the Disbursement Amount.

n.  Borrower will comply with the Settle Terms of Service located at https://app.settle.co/terms-of-service.

o.  To the extent Lender disburses funds directly to a Merchant, all information provided by Borrower in connection with the Merchant, Merchant's bank information, and any other payment details of Merchant are valid, true, and correct.

p.  There is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against or affecting Borrower or any of Borrower's assets which, if determined adversely, could have a material adverse effect on Borrower's financial condition, business or prospects or Borrower's ability to perform Borrower's obligations under this Agreement. If any such action, suit, proceeding or investigation commences or is threatened, Borrower shall promptly, but no later than five (5) business days, notify Lender in writing.

q.  Borrower will pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all of Borrower's material obligations of whatever nature, including without limitation all amounts as are or may be due under this Agreement, or any other agreement for indebtedness originated by Lender or any of Lender's affiliates.

r.  Borrower agrees to maintain any active bank connections and/or accounting platform connections with the Settle platform. Promptly upon, but in any event no longer than ten (10) days, after Lender's request, Borrower will provide Lender with such information about Borrower's financial condition and operations as Lender may from time to time request (for example, bank statements, financial statements or tax returns).

s.  Promptly upon becoming aware of any event of default or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an event of default, Borrower will provide notice thereof to Lender in writing.

t.  To the extent Lender disburses funds directly to a Merchant, promptly upon Borrower's receipt or other notice of any information impacting the Invoice in any way, Borrower will provide notice of that information to Lender in writing. This obligation includes, but is not limited to, any notice that the Invoice is owned by a party other than the Merchant. This requirement does not create or imply that any third party has any rights to receive any money from Lender.

u.  Borrower owns, or is licensed to use, all trademarks, trade names, copyrights, patents, and other intellectual property material to its business, and the use thereof by the Borrower does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected.

12.  Default. Subject to applicable law, Lender may declare Borrower to be in default under this Agreement if any one or more of the following events occurs: (a) any statement or information provided by Borrower in connection with this Agreement shall prove to have been materially inaccurate, false, misleading or incomplete when made; (b) Borrower shall fail to timely make any required payment when due, notifies Lender that Borrower will not be able to make a payment when due, fails to have on deposit in the Bank Account funds sufficient to make any required payment when due, or any EFT Lender initiates in accordance with the terms of this Agreement is dishonored, including but not limited to, any stop payment instruction provided to Borrower's Bank by Borrower;

(c) Borrower shall fail to fully and timely observe, perform or comply with any of the terms, conditions, provisions or obligations of this Agreement, including without limitation, the obligation to execute or deliver any document required under this Agreement; (d) Borrower shall terminate, attempt to terminate or fail to keep in place the Payment Authorization; (e) Borrower, the Authorized Representative or any owner of at least twenty percent (20%) of Borrower's equity shall die, dissolve, be declared incompetent or have Borrower's or its existence terminated; (f) Lender shall be unable to perfect Lender's security interest in any Collateral and/or Lender is unable to obtain a first priority security interest in any Collateral; (g) Borrower shall suffer an event of insolvency or bankruptcy or become the subject of a bankruptcy or similar proceeding; (h) Borrower shall fail to make any payment on any indebtedness when due; (i) Borrower shall suffer a material adverse change in financial condition; (j) Borrower breaches any term or condition of this Agreement; or (k) Borrower is in default of any other agreement for indebtedness originated by Lender or any of Lender's affiliates.

13. <u>Remedies Upon Default.</u> Upon any default, Lender may take one or more of the following actions, subject to applicable law (including any applicable notice requirement and/or right to cure) and subject to the Agreement to Arbitrate: (a) declare all, or any portion of, the total outstanding balance to be immediately due and payable (without any rebate of interest); (b) commence an action or arbitration proceeding against Borrower to collect amounts owed in connection with this Agreement; (c) charge deferral and/or post-default interest in accordance with this Agreement; (d) exercise any and all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time; (e) without notice or bond, obtain an immediate appointment of a receiver for all or part of the Collateral, whether such receivership is incidental to the proposed sale of the Collateral, pursuant to the Uniform Commercial Code or otherwise; and/or (f) exercise any other right and remedy available under applicable law, in equity or otherwise.

14. <u>Power of Attorney.</u> The Lender is hereby granted an irrevocable power of attorney, which is coupled with an interest, to, during the existence and continuance of any default, (a) execute all instruments, instructions or other documents, agreements or items on behalf of Borrower, as shall be deemed by the Lender to be necessary or advisable to protect the security interests and liens herein granted or the repayment of the Agreement; and (b) execute, deliver and perfect all documents and do all things that the Lender considers to be required or desirable to carry out the terms set forth in this Agreement, and the Lender shall not incur any liability in connection with or arising from the exercise of such power of attorney, except as a result of its own gross negligence or willful misconduct.

15. <u>Indemnification.</u> The Borrower shall indemnify the Lender, its affiliates, and its and their officers, directors, members, managers, agents, attorneys, and employees (each a **"Related Party"**, and together with Lender, **"Indemnitee"**) against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of counsel), incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Borrower) arising out of, in connection with, or as a result of or relating to (i) this Agreement or the transactions contemplated hereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower, and regardless of whether any Indemnitee is a party thereto.

16. <u>Attorney's Fees and Collection Costs.</u> Subject to applicable law and any limits specified elsewhere herein, in the event Lender obtains a judgment against Borrower after an event of default involving a payment delinquency of at least ten days, Borrower agrees to pay the reasonable attorney's fees of an attorney who is not Lender's employee, court costs, and fees and costs of a third party collection agency, as incurred in the collection or enforcement of this Agreement.

17. <u>Assignment.</u> Lender may transfer or assign this Agreement and/or any of Lender's rights or obligations, and such transfer or assignment shall not result in any changes to Borrower's rights and obligations under this Agreement.

18.   Entire Agreement. This Agreement constitutes the entire agreement of the parties relating to the Loan. This Agreement replaces any earlier contract of a similar nature. No oral modification is valid. The terms of this Agreement may not be waived, modified, altered, or amended except by agreement in writing signed by all the parties hereto.

19.   Notices. Any notice to Lender must be sent via email to the Notice Address and must include Borrower's name, Loan Number, mailing address, email address and telephone number. Lender may send notices to any address (including physical and email addresses) Lender has on file. Any or all communications to Borrower may be provided electronically.

20.   Credit Report Authorization. Borrower authorizes Lender to make inquiries concerning Borrower's credit history and standing, including but not limited to obtaining business credit reports from Dun & Bradstreet or other third parties from time to time both before, during and after this transaction. Lender may report information about Borrower's performance under this Agreement to other parties.

21.   Payment of Disputed Balance. If Borrower wishes to make payment in satisfaction of a disputed balance or any check or other payment marked "payment in full" or with similar language, Borrower must send it to Lender at 29 West 17th Street, 5th Floor, New York, New York 10011, Attn: Disputed Balance, together with a letter of explanation. Lender may deposit any such payment without such deposit constituting a satisfaction of the disputed balance.

22.   Bankruptcy. Borrower promises that Borrower is not contemplating bankruptcy and has not consulted with an attorney regarding bankruptcy in the past six months. Any communication with Lender required or permitted under the Federal Bankruptcy Code must be emailed to Lender at the Notice Address, with a Subject Line: Bankruptcy Notice.

23.   Governing Law; Venue. Borrower and Lender agree that this Agreement is made, accepted, and performed in New York, as such this Agreement and all transactions it contemplates shall be governed by the laws of the State of New York without regard to its conflict of law principles, except as provided in the Agreement to Arbitrate. Subject to the Agreement to Arbitrate, to the fullest extent permitted by law, for all matters arising out of, in connection with or relating to this Agreement, including, without limitation, its validity, interpretation, construction, performance and enforcement, the Parties agree that the state or federal courts located in New York County, New York shall be the exclusive venue for all claims filed in court. No claim may be brought in any other jurisdiction except as necessary to enforce a security interest or judgment obtained in the State of New York or as provided in the Agreement to Arbitrate. The Parties hereby waive any objection to the in personam jurisdiction and venue in the courts of New York County, New York and consent to the jurisdiction of the courts of New York County, New York. NO CLAIM FILED IN COURT WILL BE HEARD BY A JURY AND ANY CLAIM WILL TAKE PLACE ON AN INDIVIDUAL BASIS; CLASS ACTIONS ARE NOT PERMITTED. NO COURT MAY ORDER, PERMIT OR CERTIFY A CLASS ACTION, REPRESENTATIVE ACTION, PRIVATE ATTORNEY-GENERAL LITIGATION OR CONSOLIDATED ACTION. NO COURT MAY ORDER OR PERMIT A JOINDER OF PARTIES, UNLESS ALL PARTIES CONSENT TO SUCH JOINDER IN WRITING.

24.   Miscellaneous.

   a.   *Severability*. Subject to the differing rule concerning arbitration set forth in the Agreement to Arbitrate, any provision of this Agreement that is found to be invalid under applicable law shall be invalid only with respect to the offending provision and only to the extent of the invalidity. However, notwithstanding any provision of this Agreement to the contrary, if any law applicable to this Agreement is finally interpreted so that the interest or other fees and charges collected or to be collected in connection with this Agreement exceed the legally permitted limit, then any such interest, fee or charge shall be reduced by the amount necessary to comply with the

maximum permitted limit and any amounts above such limit already collected will be credited or refunded to Borrower.

b.   *Singulars and Plurals.* Singular words shall be construed in the plural, and plural in the singular, as their context may require, or as required to give effect to the terms of this Agreement.

c.   *Electronic Execution.* This Agreement may be executed electronically or manually. If executed manually, this Agreement may be executed in counterparts, which will together constitute a single agreement. Any copy of this Agreement (including a copy printed from an image of this Agreement that has been stored electronically) may be introduced into evidence in any legal proceeding.

d.   *Delay in Enforcement.* Lender may at any time and in Lender's sole discretion delay or waive enforcing any of Lender's rights or remedies under this Agreement or under applicable law without losing any of those or any other rights or remedies. Even if Lender does not enforce Lender's rights or remedies at any one time, Lender may enforce them at a later date, and any delay in enforcing such right or remedy shall not constitute a waiver of such right or remedy.

e.   *Section Headings.* The section headings used in this Agreement are for convenience of reference only and do not in any way limit or define Borrower or Lender's rights or obligations hereunder.

f.   *Formal Requirements to Collect Debt.* Borrower agrees that Lender is not obligated to: (i) make a formal demand for payment under this Agreement; (ii) provide formal notice that any amount due under this Agreement has not been paid; and/or (iii) provide a certification that any amount due under this Agreement was not paid by the due date. To the extent permitted by applicable law, Borrower agrees that, in any collection proceeding by Lender, unless Borrower provides affirmative evidence, sufficient to the finder of fact, that Lender's business records are incorrect, the records Lender maintain in the ordinary course of business, including monthly statements and/or summaries of information in Lender's computer records, certified by any custodian of Lender's records as accurate reflections of statements or information in Lender's business records, provide adequate proof of the amounts due hereunder.

g.   All covenants, representations, and warranties made by the Borrower herein or in connection herewith shall survive the execution and delivery of this Agreement and the making of any Loans, regardless of any investigation made by any party and notwithstanding that the Lender or any related party had notice or knowledge of any default or incorrect representation or warranty at the time the Loan is made, and shall continue in full force and effect so long as the Loan or other amount payable under this Agreement is outstanding. The provisions of Sections 15 (Indemnification), 23 (Governing Law; Venue), and the Agreement toArbitrate shall survive and remain in full force and effect regardless of the repayment of the Loans or the termination of this Agreement.

**The undersigned Borrower acknowledges receipt of this Agreement and agrees to be bound by all of the terms of this Agreement, including the Disclosure Table and the Agreement to Arbitrate.**

**CIS International Holdings (N.A.) Corp.**

**By: /s/ ___Sam Samarasinghe____        04/18/2024**

**Authorized Representative of Borrower**

**APPENDIX A**

**BUSINESS LOAN AND SECURITY AGREEMENT**

**LOAN CONFIRMATION**

**Lender:**

Settle Funding, LLC

29 W 17th Street
2nd Floor
New York, NY 10011

**Borrower:**

CIS International Holdings (N.A.) Corp.

1405 W 178th St
Gardena, CA 90248

**Contract Date ("Effective Date"):**
04/18/2024

**Loan Number:** 559396

| | |
|---|---|
| **Term:** | Lender initiated disbursement of the Disbursement Amount on 04/18/2024 (the "**Funding Date**"). The Business Loan and Security Agreement has a term of 150 days from the Funding Date. |
| **Payments:** | Borrower must make a payment of $3,335.55 every 30 days, with the first payment due on 05/18/2024, and each subsequent payment due every 30 days thereafter, with the final payment due on 09/15/2024 150 days after the Funding Date. |

# EXHIBIT B

October 15, 2024

CIS International Holdings (N.A.) Corp.
Sam Samarasinghe
1405 W 178th St.
Gardena CA 90248

**Re: Notice of Default and Demand for Payment**

Dear CIS International Holdings (N.A.) Corp.,

We are contacting you regarding various transactions between CIS International Holdings (N.A.) Corp. ("**Borrower**" or "**you**") and Settle Funding, LLC (including predecessors, successors and assigns, individually and collectively "**Settle**") listed in Exhibit A (the "**Agreements**"). Borrower is in default under the Agreements due to the failure to make payments when due.  Consequently, **Settle hereby notifies you that all amounts owed under the Agreements are immediately due and owing.** Pursuant to the arbitration provisions of the Agreements, we advise Borrower that this is a Claim asserted by Settle in regard to Borrower's Default under the Agreements.  Capitalized terms used but not defined herein are given the meanings attributed to them in the Agreements.

As of the date of this letter, the outstanding balance of the debt due and owing to Settle by Borrower under the Agreements is $2,719,077.84, plus interest, fees, costs, and other expenses, which may accrue or continue to accrue (the "**Debt Owed**").

**In accordance with the terms of the Agreements, Settle demands the immediate payment of the Debt Owed.  Settle hereby notifies you that failure to pay the Debt Owed by Friday, October 18, 2024 may result in (1) Settle exercising all rights and remedies under the default provisions of the Agreements, and/or (2) Settle taking any and all steps to collect the debt as provided for by law.**

As a Secured Party under Article 9 of the Uniform Commercial Code (UCC), Settle is entitled to exercise its rights pursuant to Section 9-406 of the UCC. This provides the authority to send Deflection Notifications to all relevant parties, including all payers on your account receivables, instructing that account receivable funds be directly remitted to Settle until the outstanding balance is paid in full.

Any acceptance, or prior acceptance, by Settle of a partial payment shall not constitute a waiver of any of the rights and remedies available to Settle. Neither this notice nor any discussions by Settle with you, or your representatives, constitutes:  (a) Settle's waiver of any default(s) by you under the Agreements whether or not referred to in any prior notice(s) of default(s); (b) Settle's sole election of remedy with respect to any such default(s), and Settle

reserves all rights and remedies under the law and under the Agreements; (c) a waiver, modification, relinquishment, or forbearance by Settle of any right or remedy under the Agreements or under law, all of which Settle reserves; or (d) a modification of any of the Agreements. Settle hereby reserves all rights and remedies under the Agreements and under applicable laws in equity, in connection with the foregoing default, and further reserves all rights and remedies with respect to any other defaults now or hereafter in existence, whether known or unknown.

Please contact us on or before the close of business on Friday, October 18, 2024 at credit@settle.co to make arrangements for payment.


Sincerely,


**SETTLE**

29 West 17th Street
5th Floor
New York, NY 10011

# EXHIBIT A

## Transaction Documents

| Invoice Number | Original Principal Amount | EPT Fees Balance Owed | Total Outstanding Balance Due | Maturity Date |
|---|---|---|---|---|
| Loan_Payoff | $1,517,859.94 | $8,261.66 | $528,850.15 | 12/12/2024 |
| 1019 | $19,661.24 | $105.77 | $4,152.05 | 11/10/2024 |
| 998 | $21,725.50 | $116.85 | $4,587.98 | 11/10/2024 |
| 1024 | $16,727.74 | $40.09 | $3,482.67 | 11/10/2024 |
| 1021 | $18,904.46 | $101.67 | $3,992.23 | 11/10/2024 |
| 1020 | $6,181.82 | $33.25 | $1,305.47 | 11/10/2024 |
| 996 | $19,675.23 | $105.85 | $4,155.01 | 11/10/2024 |
| 994 | $23,279.15 | $125.23 | $4,916.08 | 11/10/2024 |
| 1018 | $23,059.67 | $124.03 | $4,869.73 | 11/10/2024 |
| 1025 | $15,808.16 | $82.80 | $3,336.13 | 11/11/2024 |
| PInv-21-24 | $5,000.00 | $26.16 | $1,055.18 | 11/11/2024 |
| 1026 | $25,162.58 | $131.83 | $5,310.28 | 11/11/2024 |
| 5 | $5,875.00 | $29.93 | $1,239.02 | 11/12/2024 |
| 1017 | $15,831.89 | $80.69 | $3,338.91 | 11/12/2024 |
| 1007 | $23,373.69 | $119.17 | $4,929.46 | 11/12/2024 |
| 1016 | $15,101.14 | $76.94 | $3,184.79 | 11/12/2024 |
| 10 | $5,870.00 | $29.88 | $1,237.96 | 11/12/2024 |
| 1010 | $6,408.38 | $32.66 | $1,351.51 | 11/12/2024 |
| 1006 | $5,561.89 | $28.35 | $1,172.99 | 11/12/2024 |
| 5165 | $5,760.00 | $29.36 | $1,214.77 | 11/12/2024 |
| 1013 | $6,914.16 | $35.23 | $1,458.18 | 11/12/2024 |
| CaseNo.2024CV0075 | $6,000.00 | $30.59 | $1,265.39 | 11/12/2024 |

| | | | |
|---|---|---|---|
| 00005165OCTNOVDEC2023 | $5,026.25 | $24.88 | $1,059.31 | 11/13/2024 |
| 1022 | $12,238.38 | $53.76 | $2,572.42 | 11/17/2024 |
| CISINTL01.15.24 | $19,400.00 | $85.19 | $4,077.74 | 11/17/2024 |
| CISINTL01.22.24 | $21,330.00 | $93.70 | $4,483.42 | 11/17/2024 |
| Invoice_05.03.24 | $5,500.89 | $24.13 | $1,156.24 | 11/17/2024 |
| 1023 | $21,256.73 | $93.37 | $4,468.01 | 11/17/2024 |
| 105484 | $5,000.57 | $21.94 | $1,051.08 | 11/17/2024 |
| 29-Apr-2024 | $5,731.34 | $25.14 | $1,204.68 | 11/17/2024 |
| CISINTL01.08.24 | $21,855.00 | $96.01 | $4,593.77 | 11/17/2024 |
| 1011 | $24,634.98 | $104.72 | $5,174.62 | 11/18/2024 |
| 1015 | $8,063.44 | $34.28 | $1,693.74 | 11/18/2024 |
| 1014 | $23,917.05 | $101.68 | $5,023.82 | 11/18/2024 |
| 1012 | $20,571.22 | $87.48 | $4,321.03 | 11/18/2024 |
| CIS2024/02-01 | $24,998.00 | $106.25 | $5,250.87 | 11/18/2024 |
| TGSL-PSIV-2404-020 | $13,092.23 | $55.66 | $2,750.05 | 11/18/2024 |
| CIS2024/02-02 | $24,998.00 | $106.25 | $5,250.87 | 11/18/2024 |
| 1009 | $16,043.77 | $68.21 | $3,370.03 | 11/18/2024 |
| CIS2024/02-03 | $24,998.00 | $106.25 | $5,250.87 | 11/18/2024 |
| Acct#072329-1405W178 | $5,000.00 | $21.23 | $1,050.25 | 11/18/2024 |
| CIS2024/03-04 | $24,998.00 | $7.05 | $5,151.67 | 11/25/2024 |
| CIS2024/04-03 | $24,998.00 | $7.05 | $5,151.67 | 11/25/2024 |
| CIS2024/02-04 | $24,998.00 | $7.05 | $5,151.67 | 11/25/2024 |
| CIS2024/03-03 | $24,998.00 | $7.05 | $5,151.67 | 11/25/2024 |
| CIS2024/04-01 | $24,998.00 | $7.05 | $5,151.67 | 11/25/2024 |
| CIS2024/03-01 | $24,998.00 | $7.05 | $5,151.67 | 11/25/2024 |
| CIS2024/03-02 | $24,998.00 | $7.05 | $5,151.67 | 11/25/2024 |
| CIS2024/04-02 | $24,998.00 | $7.05 | $5,151.67 | 11/25/2024 |
| 100081 | $5,367.57 | $69.37 | $2,262.90 | 12/2/2024 |
| 1032 | $25,959.24 | $335.47 | $10,943.91 | 12/2/2024 |
| 1027 | $23,937.59 | $309.35 | $10,091.64 | 12/2/2024 |
| 1033 | $25,887.65 | $334.55 | $10,913.74 | 12/2/2024 |
| 6 | $11,740.00 | $148.43 | $4,946.09 | 12/3/2024 |
| 1030 | $24,602.66 | $269.73 | $10,323.82 | 12/9/2024 |
| 1034 | $5,172.86 | $56.71 | $2,170.66 | 12/9/2024 |
| CISINTL01.29.24 | $32,000.00 | $341.89 | $13,418.93 | 12/10/2024 |

| | | | | |
|---|---|---|---|---|
| 1028 | $5,060.71 | $51.24 | $2,119.34 | 12/12/2024 |
| 7 | $11,109.20 | $112.48 | $4,652.36 | 12/12/2024 |
| 1035 | $12,182.20 | $123.34 | $5,101.69 | 12/12/2024 |
| CIS2024/04-04 | $13,998.88 | $122.13 | $5,842.89 | 12/17/2024 |
| 1035 | $8,821.59 | $76.96 | $3,681.97 | 12/17/2024 |
| CISINTL02.05.24 | $36,200.00 | $50.66 | $14,844.06 | 12/22/2024 |
| CISINTL02.12.24 | $38,865.00 | $21.76 | $15,904.23 | 12/25/2024 |
| CISINTL03.04.24 | $31,943.00 | $176.66 | $13,230.40 | 11/14/2024 |
| CISINTL02.19.24 | $24,568.00 | $135.87 | $10,175.78 | 11/14/2024 |
| CISINTL02.26.24 | $28,489.00 | $157.56 | $11,799.80 | 11/14/2024 |
| 7 | $5,832.33 | $31.10 | $2,414.54 | 11/15/2024 |
| CIS2024/04-05 | $24,998.00 | $133.32 | $10,348.97 | 11/15/2024 |
| 1036 | $23,747.21 | $126.65 | $9,831.14 | 11/15/2024 |
| CIS2024/04-04 | $10,999.12 | $58.66 | $4,553.55 | 11/15/2024 |
| CISINTL03.11.24 | $35,000.00 | $364.75 | $21,666.31 | 1/1/2025 |
| CIS2024/05-01 | $24,998.00 | $260.52 | $15,474.72 | 1/1/2025 |
| CIS2024/05-02 | $24,998.00 | $260.52 | $15,474.72 | 1/1/2025 |
| 1037 | $22,601.94 | $235.55 | $13,991.46 | 1/1/2025 |
| 1039 | $22,248.18 | $231.86 | $13,772.46 | 1/1/2025 |
| 1038 | $9,920.55 | $190.93 | $6,228.75 | 1/1/2025 |
| CISINTL03.18.24 | $25,160.00 | $220.26 | $15,533.04 | 1/5/2025 |
| CIS2024/05-04 | $16,248.70 | $258.54 | $10,147.76 | 1/9/2025 |
| CIS2024/05-03 | $24,998.00 | $177.15 | $15,391.35 | 1/9/2025 |
| CIS2024/05-04 | $8,749.30 | $128.27 | $5,453.25 | 1/12/2025 |
| CIS2024/06-01 | $24,998.00 | $145.89 | $15,360.09 | 1/12/2025 |
| 7 | $9,629.17 | $113.08 | $5,973.55 | 1/19/2025 |
| 00005165OCTNOVDEC2023 | $6,558.20 | $77.02 | $4,068.45 | 1/19/2025 |
| 1038 | $5,000.00 | $58.71 | $3,101.80 | 1/19/2025 |
| CISINTL03.25.24 | $36,896.00 | $92.28 | $22,547.78 | 1/20/2025 |
| CIS2024/06-02 | $13,248.94 | $22.09 | $8,085.63 | 1/22/2025 |
| CIS2024/06-03 | $24,998.00 | $416.21 | $20,557.52 | 2/10/2025 |
| CISINTL04.01.24 | $35,268.00 | $0.00 | $21,464.68 | 1/26/2025 |
| CIS2024/07-01 | $5,249.58 | $87.40 | $4,317.08 | 2/10/2025 |
| CISINTL04.15.24 | $32,228.00 | $0.00 | $19,614.49 | 1/26/2025 |
| CISINTL04.08.24 | $32,486.00 | $0.00 | $19,771.50 | 1/26/2025 |

| | | | |
|---|---|---|---|
| CIS2024/06-04 | $24,998.00 | $416.21 | $20,557.52 | 2/10/2025 |
| A4224050569 | $6,648.00 | $56.71 | $4,102.80 | 12/13/2024 |
| 08/VIXU-2024 | $6,500.00 | $55.45 | $4,011.46 | 12/13/2024 |
| CISINTL05.06.24 | $39,897.00 | $340.35 | $24,622.31 | 12/13/2024 |
| CISINTL05.13.24 | $13,296.00 | $113.43 | $8,205.60 | 12/13/2024 |
| Acct25927-07152024 | $5,015.88 | $42.78 | $3,095.53 | 12/13/2024 |
| CISINTL04.22.24 | $43,521.00 | $371.27 | $26,858.85 | 12/13/2024 |
| CISINTL04.29.24 | $27,982.00 | $238.71 | $17,269.02 | 12/13/2024 |
| CISINTL05.20.24 | $26,138.00 | $215.29 | $16,123.30 | 12/14/2024 |
| CISINTL05.27.24 | $32,800.00 | $260.51 | $20,223.13 | 12/15/2024 |
| CISINTL06.03.24 | $53,298.00 | $647.09 | $43,590.17 | 2/3/2025 |
| CISINTL06.10.24 | $18,052.00 | $209.21 | $14,754.01 | 2/4/2025 |
| CISINTL06.17.24 | $58,000.00 | $480.12 | $47,211.68 | 2/10/2025 |
| CNJ240600595 963 961 | $5,557.50 | $110.94 | $4,588.71 | 2/10/2025 |
| 11 | $5,870.00 | $117.17 | $4,846.74 | 2/10/2025 |
| CISINTL06.24.24 | $14,717.00 | $293.77 | $12,151.51 | 2/10/2025 |
| SGM0611244 | $7,561.91 | $54.25 | $6,147.01 | 2/12/2025 |
| CISINTL07.01.24 | $64,210.00 | $318.92 | $52,053.99 | 2/16/2025 |
| CISINTL07.08.24 | $11,285.97 | $37.37 | $9,130.67 | 2/19/2025 |
| CISINTL07.08.24 | $7,132.03 | $157.15 | $7,289.18 | 3/10/2025 |
| CISINTL07.15.24 | $50,225.00 | $27.72 | $40,494.83 | 2/24/2025 |
| CISINTL07.22.24 | $249,886.01 | $5,163.74 | $255,049.75 | 3/12/2025 |
| CISINTL07.15.24 | $35,000.00 | $0.00 | $28,200.08 | 2/25/2025 |
| CIS2024/06-02 | $11,749.06 | $128.11 | $9,594.53 | 1/13/2025 |
| CISINTL07.29.24 | $31,696.35 | $345.62 | $25,883.90 | 1/13/2025 |
| CIS2024/07-02 | $16,006.22 | $174.53 | $13,071.01 | 1/13/2025 |
| CISINTL07.22.24 | $27,753.99 | $475.24 | $28,229.23 | 3/2/2025 |
| CISINTL07.29.24 | $55,570.61 | $951.55 | $56,522.16 | 3/2/2025 |
| CISINTL07.29.24 | $10,301.13 | $311.65 | $10,612.78 | 3/4/2025 |
| CISINTL07.29.24 | $10,354.92 | $306.18 | $10,661.10 | 3/5/2025 |
| CISINTL07.29.24 | $21,815.44 | $313.78 | $22,129.22 | 3/6/2025 |
| CISINTL07.29.24 | $44,876.63 | $522.53 | $45,399.16 | 3/10/2025 |
| 32 | $5,875.00 | $153.60 | $6,028.60 | 3/10/2025 |
| CISINTL07.29.24 | $9,325.52 | $237.42 | $9,562.94 | 3/11/2025 |
| CISINTL07.29.24 | $41,632.65 | $427.74 | $42,060.39 | 3/12/2025 |

| | | | | |
|---|---|---|---|---|
| 1061 | $12,182.00 | $116.82 | $12,298.82 | 3/13/2025 |
| 1060 | $17,818.00 | $170.86 | $17,988.86 | 3/13/2025 |
| 1062 | $20,326.00 | $194.91 | $20,520.91 | 3/13/2025 |
| 1063 | $9,674.00 | $233.03 | $9,907.03 | 3/13/2025 |
| CISINTL08.05.24 | $42,020.06 | $287.81 | $42,307.87 | 3/17/2025 |
| CISINTL07.29.24 | $34,466.75 | $236.07 | $34,702.82 | 3/17/2025 |
| CISINTL08.05.24 | $50,270.87 | $309.89 | $50,580.76 | 3/18/2025 |
| CIS2024/07-01 | $11,301.47 | $23.22 | $11,324.69 | 3/24/2025 |
| 1064 | $12,189.31 | $25.05 | $12,214.36 | 3/24/2025 |
| CISINTL08.05.24 | $37,914.58 | $51.94 | $37,966.52 | 3/25/2025 |
| CISINTL08.05.24 | $8,533.93 | $125.56 | $8,659.49 | 11/11/2024 |
| 1065 | $11,810.69 | $8.09 | $11,818.78 | 3/26/2025 |
| CISINTL08.12.24 | $345,463.14 | $0.00 | $345,463.14 | 3/27/2025 |

Ultimately, the Motion should be denied and the Petco A/R should either be paid directly to Settle or, at the very least, be remitted to a segregated account for adjudication of the relevant priorities. In no event, however, should it be paid to Panthers.

DATED: December 2, 2025                SEYFARTH SHAW LLP


By     /s/ Scott Olson
             Scott Olson

**SEYFARTH SHAW LLP**
560 Mission Street, 31st Floor
San Francisco, California 94105
Telephone:       (415) 397-2823
Facsimile:       (415) 397-8549
solson@seyfarth.com
Nicholas R. Marcus
(Pro Hac Vice Forthcoming)
**SEYFARTH SHAW LLP**
233 S. Wacker Drive, Suite 8000
Chicago, Illinois 60606
Telephone:       (312) 460-5143
Facsimile:       (312) 460-7491
nmarcus@seyfarth.com

*Counsel for Settle Funding, LLC*

# EXHIBIT C

# Settle

August 19, 2025

**<u>VIA EMAIL:</u>** giovanni.insana@petco.com; afletcher@bakerlaw.com
Petco Animal Supplies Stores, Inc.
Attn: Giovanni Insana
cc: Adam Fletcher
10850 Via Frontera
San Diego, CA 92127

**Re: Notice Pursuant to UCC 9-607 Regarding Payments**

Dear Giovanni:

Our company Settle Funding, LLC ("Settle") has made certain loans (the "Loans")
to  CIS International Holdings (N.A.) Corp ("Borrower"). The Loans are in default and Settle has
made demand for the immediate payment in full of all amounts owed by Borrower to Settle
under the Loans. Borrower's indebtedness to Settle under the Loans is secured by substantially
all of Borrower's assets, which include, without limitation, all of Borrower's accounts
receivable.

Accordingly, pursuant to, among other things, Section 9-607 of the Uniform Commercial Code,
you are hereby notified to promptly make payment on account of any and all accounts payable to
Borrower that are now due and payable or hereafter become due and payable directly to the
Settle to satisfy such accounts.

Please deliver payment utilizing the payment instructions enclosed herewith. Payments made in
contravention of the foregoing instructions shall not be credited to your account, as Settle has
asserted control over the Borrower's accounts receivable and its other collateral.

A copy of the UCC lien is attached. If you have any questions, please do not hesitate to contact
me by email at legal@settle.co.

Very truly yours,

The Settle Legal Team



**Settle Wire Instructions:**

| | |
|---|---|
| Beneficiary Account Name: | Settle Funding LLC Settle Funding Receivables |
| Beneficiary Account Number: | 675879301 |
| Beneficiary Bank Name: | JPMORGAN CHASE BANK, N.A. - NEW YORK |
| Beneficiary Bank Swift | BIC: CHASUS33 |
| Beneficiary Bank Routing Number: | 021000021 |

**Settle Office Address Information:**

Settle Funding LLC
29 W 17th St FL 2
New York, NY 10011-5508

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
560 Mission Street, Suite 3100, San Francisco, California 94105

A true and correct copy of the foregoing document entitled (*specify*): LENDER'S OBJECTION TO PANTHERS
CAPITAL'S MOTION TO RECONSIDER

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 12/02/2025_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☑ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL:**
On (*date*) ___12/02/2025_____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served):** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) __12/02/2025_____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 12/02/2025 | J. Gina delaCuadra | *(signature)* |
|---|---|---|
| Date | Printed Name | Signature |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                        **F 9013-3.1.PROOF.SERVICE**

1.      TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)
(Continued)

- **Ismail Amin** iamin@talglaw.com; pgilmore@talglaw.com;
kvescera@talglaw.com; shalberstadt@talglaw.com; cstark@talglaw.com;
ckim@talglaw.com; eavakian@talglaw.com

- **Tanya Behnam** tbehnam@polsinelli.com, tanyabehnam@gmail.com;
ccripe@polsinelli.com; ladocketing@polsinelli.com

- **Christopher Beyer** cab@replevin.com, ecf@writofseizure.com

- **Michael D Breslauer** mbreslauer@swsslaw.com, sdurazo@swsslaw.com

- **Dennis A Dressler** ddressler@dresslerpeters.com

- **Michael Jones** michael.jones4@usdoj.gov

- **Ron Maroko** ron.maroko@usdoj.gov

- **Byron Z Moldo** bmoldo@ecjlaw.com, aantonio@ecjlaw.com,
dperez@ecjlaw.com

- **Amitkumar Sharma** amit.sharma@aisinfo.com

- **Randye B Soref** rsoref@polsinelli.com, ccripe@polsinelli.com;
ladocketing@polsinelli.com

- **Chase Aleksander Stone** cstone@ecjlaw.com, aantonio@ecjlaw.com,
dperez@ecjlaw.com, cmacan@ecjlaw.com

- **United States Trustee (LA)** ustpregion16.la.ecf@usdoj.gov

- **Cranston J Williams** cwilliams3@socalgas.com