David M. Goodrich
 *dgoodrich@go2.law*
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Telephone    714-966-1000
Facsimile     714-966-1002

Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:25-bk-18374-BR |
| CIS INTERNATIONAL HOLDINGS CORPORATION, dba E TROPICAL FISH, | Chapter 7 |
| Debtor. | **CHAPTER 7 TRUSTEE'S LIMITED OPPOSITION TO PANTHERS CAPITAL LLC'S MOTION TO RECONSIDER ORDER APPROVING STIPULATION BETWEEN DEBTOR AND PETCO FOR TURNOVER** |
| | Hearing date, time and location:<br>Date:    December 16, 2025<br>Time:    10:00 a.m.<br>Ctrm:    1668 |

**TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE DEBTOR, THE DEBTOR'S COUNSEL, PANTHERS CAPITAL LLC, AND ALL CREDITORS AND OTHER INTERESTED PARTIES:**

David M. Goodrich, the chapter 7 trustee ("Trustee") of the bankruptcy estate ("Estate") of CIS International Holdings Corporation, dba E Tropical Fish ("Debtor"), hereby files this limited opposition to Panthers Capital LLC's ("Panthers") *Motion to Reconsider Order Approving Stipulation Between Debtor and Petco for Turnover* ("Motion to Reconsider") [Dkt. No. 100].  The Trustee submits the declaration of David M. Goodrich (the "Goodrich Declaration") in support of his limited opposition.

1

Panthers seeks an order vacating an *Order Approving Stipulation Between Debtor and Petco for Turnover (11 U.S.C. §542)* ("Order") [Dkt. No. 22].  The Trustee takes no position on Panthers' request for an order reconsidering the Order and vacating the relief provided in the Order.

Panthers, however, seeks more than relief under Rule 60(b) in its Motion. Specifically, Panthers requests the Court order:

1.    Petco deliver all receivables owed to the Debtor to Panthers;

2.    Petco and the Trustee to deliver a full, "invoice level" accounting of Debtor-origin receivables pre- and post-conversion,

3.    That any Debtor-origin Petco A/R already received by the Trustee (or CIS due to vendors credits) be segregated in an interest-bearing account and escrowed pending adjudication of ownership and priority, without prejudice to Panthers' claims;

4.    The immediate turnover to Panthers, or direction to Petco to pay Panthers, of all sums due and to become due on the affected invoices up to $1,811,280.14, plus attorney's fees and costs;

5.    The segregation and periodic reporting/accounting of any future Petco receivables as adequate protection for Panthers' interests, with replacement liens in all proceeds to the extent applicable.

*See* Motion, 17:4-17.

The Motion sets forth the elements for relief under Rule 60(b) as well as the grounds Panthers believes entitles Panthers to relief.  *See* Motion, 8:5 through 16:4.  The Motion also demand an "accounting" of all funds transferred from Petco to the Debtor and from Petco to the Trustee from the petition date to the date of the motion.  *Id.*, 16:6-13.

The Motion provides no legal argument or factual basis for the Court to order (1) Petco to turn over receivables to Panthers, (2) the Trustee to segregate, in an interest-bearing account, and escrow all funds received by the Trustee, (3) for an award of attorneys' fees, (4) segregation and periodic reporting/accounting of any future Petco receivables, and (5) replacements liens in favor of Panthers.  *See* Motion, generally.  At a

1   minimum, due process requires Panthers to provide a factual and legal basis for the relief

2   that is beyond reconsider under Rule 60(b) and an accounting.  Moreover, Panthers has

3   the burden of proof and persuasion as the moving party.  Panthers lack of a factual and

4   legal basis justifying the extraneous relief requested in the Motion should be denied.

5          Moreover, the equitable and legal ownership rights of a lender/purchaser of future

6   receipts under "merchant cash advance" agreements (aka "MCA") in a bankruptcy case is

7   unsettled. *Cap Call, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797 (Bankr. D.

8   Mont. 2021) (finding an MCA constituted a loan secured by receivables and not a true

9   sale of receivables); *In re Watchmen Security LLC*, 2024 WL 4903363 (Bankr. S.D. Ind.)

10  (finding a merchant cash advance agreement to not attach to post-petition receivables

11  and deeming the merchant cash advance's loan to be fully unsecured). *See* Exhibit 6.

12         Panthers does not cite to any law in support of its claim that its owns receivables of

13  the Debtor.  See Motion, generally.  Panthers simply cites to its agreement for the

14  proposition that it is the "absolute owner" of all accounts receivable.  *See* Motion, 10:6-8.

15  As the *Shoot the Moon* and *Watchmen* cases demonstrate, the terms of an MCA

16  agreement is not solely determinative of the rights of the creditor and debtor.  *In re Shoot*

17  *the Moon, LLC)*, 635 B.R. 797; *Watchmen Security LLC*, 2024 WL 4903363 (Bankr. S.D.

18  Ind.).  As a result, Panthers has not met its burden of proof in connection with its claim

19  that all receivables are its property. Further, an adversary may be required to determine

20  any lien rights Panthers claims.  *See* Rule 7001(b) and (i).

21         To the extent it is useful to the Court, the Trustee has provided copies of pre and

22  post-petition bank statements for the Debtor's pre-petition accounts and its debtor-in-

23  possession accounts to Panthers and all of the other known secured creditors.  *See*

24  Exhibit 1 to the Goodrich Declaration.  In response to Panthers' request for copies of

25  account statements for non-debtor bank accounts, the Trustee provided copies of relevant

26  bank statements to Panthers.  *See* Exhibit 2 to the Goodrich Declaration.  Although

27  Panthers wants an accounting from the Trustee, the bank statements for the Debtor's

28  accounts with transactions that occurred post-petition show nominal activity as well as the

total amount transferred to the Trustee - $708,382.98.  *See* Exhibit 1 and 3.  Further, the Trustee's account has no transactions other than the receipt of $708,382.98 from Genesis Bank.  *See* Exhibit 3.

While it may be possible that Panthers no longer seeks an accounting from the Trustee, the Trustee believes that Panthers' request for an accounting from the Trustee is unnecessary and unwarranted.  Moreover, the Trustee has not obtained an order to operate and, as a consequence, funds in the bankruptcy estate will not be used, excluding service fees of the Trustee's bank, by the Trustee during the chapter 7 case.  *See* Goodrich Declaration.

Based upon the foregoing, the Trustee respectfully requests that this Court:

1.      Deny all relief in the Motion, other than Panthers' request for an order reconsidering the relief provided in the Order, of which the Trustee takes no position; and

2.      For such other and further relief as the Court deems just and proper.

Dated:  December 2, 2025

By:   /s/ David M. Goodrich
      David M. Goodrich
      Chapter 7 Trustee

4

1

## **DECLARATION OF DAVID M. GOODRICH**[1]

2

3      I, David M. Goodrich, declare as follows:

4      1.      I am the duly appointed, qualified, and acting Chapter 7 trustee (the

5  "Trustee") of the bankruptcy estate (the "Estate") of CIS International Holdings

6  Corporation, (the "Debtor").  Except as otherwise stated, I have personal knowledge of the

7  facts set forth in this declaration and, if called as a witness, could and would testify

8  competently to such facts under oath.

9      2.       I have provided copies of pre and post-petition bank statements for the

10  Debtor's pre-petition accounts and its debtor-in-possession accounts to Panthers and all

11  of the other known secured creditors that I received from the Debtor.

12      3.      Attached hereto as Exhibit 1 is a true and correct copy of an email I sent to

13  counsel for all known secured creditors along with true and correct copies of the Debtor's

14  bank statements that are relevant to the Motion (which were emailed as attachments).

15      4.      In response to Panthers' request for copies of account statements for non-

16  debtor bank accounts, I provided copies of relevant bank statements to Panthers for non-

17  debtor bank accounts that I received from the Debtor.

18      5.      Attached hereto as Exhibit 2 is a true and correct copy of an email I sent to

19  counsel for all known secured creditors with bank statements attached.  Because of

20  privacy concerns, copies of the non-debtor bank account statements are not attached.

21      6.      Attached hereto as Exhibit 3 is a true and correct copy of a screenshot from

22  the "banking portal" for the Estate's account that I generated on December 2, 2025.  I

23  have not yet received a bank statement for the Estate for November 2025.

24  / / /

25

26

27

28

---

[1] Capitalized terms not otherwise defined herein have the same meaning as given to them in the limited
opposition.

7.    Attached hereto as Exhibit 4 is a true and correct copy of *In re Watchmen Security LLC* that I downloaded from Westlaw.

Executed on this <u>2nd</u> day of December 2025, at Costa Mesa, California.

/s/ David M. Goodrich
David M. Goodrich

6

# Exhibit 1

| From: | David M. Goodrich |
|---|---|
| To: | Randye Soref; Tanya Behnam; Christopher Stack; Ismail Amin; Tanner, Jolene (USACAC); Levey, Elan (USACAC); Olson, Scott |
| Cc: | Lorraine Robles |
| Bcc: | "Clio Manage (01781-David M. Goodrich, Trustee" |
| Subject: | CIS International |
| Date: | Tuesday, November 18, 2025 11:53:00 AM |
| Attachments: | image001.png |
| | image002.png |
| | image003.png |
| | Sep CIS 25.pdf |
| | Oct 25".pdf |
| | CIS Dip account - Oct 25".pdf |

All:

To the extent it is useful in relation to the motion to reconsider (Dkt. No. 100) and the stipulation between the debtor and Petco for turnover (Dkt. No. 15), attached are the DIP account statements and the post-petition non-DIP account statements for the debtor that I received from the debtor.

Thanks,

**David M. Goodrich**
Partner



T: (714) 445-1028
dgoodrich@go2.law
www.go2.law
3070 Bristol St., Ste 640
Costa Mesa, CA 92626



# Exhibit 2

## GENESIS BANK
4675 MacArthur Ct. Suite 1600
Newport Beach, CA 92660

### *Statement Ending 10/31/2025*

*CIS International Holdings N.A. Corp.*    Page 1 of 2
**Customer Number: XXXXX0102**

CIS INTERNATIONAL HOLDINGS N.A. CORP.
DEBTOR-IN-POSSESSION
CASE # 2 25-BK-18374
OPERATING
1405 W 178TH ST
GARDENA CA 90248-3201

### *Managing Your Accounts*

| | | |
|---|---|---|
| 🏛 | Branch Name | Headquarters |
| 👤 | Service Center | 888-811-7531 service@mygenesisbank.com |
| ✉ | Mailing Address | 4675 MacArthur Ct, Ste 1600 Newport Beach, CA 92660 |
| 💻 | Website | www.mygenesisbank.com |

### *Summary of Accounts*

| Account Type | Account Number | Ending Balance |
|---|---|---|
| NEXTGEN ANALYZED ACCOUNT | XXXXX0102 | $708,382.98 |

## NEXTGEN ANALYZED ACCOUNT - XXXXX0102

### Account Summary

| Date | Description | Amount |
|---|---|---|
| 10/01/2025 | Beginning Balance | $0.00 |
| | 2 Credit(s) This Period | $712,700.00 |
| | 1 Debit(s) This Period | $4,317.02 |
| 10/31/2025 | Ending Balance | $708,382.98 |

### Account Activity

| Post Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 10/01/2025 | Beginning Balance | | | $0.00 |
| 10/08/2025 | Incoming Wire 90719202 Petco Animal Su | | $709,400.00 | $709,400.00 |
| 10/15/2025 | Analysis Charges September 2025 | $4,317.02 | | $705,082.98 |
| 10/23/2025 | Incoming Wire 91177301 BRIGHTPOINT LAW LLP | | $3,300.00 | $708,382.98 |
| 10/31/2025 | Ending Balance | | | $708,382.98 |

### Daily Balances

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 10/08/2025 | $709,400.00 | 10/15/2025 | $705,082.98 | 10/23/2025 | $708,382.98 |



**GENESIS BANK**
4675 MacArthur Ct. Suite 1600
Newport Beach, CA 92660

*Statement Ending 10/31/2025*

*CIS International Holdings N.A. Corp.*  **Page 1 of 4**
**Customer Number: XXXXX7610**

### Managing Your Accounts

| | | |
|---|---|---|
| 🏛 | Branch Name | Headquarters |
| 👤 | Service Center | 888-811-7531<br>service@mygenesisbank.com |
| ✉ | Mailing Address | 4675 MacArthur Ct, Ste 1600<br>Newport Beach, CA 92660 |
| 💻 | Website | www.mygenesisbank.com |

CIS INTERNATIONAL HOLDINGS N.A. CORP.
1405 W 178TH ST
GARDENA CA 90248-3201

---

### Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| NEXTGEN ANALYZED ACCOUNT | XXXXX7610 | -$3,558.00 |

## NEXTGEN ANALYZED ACCOUNT - XXXXX7610

### Account Summary

| Date | Description | Amount |
|---|---|---|
| 10/01/2025 | Beginning Balance | -$4,202.06 |
| | 10 Credit(s) This Period | $5,972.00 |
| | 11 Debit(s) This Period | $5,327.94 |
| 10/31/2025 | Ending Balance | -$3,558.00 |

### Account Activity

| Post Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 10/01/2025 | **Beginning Balance** | | | **-$4,202.06** |
| 10/01/2025 | RETURNED CHECK# 2129928, NSF | | $908.00 | -$3,294.06 |
| 10/01/2025 | STATE FARM RO 27 CPC-CLIENT 23 S 1065199023 | $501.59 | | -$3,795.65 |
| 10/01/2025 | STATE FARM RO 27 CPC-CLIENT 23 S 1062965123 | $1,312.16 | | -$5,107.81 |
| 10/02/2025 | RETURNED ITEM, INSUFFICIENT FUNDS, STATE FARM RO 27 CPC-CLIENT 23 S 106519902 | | $501.59 | -$4,606.22 |
| 10/02/2025 | RETURNED ITEM, INSUFFICIENT FUNDS, STATE FARM RO 27 CPC-CLIENT 23 S 106296512 | | $1,312.16 | -$3,294.06 |
| 10/07/2025 | ADP PAYROLL FEES ADP FEES 933138791729 | $185.00 | | -$3,479.06 |
| 10/07/2025 | STATE FARM RO 27 RETRY PYMT 23 S 1065199023 | $501.59 | | -$3,980.65 |
| 10/07/2025 | STATE FARM RO 27 RETRY PYMT 23 S 1062965123 | $1,312.16 | | -$5,292.81 |
| 10/08/2025 | RETURNED ITEM, INSUFFICIENT FUNDS, ADP PAYROLL FEES ADP FEES 933138791729 | | $185.00 | -$5,107.81 |
| 10/08/2025 | RETURNED ITEM, INSUFFICIENT FUNDS, STATE FARM RO 27 RETRY PYMT 23 S 106519902 | | $501.59 | -$4,606.22 |
| 10/08/2025 | RETURNED ITEM, INSUFFICIENT FUNDS, STATE FARM RO 27 RETRY PYMT 23 S 106296512 | | $1,312.16 | -$3,294.06 |
| 10/08/2025 | UBIQUITY RETIREM UBIQUITY R | $176.50 | | -$3,470.56 |
| 10/09/2025 | RETURNED ITEM, INSUFFICIENT FUNDS, UBIQUITY RETIREM UBIQUITY R | | $176.50 | -$3,294.06 |
| 10/15/2025 | ADP PAYROLL FEES ADP FEES 415079429874 | $185.00 | | -$3,479.06 |
| 10/15/2025 | PAYMENT SBA EIDL LOAN 7456697405 | $740.00 | | -$4,219.06 |
| 10/16/2025 | RETURNED ITEM, INSUFFICIENT FUNDS, ADP PAYROLL | | $185.00 | -$4,034.06 |



CIS International Holdings N.A. Corp.      XXXXX7610      Statement Ending 10/31/2025      Page 3 of 4

## NEXTGEN ANALYZED ACCOUNT - XXXXX7610 (continued)

### Account Activity (continued)

| Post Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| | FEES ADP FEES 415079429874 | | | |
| 10/16/2025 | RETURNED ITEM, INSUFFICIENT FUNDS, PAYMENT SBA EIDL LOAN 7456697405 | | $740.00 | -$3,294.06 |
| 10/24/2025 | ADP PAYROLL FEES ADP FEES 929540004016 | $150.00 | | -$3,444.06 |
| 10/27/2025 | RETURNED ITEM, INSUFFICIENT FUNDS, ADP PAYROLL FEES ADP FEES 929540004016 | | $150.00 | -$3,294.06 |
| 10/28/2025 | XX4986 DDA RECURR 10/27 02:16 WEB* NETWORKSOLUT JACKSONVILLE FL 47973721 287414 | $131.97 | | -$3,426.03 |
| 10/28/2025 | XX4986 DDA RECURR 10/27 02:22 WEB* NETWORKSOLUT JACKSONVILLE FL 47973739 531795 | $131.97 | | -$3,558.00 |
| 10/31/2025 | Ending Balance | | | -$3,558.00 |

### Daily Balances

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 10/01/2025 | -$5,107.81 | 10/09/2025 | -$3,294.06 | 10/27/2025 | -$3,294.06 |
| 10/02/2025 | -$3,294.06 | 10/15/2025 | -$4,219.06 | 10/28/2025 | -$3,558.00 |
| 10/07/2025 | -$5,292.81 | 10/16/2025 | -$3,294.06 | | |
| 10/08/2025 | -$3,470.56 | 10/24/2025 | -$3,444.06 | | |

### Overdraft and Returned Item Fees

| | Total for this period | Total year-to-date |
|---|---|---|
| Total Overdraft Fees | $0.00 | $210.00 |
| Total Returned Item Fees | $350.00 | $1,400.00 |

**GENESIS BANK**
4675 MacArthur Ct. Suite 1600
Newport Beach, CA 92660

## Statement Ending 09/30/2025

*CIS International Holdings N.A. Corp.*                **Page 1 of 6**
**Customer Number: XXXXX7610**

CIS INTERNATIONAL HOLDINGS N.A. CORP.
1405 W 178TH ST
GARDENA CA 90248-3201

### Managing Your Accounts

| | | |
|---|---|---|
| 🏛 | Branch Name | Headquarters |
| 👤 | Service Center | 888-811-7531<br>service@mygenesisbank.com |
| ✉ | Mailing Address | 4675 MacArthur Ct, Ste 1600<br>Newport Beach, CA 92660 |
| 💻 | Website | www.mygenesisbank.com |

### Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| NEXTGEN ANALYZED ACCOUNT | XXXXX7610 | -$4,202.06 |

## NEXTGEN ANALYZED ACCOUNT - XXXXX7610

### Account Summary

| Date | Description | Amount |
|---|---|---|
| 08/30/2025 | Beginning Balance | -$6,021.08 |
| | 17 Credit(s) This Period | $201,404.45 |
| | 63 Debit(s) This Period | $199,585.43 |
| 09/30/2025 | Ending Balance | -$4,202.06 |

### Account Activity

| Post Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 08/30/2025 | **Beginning Balance** | | | **-$6,021.08** |
| 09/02/2025 | RETURNED ITEM, INSUFFICIENT FUNDS, CHASE CREDIT CRD RETRY PYMT 8664988414 | | $1,600.00 | -$4,421.08 |
| 09/02/2025 | CHECK # 50012 | $248.96 | | -$4,670.04 |
| 09/03/2025 | RETURNED CHECK# 50012, NSF | | $248.96 | -$4,421.08 |
| 09/03/2025 | ADP PAYROLL FEES ADP FEES 929138663304 | $485.00 | | -$4,906.08 |
| 09/04/2025 | RETURNED ITEM, INSUFFICIENT FUNDS, ADP PAYROLL FEES ADP FEES 929138663304 | | $485.00 | -$4,421.08 |
| 09/08/2025 | CHASE CREDIT CRD EPAY 8658465940 | $908.00 | | -$5,329.08 |
| 09/08/2025 | SO CAL EDISON CO BILL PAYMT 700398347924 | $16,117.96 | | -$21,447.04 |
| 09/09/2025 | xfer from 7771 to 7610 | | $150.00 | -$21,297.04 |
| 09/09/2025 | xfer from 8317 to 7610 | | $380.00 | -$20,917.04 |
| 09/09/2025 | xfer from 8317 to 7610 | | $2,850.00 | -$18,067.04 |
| 09/09/2025 | xfer from 7764 to 7610 | | $19,100.00 | $1,032.96 |
| 09/09/2025 | xfer from 7610 to 7757 | $30.66 | | $1,002.30 |
| 09/09/2025 | xfer from 7610 to 8317 | $190.00 | | $812.30 |
| 09/09/2025 | UBIQUITY RETIREM UBIQUITY R | $176.50 | | $635.80 |
| 09/10/2025 | MOBILE CAPTURE DEPOSIT | | $272.59 | $908.39 |
| 09/10/2025 | XX4986 CHK PURCHASE 09/09 12:30 EXXON ZIBA INVES INGLEWOOD CA 63396703 808239 | $15.00 | | $893.39 |
| 09/10/2025 | XX4986 CHK PURCHASE 09/09 23:43 CHEVRON 0092445 GARDENA CA 80900691 681226 | $30.02 | | $863.37 |



CIS International Holdings N.A. Corp.        XXXXX7610        Statement Ending 09/30/2025        Page 3 of 6

# NEXTGEN ANALYZED ACCOUNT - XXXXX7610 (continued)

## Account Activity (continued)

| Post Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 09/10/2025 | XX4986 PYMT FROM DDA 09/09 21:33 GSWC EZ PAY SAN DIMAS CA 003 525221606042 | $70.00 | | $793.37 |
| 09/10/2025 | XX4986 CHK PURCHASE 09/09 21:43 FISHTANKSDIRECT. 9414846736 FL 01356979 926315 | $104.99 | | $688.38 |
| 09/10/2025 | ADP PAYROLL FEES ADP FEES 930339648003 | $485.00 | | $203.38 |
| 09/11/2025 | XX4986 CHK PURCHASE 09/09 15:23 CAL ICE INGLEWOOD CA 85250755 646209 | $16.54 | | $186.84 |
| 09/11/2025 | XX4986 CHK PURCHASE 09/09 21:22 SHELL OIL 100059 TORRANCE CA 02248922 780964 | $125.00 | | $61.84 |
| 09/12/2025 | Incoming Wire 89917517 VARUNI SAMARASINGHE | | $100,000.00 | $100,061.84 |
| 09/12/2025 | xfer from 7610 to 7750 | $15.00 | | $100,046.84 |
| 09/12/2025 | xfer from 7610 to 7757 | $100.00 | | $99,946.84 |
| 09/12/2025 | xfer from 7610 to 8317 | $200.00 | | $99,746.84 |
| 09/12/2025 | Outgoing Wire 13334 NEXIA B. P. O. (PVT) LTD | $1,000.00 | | $98,746.84 |
| 09/12/2025 | xfer from 7610 to 7750 | $1,000.00 | | $97,746.84 |
| 09/12/2025 | xfer from 7610 to 7764 | $1,000.00 | | $96,746.84 |
| 09/12/2025 | xfer from 7610 to 7750 | $1,298.00 | | $95,448.84 |
| 09/12/2025 | xfer from 7610 to 7764 | $2,200.00 | | $93,248.84 |
| 09/12/2025 | xfer from 7610 to 7757 | $2,400.00 | | $90,848.84 |
| 09/12/2025 | xfer from 7610 to 8317 | $3,000.00 | | $87,848.84 |
| 09/12/2025 | xfer from 7610 to 8317 | $4,000.00 | | $83,848.84 |
| 09/12/2025 | xfer from 7610 to 7771 | $4,898.33 | | $78,950.51 |
| 09/12/2025 | xfer from 7610 to 8317 | $6,000.00 | | $72,950.51 |
| 09/12/2025 | xfer from 7610 to 7750 | $9,866.32 | | $63,084.19 |
| 09/12/2025 | xfer from 7610 to 8317 | $10,000.00 | | $53,084.19 |
| 09/12/2025 | xfer from 7610 to 7764 | $12,500.00 | | $40,584.19 |
| 09/12/2025 | xfer from 7610 to 8317 | $40,000.00 | | $584.19 |
| 09/12/2025 | XX4986 DDA RECURR 09/12 02:35 MICROSOFT#G10913 MSBILL.INFO SG 97197900 336638 | $24.00 | | $560.19 |
| 09/12/2025 | MASTERCARD INTERNATIONAL CROSS BOR MICROSOFT#G10913 MSBILL.INFO SG 97197900 3366 | $0.22 | | $559.97 |
| 09/13/2025 | xfer from 7764 to 7610 | | $11,857.00 | $12,416.97 |
| 09/13/2025 | xfer from 7610 to 7757 | $1,450.00 | | $10,966.97 |
| 09/15/2025 | Incoming Wire 89974153 VARUNI SAMARASINGHE | | $60,000.00 | $70,966.97 |
| 09/15/2025 | xfer from 7771 to 7610 | | $3,000.00 | $73,966.97 |
| 09/15/2025 | xfer from 7610 to 7757 | $1,876.47 | | $72,090.50 |
| 09/15/2025 | Outgoing Wire 13360 Hasan Basri | $2,000.00 | | $70,090.50 |
| 09/15/2025 | Outgoing Wire 13358 STAMPEDE LOGISTICS | $8,000.00 | | $62,090.50 |
| 09/15/2025 | xfer from 7610 to 7764 | $8,100.00 | | $53,990.50 |
| 09/15/2025 | Outgoing Wire 13356 Ervin Cohen & Jessup LLP | $50,000.00 | | $3,990.50 |
| 09/15/2025 | XX4986 CHK PURCHASE 09/14 08:42 WAL-MART #5072 TORRANCE CA 24507201 879175 | $22.63 | | $3,967.87 |
| 09/15/2025 | XX4986 DDA RECURR 09/12 20:25 DNH* GODADDY#3851 TEMPE AZ 77886616 074662 | $88.76 | | $3,879.11 |
| 09/15/2025 | XX4986 CHK PURCHASE 09/12 03:53 CHEVRON 0092445 GARDENA CA 98006691 469175 | $100.01 | | $3,779.10 |
| 09/15/2025 | CHASE CREDIT CRD EPAY 8720758390 | $525.00 | | $3,254.10 |
| 09/15/2025 | PAYMENT SBA EIDL LOAN 7456697405 | $740.00 | | $2,514.10 |
| 09/15/2025 | Analysis Charges August 2025 | $3,254.06 | | -$739.96 |
| 09/16/2025 | XX4986 CHK PURCHASE 09/15 22:28 CHEVRON 0092445 GARDENA CA 48232566 303519 | $120.33 | | -$860.29 |
| 09/16/2025 | XX4986 CHK PURCHASE 09/15 12:07 STAPLES 00 LOS | $166.25 | | -$1,026.54 |

| CIS International Holdings N.A. Corp. | XXXXX7610 | Statement Ending 09/30/2025 | Page 4 of 6 |
|---|---|---|---|

## NEXTGEN ANALYZED ACCOUNT - XXXXX7610 (continued)

### Account Activity (continued)

| Post Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| | ANGELES CA 42717273 369586 | | | |
| 09/16/2025 | XX4986 CHK PURCHASE 09/15 12:49 STAMPEDE LOGISTI SANTA ANA CA 15728995 499647 | $1,000.00 | | -$2,026.54 |
| 09/16/2025 | XX4986 CHK PURCHASE 09/15 09:24 ULINE * SHIP SUP 800-295-5510 WI 91298439 162503 | $1,227.52 | | -$3,254.06 |
| 09/17/2025 | CONTINUOUS OVERDRAFT FEE | $5.00 | | -$3,259.06 |
| 09/18/2025 | ADP PAY-BY-PAY PAY-BY-PAY 275101337546Q3U | $75.00 | | -$3,334.06 |
| 09/18/2025 | CONTINUOUS OVERDRAFT FEE | $5.00 | | -$3,339.06 |
| 09/19/2025 | RETURNED ITEM, INSUFFICIENT FUNDS, ADP PAY-BY-PAY PAY-BY-PAY 275101337546Q3U | | $75.00 | -$3,264.06 |
| 09/19/2025 | ADP Tax ADP Tax KVQ3U 3939397VV | $212.01 | | -$3,476.07 |
| 09/19/2025 | CONTINUOUS OVERDRAFT FEE | $5.00 | | -$3,481.07 |
| 09/22/2025 | RETURNED ITEM, INSUFFICIENT FUNDS, ADP Tax ADP Tax KVQ3U 3939397VV | | $212.01 | -$3,269.06 |
| 09/22/2025 | CONTINUOUS OVERDRAFT FEE | $5.00 | | -$3,274.06 |
| 09/23/2025 | CHECK # 2129928 | $908.00 | | -$4,182.06 |
| 09/23/2025 | CONTINUOUS OVERDRAFT FEE | $5.00 | | -$4,187.06 |
| 09/24/2025 | RETURNED CHECK# 2129928, NSF | | $908.00 | -$3,279.06 |
| 09/24/2025 | ADP PAYROLL FEES ADP FEES 930439955768 | $80.89 | | -$3,359.95 |
| 09/24/2025 | CONTINUOUS OVERDRAFT FEE | $5.00 | | -$3,364.95 |
| 09/25/2025 | RETURNED ITEM, INSUFFICIENT FUNDS, ADP PAYROLL FEES ADP FEES 930439955768 | | $80.89 | -$3,284.06 |
| 09/25/2025 | CONTINUOUS OVERDRAFT FEE | $5.00 | | -$3,289.06 |
| 09/26/2025 | ADP PAYROLL FEES ADP FEES 929640461418 | $185.00 | | -$3,474.06 |
| 09/26/2025 | CONTINUOUS OVERDRAFT FEE | $5.00 | | -$3,479.06 |
| 09/29/2025 | RETURNED ITEM, INSUFFICIENT FUNDS, ADP PAYROLL FEES ADP FEES 929640461418 | | $185.00 | -$3,294.06 |
| 09/30/2025 | CHECK # 2129928 | $908.00 | | -$4,202.06 |
| **09/30/2025** | **Ending Balance** | | | **-$4,202.06** |

### Checks Cleared

| Check Nbr | Date | Amount | Check Nbr | Date | Amount | Check Nbr | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 50012 | 09/02/2025 | $248.96 | 2129928* | 09/23/2025 | $908.00 | 2129928 | 09/30/2025 | $908.00 |

* Indicates skipped check number

### Daily Balances

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 09/02/2025 | -$4,670.04 | 09/12/2025 | $559.97 | 09/22/2025 | -$3,274.06 |
| 09/03/2025 | -$4,906.08 | 09/13/2025 | $10,966.97 | 09/23/2025 | -$4,187.06 |
| 09/04/2025 | -$4,421.08 | 09/15/2025 | -$739.96 | 09/24/2025 | -$3,364.95 |
| 09/08/2025 | -$21,447.04 | 09/16/2025 | -$3,254.06 | 09/25/2025 | -$3,289.06 |
| 09/09/2025 | $635.80 | 09/17/2025 | -$3,259.06 | 09/26/2025 | -$3,479.06 |
| 09/10/2025 | $203.38 | 09/18/2025 | -$3,339.06 | 09/29/2025 | -$3,294.06 |
| 09/11/2025 | $61.84 | 09/19/2025 | -$3,481.07 | 09/30/2025 | -$4,202.06 |

### Overdraft and Returned Item Fees

| | Total for this period | Total year-to-date |
|---|---|---|
| **Total Overdraft Fees** | $110.00 | $210.00 |
| **Total Returned Item Fees** | $210.00 | $1,050.00 |

CIS International Holdings  N.A.  Corp.          XXXXX7610                    Statement Ending 09/30/2025                    Page 5 of 6



| #50012 | 09/02/2025 | $248.96 |



| #50012 | 09/02/2025 | $248.96 |



| #2129928 | 09/23/2025 | $908.00 |



| #2129928 | 09/23/2025 | $908.00 |



| #2129928 | 09/30/2025 | $908.00 |



| #2129928 | 09/30/2025 | $908.00 |

**EXHIBIT 3**

| From: | David M. Goodrich |
|---|---|
| To: | Randye Soref; Tanya Behnam; Christopher Stark; Ismail Amin; Tanner, Jolene (USACAC); Levey, Elan (USACAC); Olson, Scott |
| Cc: | Lorraine Robles; Howard Ehrenberg; Steve Burnell |
| Bcc: | Clio Manage (01781-David M. Goodrich, Trustee |
| Subject: | RE: CIS International |
| Date: | Thursday, November 20, 2025 3:04:00 PM |
| Attachments: | image001.png |
|  | image002.png |
|  | image003.png |
|  | 8317 - Seq Lionsrock Wisconsin 25".pdf |
|  | 7750 - Sept. 25".pdf |
|  | 7764 - Sep 25.pdf |
|  | 7757 - Sep 25".pdf |
|  | image004.png |

All:

The statements for the accounts with numbers ending in 7750, 7757, 7764 and 8317 are attached. Please keep in mind the petition date is September 22, 2025.

I've copied Howard Ehrenberg and Steve Burnell, my proposed general counsel. We'll look at the transfers made from the debtor's account and address those later, if necessary.

Thanks,

Dave

**From:** Randye Soref <RSoref@Polsinelli.com>
**Sent:** Tuesday, November 18, 2025 12:09 PM
**To:** David M. Goodrich <dgoodrich@go2.law>; Tanya Behnam <TBehnam@Polsinelli.com>; Christopher Stark <cstark@talglaw.com>; Ismail Amin <iamin@talglaw.com>; Tanner, Jolene (USACAC) <jolene.tanner@usdoj.gov>; Levey, Elan (USACAC) <elan.levey@usdoj.gov>; Olson, Scott <solson@seyfarth.com>
**Cc:** Lorraine Robles <lrobles@go2.law>
**Subject:** RE: CIS International

David,

Thank you for providing. The September 2025 account statement for the account ending 7610, reflects multiple transfers to and from other accounts ending in 7750, 7757,7764 and 8317. Please provide account statements for each of these other accounts.

Thank you.

**Randye Soref**
*Principal*

**LA BUSINESS JOURNAL**
**TOP 100 LAWYERS 2022**

rsoref@polsinelli.com
**Direct: 310.203.5367**
**Mobile: 310.968.2784**
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
polsinelli.com

Polsinelli PC, Polsinelli LLP in California

**From:** David M. Goodrich <dgoodrich@go2.law>
**Sent:** Tuesday, November 18, 2025 11:53 AM
**To:** Randye Soref <RSoref@Polsinelli.com>; Tanya Behnam <TBehnam@Polsinelli.com>; Christopher Stark <cstark@talglaw.com>; Ismail Amin <iamin@talglaw.com>; Tanner, Jolene (USACAC) <jolene.tanner@usdoj.gov>; Levey, Elan (USACAC) <elan.levey@usdoj.gov>; Olson, Scott <solson@seyfarth.com>
**Cc:** Lorraine Robles <lrobles@go2.law>
**Subject:** CIS International

**EXTERNAL EMAIL**  dgoodrich@go2.law

All:

To the extent it is useful in relation to the motion to reconsider (Dkt. No. 100) and the stipulation between the debtor and Petco for turnover (Dkt. No. 15), attached are the DIP account statements and the post-petition non-DIP account statements for the debtor that I received from the debtor.

Thanks,

**David M. Goodrich**
Partner
...............................................................


T: (714) 445-1028
dgoodrich@go2.law
www.go2.law
3070 Bristol St., Ste 640
Costa Mesa, CA 92626



This electronic mail message contains CONFIDENTIAL information which is (a) ATTORNEY - CLIENT PRIVILEGED COMMUNICATION, WORK PRODUCT, PROPRIETARY IN NATURE, OR OTHERWISE PROTECTED BY LAW FROM DISCLOSURE, and (b) intended only for the use of the Addressee(s) named herein. If you are not an Addressee, or the person responsible for delivering this to an Addressee, you are hereby notified that reading, copying, or distributing this message is prohibited. If you have received this electronic mail message in error, please reply to the sender and take the steps necessary to delete the message completely from your computer system.

# Exhibit 4

In re Watchmen Security LLC, Slip Copy (2024)

2024 WL 4903363
Only the Westlaw citation is currently available.
United States Bankruptcy Court, S.D. Indiana,
Indianapolis Division.

IN RE: WATCHMEN SECURITY LLC, Debtor.

Case No. 24-00087-JMC-11
|
Signed November 20, 2024

**Attorneys and Law Firms**

David R. Krebs, Hester Baker Krebs LLC, Indianapolis,
IN, for Debtor.

Ronald J. Moore, DOJ-Ust, Indianapolis, IN, for U.S.
Trustee.

## ORDER REGARDING DISALLOWANCE OF ASSERTED SECURED CLAIM

James M. Carr, United States Bankruptcy Judge

**\*1** THIS MATTER comes before the Court on the
*Limited Objection to Claim 21 of Reliance Financial with
Notice and Certificate of Service* filed by Watchmen
Security LLC ("Debtor") on August 7, 2024 (Docket No.
123) (the "Objection"). The Court reviewed the
Objection, Proof of Claim No. 21-1 (the "Claim") filed by
Reliance Financial ("Creditor") on March 19, 2024, and
the *Response to Limited Objection to Claim 21 of
Reliance Financial* filed by Creditor on August 20, 2024
(Docket No. 128) (the "Response"), and heard the
representations of counsel for Debtor and counsel for
Creditor at a hearing on August 21, 2024 (the "Hearing").
At the Hearing, the Court disallowed the Claim as a
secured claim and allowed the Claim as a general
unsecured claim. This opinion sets forth more fully the
bases of the Court's ruling at the Hearing.

The Parties' Positions
By its proof of claim, Creditor alleges that it holds a claim
in the amount of $55,669.65 secured by
"Accounts/Purchased Receipts". As the basis of the
Claim, Creditor asserts: "Agreement for the sale of future
receipts". Attached to the proof of claim are a *Standard
Merchant Cash Advance Agreement* dated February 16,
2023, including various addenda and related documents
(collectively, the "Agreement"), and a *UCC Financing
Statement*, File #202302233035626 filed with the Indiana
Secretary of State on February 23, 2023 (the "UCC-1").[1]

Debtor objects to the asserted secured status of the Claim.
Debtor pledged virtually all of its assets, owned as of the
petition date, January 9, 2024 (the "Petition Date"), as
security to the first position lienholder, The Freedom
Bank of Virginia ("Freedom Bank"). As of the Petition
Date, there was no value in any of Debtor's pre-petition
assets (or their products and proceeds) to which Creditor's
security interest, if any, could attach.[2] Accordingly,
Debtor asks that the Claim be allowed only as a general
unsecured claim.

Creditor's Response has two components: (1) Debtor
failed to rebut the *prima facie* validity of the Claim
(Response, ¶ 4); and (2) the collateral is being improperly
valued – rather than valuing the collateral on the Petition
Date, the Court should engage in a forward-looking
valuation where the value of Debtor's post-petition
receipts and anticipated receipts during the proposed plan
period are included in determining the value of Creditor's
collateral (Response, ¶¶ 5-9).

**\*2** At the Hearing, counsel for Creditor argued that (1)
Creditor holds an interest in property, asserted to be
property of Debtor's estate, in accounts receivable
generated by Debtor post-petition; and (2) Creditor
"owns" those accounts receivable generated by Debtor
postpetition based on the pre-petition Agreement.
Creditor further argued that 11 U.S.C. § 552(a) does not
limit Creditor's interest in Debtor's property to an interest
in pre-petition accounts receivable.

The Agreement
Under the Agreement, Creditor advanced to Debtor
$125,000 (the "Advance").[3] In exchange for the Advance,
Debtor purported to "sell" to Creditor $186,250[4] of
unspecified "Receivables". In addition:

• Section 1 of the Agreement provides that " ... until the [$186,250] has been received in full by [Creditor], [Debtor's] Receivables, up to the balance of [$186,250], are the property of [Creditor] and not the property of [Debtor]".

• Section 3 of the Agreement purports to "Cap" the amount that Creditor will collect from Debtor on a weekly basis. However, the "Cap" of $6,651.79 also may be a floor because if Creditor does not collect the weekly Cap, Creditor may collect in excess of 9% of Debtor's Receivables.

• Section 15 of the Agreement says that the parties agree "that the [Advance] under this Agreement is in exchange for the [$186,250 of Debtor's receivables] and that such [Advance] is not intended to be, nor shall it be construed as a loan from [Creditor] to [Debtor]".

• Section 31 of the Agreement provides "To secure [Debtor's] performance obligations to [Creditor] under this Agreement and any future agreement with [Creditor], [Debtor] grants to [Creditor] a security interest in collateral (the "Collateral"), that is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, and instruments, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by [Debtor]; and (b) all proceeds, as that term is defined by Article 9 of the UCC."[5]

• Section 36 of the Agreement chooses New York state law to govern the Agreement (to the extent not superseded by the Bankruptcy Code).

Austin L. Smith, Debtor's principal, executed a *Standard Merchant Cash Advance Agreement Guarantee* (the "Guarantee"), personally and absolutely guaranteeing Debtor's performance of the Agreement. In section G11 of the Guarantee, Mr. Smith agreed that if Debtor breached the Agreement and both Debtor and Mr. Smith, as guarantor, became obligated to Creditor, then Creditor would be entitled to recover prejudgment interest at the rate of 24% per annum and such interest would continue to accrue post-petition. Under sections G10 and G12 of the Guarantee, Creditor would also recover its attorney fees and costs.

The Bankruptcy Case

*3 This chapter 11 case was commenced on January 9, 2024. On January 18 and 31 and February 14 and 29, 2024, the Court conducted a series of hearings on requests by Debtor to use cash collateral on an interim and final basis. By interim orders dated January 23, 2024, January 31, 2024 and February 15, 2024 and a final order dated March 1, 2024 (Docket Nos. 26, 30, 44 and 69, respectively), the Court found that, at the Petition Date, Debtor held approximately $17,567.87 in cash and approximately $2,000 in "collectible receivables".[6] As a result of such hearings, the Court determined that the pre-petition cash and receivables were fully encumbered by a first perfected security interest held by Freedom Bank to secure a debt in excess of $1.17 million.

Reasoning

*The Asserted Nature of Creditor's Interest*

In its Response to the Objection, Creditor asserts the following:

6. The Debtor sold future receipts, as that term is defined in the Agreement between the Debtor and Reliance Financial that is attached to the claim, to Reliance Financial. The transaction was a sale of "accounts" and "proceeds of accounts" as those terms [are] defined by the Uniform Commercial Code. As the transaction between the Debtor and Reliance Financial was a sale of accounts and proceeds of accounts, Reliance Financial automatically obtained a security interest in the future receipts that were sold to it by the Debtor (no specific grant of a security interest was necessary) and the security interest was perfected on attachment. See UCC §§ 1-201(37), 9-109(a)(3), and 9-309. Nevertheless, Reliance Financial filed a UCC-1 Financing Statement, which is attached to its claim, to put others on notice of its transaction.

7. As the security interest in the Receipts purchased did not arise via a security agreement, but rather, automatically, its security interest is not subject to Section 552 of the Bankruptcy Code and thus, its security interest attached to each and every Receipt generated post-petition without the need for a replacement lien.

8. Considering the nature of the transaction, which is contemplated by the plain language of Section 506 of the Bankruptcy Code, the only appropriate way to

value the collateral if the Court does not outright deny the objections due to the Debtor's failure to rebut the prima facie validity of the claims as it should, is a forward-looking valuation where the Debtor's post-petition receipts and anticipated receipts during the proposed Plan period (which is reflected in the cash flow projections) is examined because, again, Reliance Financial has an interest in all post-petition receipts and that is what was contemplated when the transaction was entered into.

9. When the monthly operating reports and cash flow projections are examined, it is clear the claim is fully secured because the Debtor, even during the pendency of this case, has collected enough receipts (which is shown by the gross revenue numbers in such documents) to satisfy the obligation, and there is simply no reason why Reliance Financial should not realize the benefit of its bargain with the Debtor (i.e.-having all receipts they purchased from the Debtor remitted as long as the Debtor is continuing to operate and collect receipts).

Creditor's assertions give rise to three lines of inquiry: (a) what is Creditor's interest in Debtor's pre-petition receivables; (b) what is Creditor's interest in Debtor's post-petition receivables; and (c) what gives rise to Creditor's interest – a loan or a true sale.

*(a) Creditor's Interest in Debtor's Pre-Petition Accounts Receivable*
**\*4** Whatever interest (ownership or lien) Creditor held in Debtor's pre-petition receivables under the Agreement, it was determined by the Court to be inferior to the security interest held by Freedom Bank. Bankruptcy Code § 506(a) provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. Such value shall be determined in light of the purpose

> of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

Given the relatively small value of Petition Date receivables and arguable proceeds and the overwhelming amount of prior secured debt owed to Freedom Bank, there is no value in the prepetition receivables to create any allowable secured claim for Creditor.

*(b) Creditor's Interest in Debtor's Post-Petition Accounts Receivable*
Notwithstanding its lack of Petition Date collateral, Creditor asserts a secured claim, contending that it acquired, pre-petition, Debtor's post-petition accounts receivable. However, Creditor fails to explain (and would be hard pressed to do so) (1) how it could acquire, by a purported pre-petition purchase, accounts receivable of Debtor generated post-petition; and (2) how any such acquisition could be effected free and clear of the lien of Freedom Bank.

It cannot be posited that a pre-petition debtor somehow has the authority and power to sell or otherwise transfer any interest in accounts receivable which do not come into existence until post-petition and are, therefore, property of the bankruptcy estate. In a very insightful article, *A "Sale" of Future Receivables: Disguising a Secured Loan as a Purchase of Hope*, the authors negate Creditor's central position, explaining that

> To begin with, the type of transaction at issue in the *Cornerstone* cases[7] – a putative present sale of rights to payment that do not yet exist (or, more accurately, of an undivided share of such nonexistent rights) – is both a metaphysical and legal impossibility. It is metaphysically impossible because the essence of a sale is the transfer to the buyer of that which is being purchased. A transfer of future rights to payment – that is, rights that as yet do not exist – cannot occur unless and until the rights to payment arise.

> It is a legal impossibility for much the same reason. The law simply does not comprehend or countenance a present transfer of future property. It might recognize and even enforce a *promise* to transfer property that the

promisor hopes later to acquire, but that is something different. As one court put it, "[a]t law one cannot transfer by a present sale what he does not then own, although he expects to acquire it. But, while [such a] contract [is] without effect at law as a contract of sale, it operate[s] as an executory agreement to sell." Indeed, it is a basic legal maxim that "one cannot give what one does not have" (or, in one of several phrasings in Latin, "*nemo dat qui non habet*").

**\*5** Thus, "[t]here is no doubt that the assignment of a truly future claim or interest does not work a present transfer of property. It does not because it cannot; no property yet exists." It is simply incoherent to assert that a putative buyer has purchased rights to payment that do not exist at the time of the transaction and that may never exist. The buyer's property interest arises, if at all, when the seller first obtains an interest in the applicable right to payment.

The provisions of the Uniform Commercial Code are consistent with these concepts. Specifically, Article 9 does not allow a party to create a security interest in property that does not yet exist. Under U.C.C. § 9-203(b)(2), a debtor must have "rights in the collateral or the power to transfer rights in the collateral" in order for a security interest (including the security interest of a purchaser of receivables) to attach. As the Official Comments to that section explain, "[a] debtor's limited rights in collateral, short of full ownership, are sufficient for a security interest to attach. However, in accordance with basic personal property conveyancing principles, the baseline rule is that a security interest attaches only to whatever rights a debtor may have, broad or limited as those rights may be."⁸

Because the Agreement could not effect a pre-petition sale or transfer of post-petition receivables (that did not exist pre-petition), the next question becomes "Did Debtor, postpetition, transfer any interest in post-petition receivables to Creditor or did a security interest granted to Creditor under the Agreement attach to any of the post-petition receivables"? The short answer to both questions is "no", Debtor did not and could not effect a post-petition transfer of any interest in post-petition receivables by sale or grant of a security interest.⁹ Moreover, Debtor's post-petition receivables are not "proceeds" of pre-petition collateral. In relevant part, § 102(64) of Article 9 of the U.C.C. defines "proceeds" as:

(A) Whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral.

(B) Whatever is collected on, or distributed on account of, collateral.

(C) Rights arising out of collateral.

Debtor historically operates as a security company "providing security, surveillance and consulting" – it is a service not a sale business.¹⁰ Any of Debtor's post-petition receivables arose from services performed by Debtor post-petition and, therefore, could not have been identifiable proceeds of pre-petition collateral.

### (c) *Loan or True Sale*

The interest in Debtor's receivables claimed by Creditor is either (1) a security interest; or (2) outright and complete ownership. Several cases have addressed whether an interest granted to a party (like Creditor) under a merchant cash advance agreement (an "MCA") constitutes (1) a security interest to secure repayment of a loan; or (2) an absolute transfer or true sale of a debtor's receivables.

**\*6** *Cap Call, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797 (Bankr. D. Mont. 2021) held that advances under an MCA, much like the Agreement, constituted a loan purportedly secured by receivables, *not* a true sale of those receivables as the MCA in that case expressly provided. *Shoot the Moon* explained:

An entity seeking liquidity may monetize its present or future accounts receivable in two primary ways: by either selling or borrowing against the receivables. While the monetization methods differ in obvious and key respects, they are not entirely dissimilar. The shared aspects are reflected in the commentary to Article 9 of the Uniform Commercial Code where the drafters recognize that "[i]n many commercial financing transactions the distinction is blurred." In light of this, Article 9 treats both secured loans and "a sale of accounts, chattel paper, payment intangibles, or promissory notes" as secured transactions subject to that statute's detailed rules regarding perfection and priority. The statute stops short of "delineat[ing] how a particular transaction is to be classified" and, by design, the "issue is left to the courts."

Courts have formulated a holistic, multipart framework to examine a transaction on the way to classifying it as a sale or a loan. In a notable article, Robert D. Aicher and William J. Fellerhoff catalog factors courts often consider:

(1) whether the buyer has a right of recourse against the seller;

(2) whether the seller continues to service the accounts and commingles receipts with its operating funds;

(3) whether there was an independent investigation by the buyer of the account debtor;

(4) whether the seller has a right to excess collections;

(5) whether the seller retains an option to repurchase accounts;

(6) whether the buyer can unilaterally alter the pricing terms;

(7) whether the seller has the absolute power to alter or compromise the terms of the underlying asset; and

(8) the language of the agreement and the conduct of the parties.

As with many multi-factor tests, no individual factor or combination thereof is determinative. The inquiry is not a quantitative exercise susceptible to replication by a computer program, but a comprehensive and heavily contextual endeavor. A court's "[a]nalysis of the various factors and their impact on the nature of the parties' agreement is fact-intensive, and a determination must be made based on the totality of the circumstances." That said, a consideration that overlays and unites the factors is how the parties allocated *risk*. A sale typically occurs when the risk of loss from the purchased assets passes to the buyer – a gamble usually reflected in the purchase price. Conversely, in a disguised loan, the parties may employ various methods to allocate risk – the putative seller typically remains exposed to the underlying receivables and may grant the putative buyer recourse to sources of recovery beyond the receivables.

*Shoot the Moon*, 635 B.R. at 812-14 (footnotes omitted).[11] *Shoot the Moon* decided that its holding would be the same whether that court applied New York law (as the MCA's choice-of-law provision provided) or Montana law (the home of the debtors).

**\*7** In the present case, the Agreement reflects at least seven of the eight factors indicating that the transaction underlying the Claim is in fact a loan secured by a junior lien against Debtor's pre-petition accounts receivable, not a "true sale" of such receivables. As to the ultimate question of "how the parties allocated risk", it is clear that the Debtor and its principal, as guarantor, bore the entire risk of non-payment of the "sold" (undifferentiated 9%)

receivables with Creditor bearing no risk that it would be limited to recovery from the "sold" receivables.

If the Court characterizes the Agreement as a security agreement under which Debtor granted only a security interest in some or all of its receivables, then any claim that such a security interest would attach to Debtor's post-petition receivables would be defeated by 11 U.S.C. § 552(a). Pursuant to 11 U.S.C. § 552(a), "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."[12] Accordingly, by operation of law as expressly dictated by the Bankruptcy Code, the Agreement cannot be the basis of a security interest in favor of Creditor in any accounts receivable acquired by the estate after the Petition Date.

The subject of *Smoker v. Hill & Assocs.*, 204 B.R. 966 (N.D. Ind. 1997), was a settlement agreement under which "Hill" collaterally assigned to "Smoker",[13] to secure repayment of a debt, (1) commission agreements between Hill, an insurance broker, and various insurance companies; and (2) future commissions generated and payable to Hill under such agreements. After Hill filed a chapter 13 bankruptcy case, Hill attempted to cut off Smoker's security interest in commissions Hill earned post-petition. On appeal from the bankruptcy court, the District Court, Judge Allen Sharp, held that § 552(a) would have cut off Smoker's security interest in post-petition receivables unless such receivables constituted identifiable proceeds of Smoker's pre-petition collateral. Judge Sharp explained:

Under Indiana law, an agreement which *conditionally* transfers ownership rights to a creditor and permits the creditor to exercise its right to possession only upon a default is a security agreement—not an outright assignment. *Brown*, 476 N.E.2d at 892; *see* IND.CODE § 26–1–1–201(37) (1993) (A security interest created by such an agreement is "an interest in personal property or fixtures which secures payment or performance of an obligation"). ...

Section 552(a) of the Bankruptcy Code states the general rule that a prepetition security interest does not extend to property acquired by the estate after the filing of the bankruptcy petition. The exception to this general rule, found in § 552(b), applies to proceeds, product, offspring, or profits of encumbered property acquired postpetition if (1) the parties entered into a security agreement before the bankruptcy petition was filed; *and* (2) the security interest extends to prepetition property of the debtor and to proceeds, product, offspring, or profits of such property. Thus, while

creditors ordinarily may not reach property of the debtor acquired postpetition, § 552(b) provides an exception if the creditor can demonstrate a connection between prepetition and postpetition property.

*Smoker*, 204 B.R. at 973.

**\*8** In the present case there is no possibility that the receivables generated by Debtor postpetition were proceeds of any of Creditor's pre-petition receivables or other collateral.[14]

If we concede that the Agreement effects, as it purports, a "true sale" of Debtor's receivables and does not constitute merely the purported grant of security interests therein, then any purported transfer of post-petition receivables that was not approved by the Court using the law and procedure provided by 11 U.S.C. § 363, is an unauthorized post-petition transfer of estate property and avoidable pursuant to 11 U.S.C. § 549. Were there to be any such unauthorized transfer, then Creditor's claim would be fully disallowable pursuant to 11 U.S.C. § 502(d).

Finally, the Court acknowledges the displeasure of counsel for Creditor at the Hearing that the Court was addressing issues outside "the four corners" of the Objection. However, Creditor placed the nature of the transaction before the Court in the Response. Specifically,

Creditor asserts that the nature of the transaction mandates a different valuation than Debtor asserts in the Objection. Because Creditor asked the Court to consider the nature of the transaction when ruling on the Objection, Creditor's argument that the Court is "out of bounds" is unavailing. Moreover, 11 U.S.C. § 105(a) expressly authorizes the Court to *sua sponte* make any determination necessary or appropriate. That section provides that "[n]o provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders".

For the reasons described on the record at the Hearing and in this opinion, the Court, effective as of the conclusion of the Hearing, SUSTAINS the Objection and DISALLOWS the Claim as a secured claim and ALLOWS the Claim as a general unsecured claim.[15]

IT IS SO ORDERED.

**SO ORDERED: November 20, 2024.**

**All Citations**

Slip Copy, 2024 WL 4903363

### Footnotes

[1]   Creditor asserts that it was not required to file a UCC financing statement because Creditor, not Debtor, owns the "future receipts" that it purchased from Debtor pre-petition in a transaction that was a sale of the "accounts" and "proceeds of accounts". As a result, Creditor argues that its interest in the accounts was automatically perfected pursuant to UCC §§ 1-201(37), 9-109(a)(3) and 9-309.

[2]   The Court notes that Freedom Bank filed Proof of Claim No. 12-1 on February 21, 2024 asserting a claim in the amount of $1,173,680.12, which is secured to the extent of the value of the collateral described in Freedom Bank's *UCC Financing Statement*, File # 202212303015295, filed on December 30, 2022. That collateral includes, among other things, a first priority lien on all of Debtor's accounts receivable and proceeds.

[3]   The Agreement characterizes the Advance as the "Purchase Price" of the sold receivables. The Agreement also provides for certain fees to be paid to Creditor reducing, to $121,250, the amount of the Advance actually disbursed to Debtor.

[4]   In the Agreement, the parties projected that the specified dollar amount of receivables purchased would represent

In re Watchmen Security LLC, Slip Copy (2024)

an unidentified 9% of Debtor's receivables generated during the pay back period.

[5]    Default would result in the percentage of Debtor's receivables that would secure repayment increasing from 9% to 100% of Debtor's receivables.

[6]    In the interim order dated January 23, 2024 (Docket No. 26), the approximate amount of cash on hand was $9,329.87. The delta between that amount and the $17,567.87 amount in subsequent cash use orders is the $8,238 balance of the pre-petition retainer held by Debtor's counsel.

[7]    *Off. Comm. of Unsecured Creditors v. LG Funding, LLC (In re Cornerstone Tower Servs., Inc.),* No. BK16-40787, 2018 WL 6199131 (Bankr. D. Neb. Nov. 9, 2018); *Off. Comm. of Unsecured Creditors v. EBF Partners, LLC (In re Cornerstone Tower Servs., Inc.),* No. BK16-40787, 2019 WL 127359 (Bankr. D. Neb. Jan. 3, 2019).

[8]    John F. Hilson & Stephen L. Sepinuck, A "Sale" of Future Receivables: Disguising A Secured Loan as a Purchase of Hope, 9 Transactional Lawyer 14, 15 (2019) (footnotes omitted).

[9]    In addition to the discussion above, see the discussion below regarding unauthorized post-petition transfers of estate property.

[10]    *See* § 2.2 of the *Amended Small Business Chapter 11 Plan for Watchmen Security LLC dated June 28, 2024* filed by Debtor on June 28, 2024 (Docket No. 106).

[11]    For an excellent overview of the history of MCAs and issues raised by MCAs, *see* Kara J. Bruce, *The Murky Process of Characterizing Merchant Cash Advance Agreements,* Bankruptcy Law Letter, Vol. 42, Issue 4, April 2022, at 1.

[12]    Exceptions are provided thereto in 11 U.S.C. § 552(b), but none of those exceptions is applicable.

[13]    The assignments were expressly characterized as absolute and not collateral assignments.

[14]    *See* page 8 herein regarding the definition of proceeds.

[15]    The Court has not been asked to address any objection that could be asserted regarding Creditor's unsecured claim.

**In re Watchmen Security LLC, Slip Copy (2024)**

The Court has not chosen to address, *sua sponte*, any such possible objections.

---

**End of Document**                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this case or adversary proceeding. My business address is: 3070 Bristol Street, Suite 640, Costa Mesa, CA 92626

A true and correct copy of the foregoing document entitled (specify) **CHAPTER 7 TRUSTEE'S LIMITED OPPOSITION TO PANTHERS CAPITAL LLC'S MOTION TO RECONSIDER ORDER APPROVING STIPULATION BETWEEN DEBTOR AND PETCO FOR TURNOVER** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On December 2, 2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Ismail Amin    iamin@talglaw.com,
  pgilmore@talglaw.com;kvescera@talglaw.com;shalberstadt@talglaw.com;cstark@talglaw.com;ckim@talglaw.com;eavakian@talglaw.com
- Tanya Behnam    tbehnam@polsinelli.com,
  tanyabehnam@gmail.com;ccripe@polsinelli.com;ladocketing@polsinelli.com
- Christopher Beyer    cab@replevin.com, ecf@writofseizure.com
- Michael D Breslauer    mbreslauer@swsslaw.com, sdurazo@swsslaw.com
- Dennis A Dressler    ddressler@dresslerpeters.com
- Michael Jones    michael.jones4@usdoj.gov
- Ron Maroko    ron.maroko@usdoj.gov
- Byron Z Moldo    bmoldo@ecjlaw.com, aantonio@ecjlaw.com,dperez@ecjlaw.com
- Scott Olson    solson@seyfarth.com, scott-olson-
  2161@ecf.pacerpro.com,ecfsfdocket@vedderprice.com,nortega@vedderprice.com,chidocket@seyfarth.com
- Amitkumar Sharma    amit.sharma@aisinfo.com
- Randye B Soref    rsoref@polsinelli.com, ccripe@polsinelli.com;ladocketing@polsinelli.com
- Chase Aleksander Stone    cstone@ecjlaw.com, aantonio@ecjlaw.com,dperez@ecjlaw.com,cmacan@ecjlaw.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Cranston J Williams    cwilliams3@socalgas.com

2. <u>SERVED BY UNITED STATES MAIL</u>:
On December 2, 2025, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

<u>Debtor</u>
CIS International Holdings
1405 W. 178th Street
Gardena, CA 90248

3. <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)</u>: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on November 10, 2025, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| December 2, 2025 | Lorraine L. Robles | /s/ Lorraine L. Robles |
| *Date* | *Printed Name* | *Signature* |